UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

FRANCOIS TRAHAN,

          *Plaintiff*,

    v.

NANCY LAZAR, ANDREW LAPERRIERE,
ROBERTO PERLI, MICHAEL KANTROWITZ,
GEORGE ZACHAR, CORNERSTONE MACRO
HOLDINGS LLC, AND CORNERSTONE
MACRO RESEARCH LP F/K/A CORNERSTONE
MACRO LP,

          *Defendants*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 19 CV 1131

## **COMPLAINT**

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.6235

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

PARTIES ......................................................................................................... 5

JURISDICTION AND VENUE ........................................................................... 6

FACTUAL ALLEGATIONS ............................................................................... 7

    A.   Francois Trahan is a Leading Portfolio Strategist and Quantitative Analyst and Has Developed and Owns Extensive Intellectual Property ........................................... 7

    B.   Trahan and the Limited Partner Defendants Form Cornerstone Macro ........................ 9

    C.   Cornerstone Macro Experienced Success Over Many Years Based on Trahan's Leadership, Client Base, Contributions, and Intellectual Property .............................. 14

    D.   The Limited Partners Defendants, Kantrowitz, and Others Conspire and Scheme to Misappropriate Trahan's Business and Intellectual Property .................. 16

        1.  Kantrowitz was a Faithless Servant For Years ..................................... 16

        2.  The Cornerstone Macro Partnership Begins to Fracture Due Substantially to Defendant Nancy Lazar's Mismanagement and Jealousy ...................................... 20

        3.  Defendants Hatch a Plan to Steal Trahan's Business .............................. 23

        4.  The Limited Partner Defendants Scheme with Kantrowitz to Elevate Kantrowitz, Remove Trahan, and Pilfer Trahan's Business and Intellectual Property .......................................................................... 25

    E.   Unbeknownst to Trahan at the Time, Defendants Were Sabotaging Him Throughout the Spring of 2018 in an Effort to Position Themselves to Steal His Business and Intellectual Property ............................................................... 30

    F.   After Trahan's Removal, Defendants Steal, Misappropriate, and Pass Off as Their Own the Trahan IP, While Audaciously Trying to Cover Their Electronic Tracks ....................................................................................... 38

LIABILITY FOR THE ACTIONS OF OTHERS ............................................... 74

CAUSES OF ACTION ..................................................................................... 77

    FIRST CLAIM FOR RELIEF (Unfair Competition—Against All Defendants)................ 77

i

SECOND CLAIM FOR RELIEF (Violation of the Economic Espionage Act, as
   Amended by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836—
   Against All Defendants) ............................................................................. 81

THIRD CLAIM FOR RELIEF (Common Law Misappropriation of Trade Secrets—
   Against All Defendants) ............................................................................. 92

FOURTH CLAIM FOR RELIEF (Breach of Fiduciary Duty—Against All
   Defendants Other Than Cornerstone Macro Research LP and George Zachar) .......... 93

FIFTH CLAIM FOR RELIEF (Aiding and Abetting Breach of Fiduciary Duty—
   Against All Defendants) ............................................................................. 97

SIXTH CLAIM FOR RELIEF (Faithless Servant Doctrine—Against All Defendants
   Other Than Cornerstone Macro Research LP and George Zachar) ............................. 98

SEVENTH CLAIM FOR RELIEF (Breach of Contract—Against all Defendants
   who were Parties to the LPA and LLC Agreement) ................................................. 100

EIGHTH CLAIM FOR RELIEF (Breach of Covenant of Good Faith and Fair
   Dealing—Against the Contract-Party Defendants) .................................................. 102

NINTH CLAIM FOR RELIEF (Tortious Interference with Contract—Against
   Kantrowitz and Zachar) ............................................................................. 104

TENTH CLAIM FOR RELIEF (Fraud—Against All Defendants) ................................... 105

ELEVENTH CLAIM FOR RELIEF (Negligent Misrepresentation—Against All
   Defendants Other Than Cornerstone Macro Research LP and George Zachar) ......... 106

TWELFTH CLAIM FOR RELIEF (Unjust Enrichment—Against All Defendants) ......... 108

THIRTEENTH CLAIM FOR RELIEF (Conversion—Against All Defendants) ............... 109

FOURTEENTH CLAIM FOR RELIEF (Declaratory Judgment Regarding
   Indemnification—Against the Contract-Party Defendants) ....................................... 110

FIFTEENTH CLAIM FOR RELIEF  (Declaratory Judgment Regarding Capital
   Account Balance Payments—Against the Contract-Party Defendants) .................... 112

SIXTEENTH CLAIM FOR RELIEF  (Violation of New York Labor Laws
   Regarding Accrued Net Cash Flow Distribution—Against the Contract-Party
   Defendants) ............................................................................................. 114

PRAYER FOR RELIEF ................................................................................. 115

Francois Trahan ("Trahan"), by his undersigned attorneys, as and for his complaint against Nancy Lazar ("Lazar"), Andrew Laperriere ("Laperriere"), and Roberto Perli ("Perli") (Lazar, Laperriere, and Perli, collectively, the "Limited Partner Defendants"); Michael Kantrowitz ("Kantrowitz"); George Zachar ("Zachar"); Cornerstone Macro Holdings LLC (the "General Partner"); and Cornerstone Macro Research LP (f/k/a Cornerstone Macro LP) (the "Partnership," and collectively with the General Partner, "Cornerstone Macro") (the Limited Partner Defendants, Kantrowitz, Zachar, and Cornerstone Macro, collectively, "Defendants"), alleges as follows:

## INTRODUCTION

1.      This is an action to remedy and prevent the further implementation of the unlawful and fraudulent scheme perpetrated by Defendants—former partners and the former deputy of Trahan at Cornerstone Macro, the successful portfolio strategy firm he co-founded—to secretly misappropriate Trahan's market strategy and quantitative analysis business and his confidential, proprietary, and trade secret intellectual property—the product of Trahan's sweat equity for decades and worth tens of millions of dollars—in violation of federal law, their fiduciary duties, the parties' agreements, and all notions of fair play.  In early March 2018, Trahan told his co-founder, Defendant Nancy Lazar, that Trahan had decided he could no longer remain in business with Lazar, and Trahan offered to buy out Lazar's interest in Cornerstone Macro for tens of millions of dollars or sell his own interest in the firm to Lazar for the same amount of money.  Once Trahan decided to end his professional relationship with the Cornerstone Macro partnership as it existed, Defendants accelerated their scheme to steal Trahan's multi-million dollar business through deception and fraud, without paying a dime for it.

2.      Defendants' scheme involved, among other things, the Limited Partner Defendants' secret coordination with Trahan's former deputy—Defendant Michael Kantrowitz—

1

to frustrate and sabotage Trahan's work at every turn, and at the same time induce Trahan to elevate Kantrowitz to co-head of the Market Strategies Advisory Business—the division founded and run by Trahan—in order to better position Defendants to steal Trahan's business and intellectual property after summarily removing him from the partnership.  Kantrowitz was a longtime Trahan employee who, in late 2017, was disciplined by Trahan for a series of performance and interpersonal issues.  When Trahan then reduced Kantrowitz's compensation for the year (albeit Kantrowitz was still going to make over $1 million a year), the Limited Partner Defendants saw an opportunity to turn Kantrowitz against Trahan—and they did.  Trahan later discovered that Kantrowitz had been secretly acting contrary to Trahan's interests for years, including by sending out versions of Trahan's market strategy reports in the deputy's own name to selective clients in advance of Trahan sending out the same report to all clients simultaneously.  After Trahan discovered this selective dissemination—which raised criminal, regulatory, and other concerns—Kantrowitz was unrepentant and became increasingly hostile with the knowledge that there was a plan underway to pilfer Trahan's business.

3.     Knowing that Trahan was considering ending his business relationship with Defendant Nancy Lazar, and having put into place their scheme to sabotage Trahan's work and steal his business—including by convincing Trahan to look past Kantrowitz's recent checkered history and elevate him to co-head of the Market Strategies Advisory Business—the Limited Partner Defendants voted Trahan out of the partnership pursuant to a contractual provision that enabled the majority of the partners to vote out any one partner without cause.  And after doing so, Defendants actively and repeatedly violated their contractual and fiduciary duties by doing everything they could to steal Trahan's intellectual property and retain Trahan's employees by, among other things, threatening and intimidating the employees never to speak with Trahan

again through coercion and bribery, by directly and indirectly offering to pay Trahan's

employees more money to stay, and through defamatory and false statements about Trahan.

4.      By reason of Defendants' treachery, chicanery, and faithlessness, Defendants now

possess all of Trahan's proprietary computer coded models, reports, data compositions, and data

analysis, and—as the final step of their plan after Trahan rejected their offers to obtain the rights

to his business and intellectual property for a fraction of their value—are actively using that

information to court and retain Trahan's clients, while passing his intellectual property and trade

secrets off as their own.  At each stage and with each element of their scheme, Defendants

sought to use Trahan's intellectual property and trade secrets by secretly and improperly seizing

and misappropriating it, misled Trahan through lies, deception, and misinformation, and engaged

in self-dealing, in violation of their duties to Trahan of loyalty, candor, and good faith.

5.      In furtherance of Defendants' conspiracy to steal Trahan's intellectual property,

and in violation of their contractual and fiduciary obligations, Defendants did not return all of

Trahan's intellectual property following Trahan's departure.  Defendants falsely represented that

they were returning his intellectual property, but deceptively, knowingly, and intentionally

omitted significant portions of his intellectual property.  For example, Defendants failed to return

Trahan's computer code for 37 of his propriety quantitative models and a historical database he

had developed, selected, and collected over his career.

6.      Well aware that they are willfully violating federal law and engaging in sweeping

wrongdoing in copying and using Trahan's intellectual property and trade secrets, Defendants

have taken deliberate and premeditated steps to avoid detection and cover their electronic tracks.

This shocking, brazen misconduct includes instructing employees to use Trahan's models and

intellectual property on Cornerstone Macro's servers for as long as possible until they will have

to shut off access to the data; instructing employees to open Trahan's code and transcribe it into a new document, or otherwise recreate Trahan's intellectual property in new documents; and instructing employees not to "save" files after opening them in order to copy Trahan's intellectual property without leaving any electronic trace that the file was opened and the contents copied.  These actions to evade detection—which Defendants have engaged in despite being well aware of Trahan's assertion of rights and the existence of impending litigation— clearly and undeniably evidence that Defendants have engaged in and continue to engage in a premediated scheme to knowingly and intentionally steal Trahan's intellectual property and defraud Trahan.  Not only that, in furtherance of their scheme to steal Trahan's intellectual property, Defendants have engaged in criminal conduct.[1]

7.     Although the full extent of Defendants' misconduct has not been uncovered—as a result of Defendants' plan to conceal and cover their electronic tracks, and through their intimidation and threats of Trahan's former employees—Trahan seeks by this action to, among other things, prevent them from causing him further irreparable harm by misappropriating, exploiting, and using his intellectual property and trade secrets; hold them accountable for the substantial damages they have caused, and continue to cause, as a result of their unlawful and

---

[1]  18 U.S.C. § 1832 imposes criminal penalties on "[w]hoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly . . .  (2) without authorization copies, duplicates, . . . photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information; (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization; . . . or (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3) . . ."  The statute further provides that an organization that engages in the above acts may be fined up to $5,000,000.  18 U.S.C. 1832(b).  In violation of the statute, Defendants have intentionally converted Trahan's intellectual property—a product sent to Cornerstone Macro clients in interstate commerce—to the benefit of Cornerstone Macro, knowing that such action would injury Trahan.  They have done so by knowingly copying, duplicating, sending, and communicating Trahan's intellectual property; possessing Trahan's intellectual property knowing that Cornerstone Macro had no rights to it; and conspiring to commit the aforementioned acts.

tortious activities; obtain the value of the business Defendants stole from him through deception and trickery; and obtain the forfeiture and disgorgement of all compensation received by Defendants—as faithless fiduciaries and agents—from Trahan or Cornerstone Macro.

## PARTIES

8.      Plaintiff Francois Trahan is a natural person residing in the State of New York.

9.      Defendant Nancy Lazar is a natural person residing in the State of New York. Lazar is a Limited Partner in the Partnership under the Cornerstone Macro LP Amended and Restated Limited Partnership Agreement effective April 20, 2013 and amended October 31, 2016 ("the LPA"), and a Member of the General Partner under the Cornerstone Macro Holdings LLC Amended and restated Limited Liability Company Agreement effective April 20, 2013 ("LLC Agreement").  She is the CEO of the broker-dealer and registered and licensed with FINRA, and must comply with, among other things, FINRA's rules and regulations.  She regularly conducts business at Cornerstone Macro's offices in New York City.

10.     Defendant Andrew Laperriere is a natural person residing in Mclean, Virginia. He is a Limited Partner in the Partnership under the LPA, and a Member of the General Partner under the LLC Agreement.  He regularly conducts business at Cornerstone Macro's offices in New York City.

11.     Defendant Roberto Perli is a natural person residing in the Arlington, Virginia. He is a Limited Partner in the Partnership under the LPA, and a Member of the General Partner under the LLC Agreement.  He regularly conducts business at Cornerstone Macro's offices in New York City.

12.     Defendant Michael Kantrowitz is a natural person residing in the State of New Jersey.  He currently heads the Market Strategies Advisory Business at Cornerstone Macro and was an employee of Trahan's and a member of Trahan's division.  He regularly conducts

business at Cornerstone Macro's offices in New York City. He is registered and licensed with FINRA, and must comply with, among other things, FINRA's rules and regulations, and he is a CFA charterholder bound to comply with its guidelines.

13.     Defendant George Zachar is a natural person residing in the State of New York. Zachar is the husband of Defendant Nancy Lazar. He is an Organizational Member of Cornerstone Macro LLC and an Organizational Limited Partner of Cornerstone Macro Research LP. He has acted as an agent, officer, and undisclosed partner of Lazar's division, regularly conducting business at Cornerstone Macro's offices in New York City, including attending partner and research meetings, managing certain aspects of Cornerstone Marco's business, and supervising employees.

14.     Defendant Cornerstone Macro Holdings LLC is a Delaware limited liability company and the General Partner of the Partnership. It is governed by the LLC Agreement.

15.     Defendant Cornerstone Macro Research LP is a Delaware limited partnership. It is governed by the LPA.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over Trahan's federal claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c). The Court has supplemental jurisdiction over Trahan's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so closely related to the federal claims as to form part of the same case or controversy, and pursuant to Section 13.10 of the Limited Partnership Agreement and the LLC Agreement.

17.     Personal jurisdiction and venue are proper over all Defendants in this district pursuant to 18 U.S.C. § 1965(a) and (b), 28 U.S.C. 1391(b)(2), Federal Rule of Civil Procedure 4(k), and pursuant to Section 13.10 of the LPA and the LLC Agreement.

18.     Defendants regularly transact business and derive substantial revenue from services rendered in the State of New York, including through the acts detailed herein and others within or targeted at New York.  Defendants participated in the transactions, communications, and other activities within or targeted at New York that gave rise to the claims in this Complaint.  Moreover, Defendants have committed tortious acts causing injury to Trahan in New York.  In addition, a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     Francois Trahan is a Leading Portfolio Strategist and Quantitative Analyst and Has Developed and Owns Extensive Intellectual Property**

19.     Trahan's credentials are unparalleled in the field of portfolio strategy and quantitative analysis.  After obtaining a Master of Science in economics at the University of Montreal in 1994, Trahan began his career in Canada's Department of Finance, where he provided quantitative and economic analysis in the fields of tax policy, employment, and investment.  From approximately 1996 through 1999, Trahan worked as an analyst at The Bank Credit Analyst research group and later as a strategist at Ned Davis Research Group.  Then, in March 1999, Trahan moved to New York to become an equity strategist at Brown Brothers Harriman & Co, where he was responsible for the firm's strategic focus list, sector strategy recommendations, and quantitative product offering.  In November of 2002, Trahan joined Bear Stearns & Co. to become the Chief Investment Strategist.  There, Trahan established the firm's view on equities and acted as a spokesperson for the brokerage unit, including weekly television appearances and press coverage.

20.     In February 2007, Ed Hyman and Defendant Nancy Lazar, then partners at International Strategy & Investment Group ("ISI"), courted Trahan and encouraged him to join

the firm as the Executive Director & Chief Investment Strategist.  At ISI, Trahan headed the firm's investment committee and set the firm's view on portfolio strategy, sector selection, asset allocation and quantitative analysis.  As a spokesperson for ISI, Trahan continued to make appearances on financial television programs.

21.     Approximately three years later, as ISI began to shift from macroeconomic to fundamental analysis, Trahan was approached by a former colleague to help grow his independent research boutique, Wolfe Research.  In exchange for lending Trahan's name and expertise to Wolfe's boutique, Wolfe offered to provide Trahan with insight into how to build a financial advisory firm.  Trahan agreed and, bringing his team from ISI, the firm was renamed Wolfe Trahan & Co.  While at the boutique, Trahan analyzed global macroeconomic trends to formulate investment themes across financial markets, sectors, industries, and stocks for institutional portfolio managers.  Trahan continued his appearances on programs in the financial media and in 2011, Trahan co-authored the book, *The Era of Uncertainty: Global Investment Strategies for Inflation, Deflation, and the Middle Ground*.

22.     Throughout his long career, Trahan has developed a unique and recognizable approach to both portfolio market strategy and quantitative analysis.  While a typical portfolio strategist makes recommendations based on an analysis of company earnings in aggregate, Trahan analyzes what is occurring in the economy and uses that insight to forecast financial markets.  More specifically, Trahan has devoted over 20 years to studying and understanding the various stages of the business cycle and how that translates to the stock market.  With respect to quantitative analysis, over the course of the last 12 years, Trahan has developed models that rank stocks and provide recommendations on which to buy, and when, while incorporating the business cycle.  Part of what makes Trahan's work in both portfolio strategy and quantitative

analysis so unique, and recognizably identifiable to him, is his ability to translate complex macroeconomic concepts into distillable and unique charts and graphs that are quickly digestible. Trahan's intellectual property is discussed in more detail below.

23.     Trahan's work has been widely recognized.  For sixteen consecutive years from 2002 through 2018, the most prominent organization to recognize the best research analysts in the world, *Institutional Investor*, ranked Trahan as a leading portfolio strategist and, in certain years, as a leading quantitative researcher.  Moreover, since in or about 2005, *Institutional Investor* has awarded Trahan with the highly prestigious honor of being the number one portfolio strategist in the world at least 10 times.  In 2016, based on Trahan's leadership in portfolio strategy and number one ranking as the best portfolio strategist in the world ten times, *Institutional Investor* awarded Trahan with a placement in the All-America Research Team Hall of Fame for Portfolio Strategy.  Trahan is the only portfolio strategist to have ever entered the Hall of Fame.

24.     Trahan's unconventional approach has been so extraordinarily successful that, at times, third-parties have attempted to misappropriate his work.  On those occasions, Trahan's own clients informed Trahan that his work had been stolen by other analysts.  Because his intellectual property was the product of extensive research, sweat equity, and ingenuity, and worth many millions of dollars, Trahan repeatedly took steps to protect his intellectual property. Among other things, for example, Trahan has filed lawsuits against various infringers of his intellectual property and has been successful in stopping those infringers.

**B.     Trahan and the Limited Partner Defendants Form Cornerstone Macro**

25.     In or around November 2012, Trahan began to consider creating his own firm. Then, on New Year's Eve in 2012, Trahan connected with Defendant Andrew Laperriere, at that

time a policy analyst at ISI based in Washington, DC, who suggested that the two meet to discuss future career prospects.  Laperriere later asked that Defendant Nancy Lazar and Defendant Roberto Perli join as well, and Trahan agreed.  The meeting occurred on or about January 10, 2013, and after reminiscing about how ISI had previously focused on macroeconomic top-down research, the analysts began to discuss creating a new firm.  A few days later the four met again and preliminarily agreed to move forward with a new partnership. The following day, Trahan submitted his ninety-day notice of his departure from Wolfe Trahan & Co.

26.     Over the ensuing months, with the help of counsel, the four drafted the terms of what would become Cornerstone Macro.  Their efforts culminated on April 20, 2013, when the four founding partners signed Cornerstone Macro's two governing agreements: the LLC Agreement and the LPA.[2]  Under the terms of the LPA, the partnership had one General Partner, Cornerstone Macro Holdings LLC, and four Limited Partners (each a "Partner") with varying percentage interests: Trahan with a 33.33 percent interest; Lazar with a 33.33 percent interest; Perli with a 16.67 percent interest; and Laperriere with a 16.67 percent interest.

27.     Trahan and Defendant Nancy Lazar agreed that they would design a partnership where each of them separately owned and controlled the businesses that each of them were bringing to the partnership; that each of them would own and control the intellectual property of each of their separate businesses; that each of them would hire, fire, and determine compensation for the employees in each of their separate businesses; that each of them would control the nature and extent of their necessary expenditures to operate their separate businesses; and that they

---

[2]  The relevant provisions found within the LLC Agreement are virtually identical to those found within the LPA.

10

would share certain resources such as sales staff, a trading desk, and administration.  The firm

was specifically *not* designed to be a partnership where costs, profits, and decisions are shared

equally among partners or based on ownership percentage.  Instead, Article I of the LPA

organized Cornerstone Macro into three main divisions, the Economic Advisory Business

("EAB") with Defendant Nancy Lazar as the owner and in charge of that business, the Market

Strategies Advisory Business with Trahan as the owner and in charge of that business, and the

Policy Advisory Business ("PAB") with Defendant Andrew Laperriere and Defendant Roberto

Perli as joint owners and in charge of that business.  Each Partner had complete control over his

or her own division, including hiring and firing employees, setting compensation, and

determining the extent of their own expenditures.

28.     This allocation of management naturally affected the distribution of profits to

each Partner.  Specifically, per Section 5.2(a) of the LPA and LLC Agreement, in connection

with Schedule A of the LPA, each Partner was entitled to receive the Net Cash Flow associated

with their respective divisions.  In turn, the revenue of each division was defined in Article I and

the First Amendment to the LPA as:

> with respect to any Fiscal Year or other period for which computation may
> be appropriate the sum of the amount of all cash receipts, if any, of the
> Partnership and any Operating Entities during such period that are
> attributable to the [division] and any reduction in reserves that are
> attributable to the [division] existing at the start of such period, all as
> determined by the General Partner based on the annual survey of Sales.[3]

29.     In practice, to determine the percentage of total profits to be apportioned to each

division, Cornerstone Macro would periodically engage in a weeks-long independent, attribution

process whereby each member of Cornerstone Macro's sales force reviewed his or her accounts,

---

[3]  The phrase "based on the annual survey of Sales" was added by the First Amendment.

the role the analysts played in generating revenue for those accounts, and then assigned credit for each of Cornerstone Macro's clients to one (or more) of the analysts. This process was carried out independently of the Partners who were not permitted to direct, influence, or view the steps taken by the sales force to assess credit for each of the clients. The calculation was then used to determine the percentage of revenue attributable to each division, which translated into the funds available to the Partner to allocate within his or her division, including the Partner's compensation. If a Partner disagreed with the attribution, he or she was able to question the results.[4]

30. The Partnership also employed or made use of certain non-revenue generating shared employees or resources, including a sales force, an operations team (consisting of an office manager, a CFO/comptroller, a compliance officer, and a receptionist), and a trading desk. The costs from these sections were borne by the Partners based on their ownership interests. In addition, the firm had additional revenue-generating product offerings that were not part of a particular Partner's division, namely, a technical analysis, an energy team, and an options team. The profits from these sections were distributed to the Partners. In order to manage the day-to-day functions of the firm, and especially with respect to the shared resources, the Partners amended the LPA on October 31, 2016 to empower the General Partner to appoint a Managing Partner. The Partners appointed Trahan to become the firm's first Managing Partner.

---

[4] In the first two years following Cornerstone Macro's founding, the Partners did not engage in the attribution process, but simply allocated 40% of the profits to Trahan, 40% to Lazar, 10% to Laperriere and 10% to Perli. In June 2015, Cornerstone Marco performed the first attribution. In June 2015, June 2016, and June 2017, Defendant Nancy Lazar was upset that her attribution was less than Trahan's each year. In July 2017, the Partners created a process to challenge the attribution, in which a panel of three individuals, none of which could be a Partner, would question the sales team about their results.

31.     In drafting the partnership agreements, the Partners made sure that any one Partner could withdraw or be asked to leave the partnership, and that such Partner would be able to take his or her business with them upon departure.  Accordingly, the LPA provides the "Leaving Partner" with certain protections, including that he or she was entitled to take his or her intellectual property upon departure.  Specifically, Section 3.7(f)(i) of the LPA governs the rights the Leaving Partner has to their "Intellectual Property," providing:

> The Partnership shall grant to a Leaver all rights in, title to, and ownership of all Intellectual Property owned by the Partnership which is utilized solely by the Business managed by such Leaver and the Partnership shall take all reasonable steps necessary to assign to such Leaver all rights in, title to, and ownership of any such Intellectual Property within a reasonable period of time following the Leaver's withdrawal from the Partnership.

32.     In turn, "Intellectual Property" is defined broadly in Article I to mean:

> patents, patent applications, inventions and discoveries (whether or not patentable), registered and unregistered copyrights in both published works and unpublished works, copyrightable works, copyright registrations, moral rights, computer software and systems, source code, object, executable or binary code, objects, screens, user interfaces, report formats, files, data, materials, manuals, design notes, user documentation, know-how, trade secrets, confidential or proprietary information, client lists, databases, database rights, business and marketing plans and analyses, utility models, technical information, operating procedures, process technology, formulas, rights in internet web sites and internet domain names and other commercial intellectual property rights whether registered or capable of registration and all applications for registration or protection of any of the foregoing.

33.     Furthermore, to enable the Leaving Partner to take his or her business with them upon departure, the Leaving Partner has the right to offer employment to employees within his or her division, and the remaining Partners may not make any such offers for 180 days.  More specifically, Section 13.4 of the LPA provides, in relevant part:

> In the event a Withdrawing [Founding Partner] wishes to make an offer of employment to any employee of the Partnership or any Operating Entity who is or was a member of the Withdrawing [Founding Partner's] Team,

13

he or she shall notify the General Partner thereof in writing within thirty
(30) days after delivery of his or her Withdrawal Notice pursuant to
Section 3.7(b)(i) and, upon receipt thereof, the General Partner shall
refrain from making, or causing the Partnership or any Operating Entity to
make, any counteroffer to the relevant employee for a period of not less
than one-hundred and eighty (180) days thereafter.

34.     Finally, pursuant to Section 3.7(b) of the LPA, the Leaving Partner is "entitled to receive" certain payments after withdrawal intended to transfer the value of the Leaving Partner's business back to him or her.[5]

35.     Thus, the Partners intended to create a partnership that provided their clients with three divisions of services while, to the greatest extent possible, allowing the divisions to operate independently and retain the rights and value of their independent businesses—through and including the withdrawal or removal of a Partner.

**C.     Cornerstone Macro Experienced Success Over Many Years Based on Trahan's Leadership, Client Base, Contributions, and Intellectual Property**

36.     In agreeing to co-found Cornerstone Macro, Trahan brought his quantitative models and portfolio strategy franchise to the new firm, ensuring its success.  Trahan led Cornerstone Macro and the Market Strategies Advisory Business that provides market strategy and quantitative analysis to its clients, and helped both his Market Strategies Advisory Business and Cornerstone Macro rapidly grow into a successful and renowned firm providing cutting edge research to institutional investors.  Over the years, Trahan cultivated a client base of approximately 775 institutional accounts consisting of over 15,000 people.  Trahan's Market Strategies Advisory Business consistently brought in the highest revenues to Cornerstone Macro.

---

[5]  Sections 13.4 and 3.7(a) of the LLC Agreement contain substantively identical provisions to Section 13.4 and 3.7(b) of the LPA.

37.     In addition to his division's success, Trahan contributed countless hours to Cornerstone Macro's day-to-day operations through his role as the firm's Managing Partner; a job for which he received zero compensation.  Trahan led the way in interviewing and the eventual hiring of qualified analysts to meet the growing demands for Cornerstone's products, and organized Cornerstone's off-site activities—time consuming endeavors.  When Cornerstone's CFO, Stephen Killorin, passed away, Trahan was left to shoulder those responsibilities as well.  Starting in January 2017, in total, Trahan spent approximately half of his time devoted to these duties on top of managing the Market Strategies Advisory Business.

38.     Through Trahan's leadership and brand recognition, Cornerstone Maco quickly became a valuable enterprise, and there is no question that the Limited Partner Defendants were aware of Cornerstone Macro's, and Trahan's division's, value.  The Partners had received several offers over the years to purchase the firm, which provided a rough proxy for the firm's value.  Most notably, in 2016, a well-established financial institution offered to purchase Cornerstone Macro for approximately $165 million—$100 million of which was to be paid in cash with the remainder to be paid based on performance.  The deal, however, never closed when the Partners generally agreed in or around October 2016 that Cornerstone Macro was worth more.

39.     In May 2018, Trahan was, as always, looking to the future growth of Cornerstone Macro.  He and the Limited Partner Defendants had been discussing expanding the number of Partners to create a second generation at Cornerstone Macro.  To determine how Cornerstone Macro could accomplish this, Trahan met with an individual at yet another financial institution specializing in this type of transaction to discuss the valuation of the firm.  During their

discussions, Trahan learned that his Market Strategies Advisory Business alone was worth approximately $48 million.

**D. The Limited Partners Defendants, Kantrowitz, and Others Conspire and Scheme to Misappropriate Trahan's Business and Intellectual Property**

**1. Kantrowitz was a Faithless Servant For Years**

40. In early 2007, while at ISI, Trahan hired Defendant Michael Kantrowitz, who had been working at Merrill Lynch, to become the most junior member of his team. From that day on, Trahan mentored Kantrowitz, teaching the young analyst his trade secrets and proprietary methods. At Trahan's urging, Kantrowitz left ISI to join Trahan at Wolfe Trahan. There, Trahan continued to guide Kantrowitz and encouraged him to begin interacting and meeting with clients more consistently. When Trahan founded Cornerstone Macro, Kantrowitz followed—as did Trahan's mentorship. To help promote Kantrowitz's career, Trahan twice asked Cornerstone Macro's head of sales to permit Kantrowitz replace Trahan as the firm's representative in *Institutional Investor's* survey of top analysts. Trahan was told no both times—Kantrowitz, Trahan was told, was not ready.

41. Rather than work with his mentor, Defendant Michael Kantrowitz misused the trust and confidence Trahan had placed in him. Recently discovered events have revealed that Kantrowitz was regularly and repeatedly disloyal to Trahan, going behind his back in bad faith, misappropriating Trahan's intellectual property (and the Intellectual Property of Trahan's Market Strategies Advisory Business) and the Market Strategies Advisory Business clients in order to further Kantrowitz's personal visibility and reputation, all at his mentor's expense and the expense of Trahan's Market Strategies Advisory Business.

42. Beginning as early as June 2016, Trahan became aware of issues with Defendant Michael Kantrowitz's performance and his interactions with other employees. An employee

who played a significant and important role ("MSAB Employee-1") in Trahan's Market

Strategies Advisory Business complained to Trahan on numerous occasions that Kantrowitz was

shirking his responsibilities and, as a result, forcing MSAB Employee-1 to pick up his slack and

complete the majority of his work.  MSAB Employee-1 showed Trahan emails to support MSAB

Employee-1's contentions.  At one point, another employee in the Market Strategies Advisory

Business, who is an uncharged co-conspirator ("CC-1"), asked to be made head of the team in

order to keep Kantrowitz in check.

43.     The issue came to a head in October 2017 when MSAB Employee-1 broke down

in Trahan's office over Defendant Michael Kantrowtiz's misconduct.  Trahan took steps to

remedy this problem.  Among other things, Trahan confronted Kantrowitz about his conduct and

explained that, if Kantrowitz hoped to advance to a managerial role one day, Kantrowitz had to

improve his behavior.  Unable to deny that there was an issue, Kantrowitz admitted in emails that

his own difficulties were negatively impacting team relationships:  "I realize that my team

relationships have suffered as a result of many things, some that are my [sic] definitely my fault,

that I think I can fix."  Notwithstanding Trahan's attempts to solve the issues with Kantrowitz

directly, Trahan felt that Kantrowitz's performance issues were serious enough to merit

requesting that Cornerstone Macro's Chief Compliance Officer document the matter.

44.     From there, things only got worse.  At the end of 2017, the Market Strategies

Advisory Business's profits declined approximately 18 percent as compared to 2016, and were

off approximately 32 percent from the fiscal year-end profits estimates done in January

2017.  Because of, among other things, regulatory changes, many clients were reducing

payments to Cornerstone Macro.  Given that approximately eighty-three percent of Cornerstone

Macro's expenses were employee compensation, Trahan reduced the compensation of his

employees to account for the decline in profits.  Trahan reduced Defendant Michael Kantrowitz's compensation by approximately fifteen percent.  Notwithstanding that the reduction in Kantrowitz's compensation was less than the decline in the Market Strategies Advisory Business's profits, Kantrowitz was incensed.  He complained about his reduced compensation to sales people incessantly in early 2018.  Kantrowitz's anger made no sense.  In truth and in fact, Kantrowitz was paid significantly more than $1 million per year—and Trahan paid a higher percentage of the revenues of the Market Strategy Advisory Business to his employees than the Limited Partner Defendants paid to their employees.  Moreover, in July 2017, Trahan offered to give additional money to Kantrowitz knowing that Kantrowitz had spent hundreds of thousands of dollars constructing a residential swimming pool and was feeling financial stress.  Throughout most of 2017, Kantrowitz spoke openly about his financial issues.  On October 19, 2017, for example, Kantrowitz stated that he "had a very difficult period over the past 9 months or so."

45.     The situation was far worse than Trahan knew.  In February 2018, Trahan discovered that Defendant Michael Kantrowitz had, behind Trahan's back and without his knowledge or authorization, been regularly publishing reports to about 3,500 of Trahan's approximately 15,000 client distribution list (typically on Fridays, but sometimes as many as three times a week).  Kantrowitz put only his own name to those reports, notwithstanding that he knew the same reports, or portions thereof, were going to be published shortly thereafter (typically the following Monday) by the Market Strategies Advisory Business to all clients simultaneously, under Trahan's name, and notwithstanding that the reports were generated with the resources of the Market Strategies Advisory Business, using Trahan's trade secrets.  On February 23, 2018, after Kantrowitz sent out one of these reports unbeknownst to Trahan, one of Trahan's clients responded to Kantrowitz's email about the report and copied Trahan.  Trahan

immediately forwarded that email to Cornerstone Macro's head of sales seeking to find out how often Kantrowitz sent these reports out stating, in part, that Kantrowitz "keeps me i[n] the dark on this."

46.     Moreover, some of these emails contained reports from the Market Strategies Advisory Business's proprietary Macro Accommodation Barometer ("MAB") model—a model that combines various other models and leading indicators identified by Trahan—that Trahan had specifically told Kantrowitz not to use or disseminate without his prior approval.  For example, on January 23, 2018, Trahan directed Kantrowitz in writing not to use the MAB model in the Market Strategies Advisory Business's report to clients.  Kantrowitz agreed, responding in relevant part:  "Kills me to ditch such a good chart!!! ☺ But, alas . . [.] I'll remove . . ."  Unbeknownst to Trahan, Kantrowitz secretly and without approval subsequently used the MAB model in one and more of the reports he sent to about 3,500 clients and concealed from Trahan.

47.     Trahan and others were concerned when they learned about Kantrowitz's selective disclosure.  But when Trahan confronted Kantrowitz about this, he refused to apologize, instead maintaining that he was building his own brand.  By sending out the analysis of the Market Strategies Advisory Business, or portions thereof, to select clients in advance of Trahan sending out reports to all clients, Kantrowitz's actions raised serious criminal, regulatory, and other concerns, including that Kantrowitz was violating obligations and duties to Cornerstone Macro's clients by enabling select clients to receive the analyses of the Market Strategies Advisory Business in advance of all other clients.  Trahan subsequently agreed to let Kantrowitz publish his thoughts under certain conditions.  Among other things, Trahan directed him not to use any materials to be published in upcoming Market Strategies Advisory Business

reports, to only publish original material, to publish not more than once every two weeks, and to provide drafts to Trahan for review and approval prior to sending the emails. Kantrowitz agreed, but did not comply with Trahan's requests and what he agreed to do. Indeed, Kantrowitz continued to use materials yet to be published in upcoming Market Strategies Advisory Business reports in the emails that he distributed to select clients, and he did not provide drafts to Trahan for his review and approval in advance.

48.     Moreover, Trahan recently discovered that—going back years Defendant Michael Kantrowitz was at Cornerstone Macro working for Trahan and Cornerstone Macro—Kantrowitz had been sending his own marketing deck to potential clients, attributing such materials solely to Kantrowitz. This, despite the fact that Trahan had explicitly forbid him from doing so, after explaining to Kantrowitz that the Market Strategies Advisory Business invested significant resources in the decks and that for business reasons, the reports of the Market Strategies Advisory Business should have a uniform attribution to the Market Strategies Advisory Business—not Kantrowitz alone.

### 2.     The Cornerstone Macro Partnership Begins to Fracture Due Substantially to Defendant Nancy Lazar's Mismanagement and Jealousy

49.     As time went on, conflicts within Cornerstone Macro escalated and Defendant Nancy Lazar's conduct was at the center. The first major fissure in the Partnership that put at risk its survival occurred in February 2017. Cornerstone Macro had launched with a commission-based compensation system for its sales team. Over time, however, it became clear that this compensation system was not working. The competitive nature of the sales team's compensation was leading to counterproductive infighting. In an effort to ease these tensions, Cornerstone Macro's head of sales suggested that the firm switch to a discretionary payment system. Trahan supported this proposal, because it made sense and it was in everyone's best

interests to alleviate the tensions the original method was causing.  Lazar opposed the change.
There was a bitter debate among the Partners and, in the end, the Partners could not agree to
change the sales team's compensation model.

50.     Around this time, tensions were also brewing over Cornerstone Macro's
attribution process.  In 2016, Trahan's Market Strategies Advisory Business achieved a 37%
attribution, while Defendant Nancy Lazar's EAB division achieved only a 30.8% and Defendants
Andrew Laperriere's and Roberto Perli's PAB division achieved 22.2%.  Lazar was not pleased
with the results.  In July 2017, at Lazar's suggestion, the Partners instituted a process to
challenge the attribution.

51.     During the next attribution process, Defendant Nancy Lazar proposed that
Cornerstone Macro use unrepresentative metrics to calculate attribution, which, in effect, skewed
the numbers in the EAB division's favor.  Recognizing the impropriety of such action, Defendant
Roberto Perli engaged in the same exercise, but skewing the numbers in PAB's favor, to, in
Perli's own words, "counter Nancy's presumably self-serving count."  Lazar's attempt to fix
attribution in her favor failed, and the results in 2017 frustrated her further:  35.6% was attributed
to the Market Strategies Advisory Business; 29.2% was attributed to EAB; and 24.8% was
attributed to PAB.

52.     Trahan was well aware that Defendant Nancy Lazar was upset about attribution.
In an attempt to create a hospitable work environment—though at great financial cost to
himself—Trahan offered to split attribution with Lazar in June 2016, June 2017, December 2017,
and June 2018.  But Lazar rejected the proposals.

53.     Instead, Lazar behaved in a manner that negatively affected Cornerstone Macro—
a fact the Partners and employees readily noted.  For example:

- In a December 7, 2016 email discussing Lazar's conduct, Defendant Roberto Perli wrote to Trahan that "we need to confront her," and that "she needs to be put in her place in no uncertain terms. Among other things there is nothing worse than a senior person to be condescending towards younger folks. I'm totally fine with an ultimatum."

- In a December 11, 2016 email, Defendant Roberto Perli recounted a conversation he had with Lazar, in which Perli told Lazar that Cornerstone's head of sales was not "taking [Trahan's] side all the time," but rather "[w]hen [Trahan is] on the side of the right things, he sides with [Trahan], and when [Lazar] is he sides with her (although I don't recall the last time the latter happened . . .)." Perli at that time also provided advice with how to deal with Lazar, stating in the email, "If we don't want to be confrontational, making her feel like she is heard might help at the margin."

- In a June 24, 2017 email, Defendant Roberto Perli told Defendant Michael Kantrowitz, CC-1, and Trahan that, "As you know, I've been telling you for a while that ripping the bandaid [sic] is the right thing to do, but I respect the value you put in trying to salvage this - - after all, it was exactly my position until six months ago or so. If we still want to make it work, maybe using Consumer to bring Nancy to a more reasonable position (if that's even possible) is a good idea."

- In a June 25, 2017 email, Defendant Roberto Perli wrote the following to Trahan: "I also agree with your analysis of Nancy's state of mind. Honestly I don't care how crazy she is; what I care about is that people get a better appreciation of that fact. If they want to impugn the integrity of sales, we should make sure it becomes even more public than it already is."

- In August 2017, Defendant Michael Kantrowitz sent a text message to Trahan regarding Lazar in which Kantrowitz stated, "'Can't ration with crazy' … unfortunately won't change."

- On August 16, 2017, Defendant Roberto Perli sent a text message to Trahan regarding Lazar in which Perli stated, "No matter how much you think she will screw things up, she always goes beyond expectations."

- On January 26, 2018, Defendant Roberto Perli lobbied Trahan to leave Cornerstone Macro, as Perli had been doing for years, via text message, stating "I know my stress level would diminish if we left! . . . If we can find a compromise that works, maybe that takes away a source of tension and she calms down. (I think I'm speaking more out of Hope [sic] than conviction)."

- In April 2018, several of the sales team members reported to Cornerstone's head of sales that that they found it difficult to work with Lazar. In an email sent to Trahan, one sales person reported that she was "[f]rustrated with many of Nancy's issues," and another reported that "Nancy is a bit like my mother and while I care for her

deeply it's sometimes hard for me to get things across to her because she is set in her ways and has a hard time listening to me."

- In March 2018, <u>two of Lazar's top employees</u> threatened to quit due to Lazar's managerial style, and in April, one of those employees left.

54.     Defendant George Zachar's involvement in Cornerstone Macro only compounded tensions.  Although he was not an employee of the firm and received no compensation, he had an office, desk, company email address, and phone at Cornerstone Macro's office, frequently attended partner and research meetings, directed Defendant Nancy Lazar's team in her absence and put himself, for a time, on the Cornerstone Partner email distribution list.  Zachar's attempts to manage and oversee various aspects of the business did not sit well with Trahan.  In or around 2014, Trahan insisted that Zachar should not attend Partner-only meetings and that his name had to be removed from the partner distribution list.  While Zachar's name was removed from that list, he continued to attend Partner meetings over the prior objections of Trahan and continued to take on duties and responsibilities within the Economic Advisory Business.

55.     Certain aspects of Defendant George Zachar's conduct within Cornerstone Macro—hidden and unbeknownst to Trahan at the time—raise serious FINRA compliance concerns.  Moreover, on at least one occasion, Zachar attempted to submit a reimbursement request that did not constitute a firm expense.  Cornerstone Macro's Chief Compliance Officer, recognizing the impropriety of the request and the possibility that it violated FINRA rules and constituted fraud, rejected it.

### 3.     Defendants Hatch a Plan to Steal Trahan's Business

56.     On or about March 6, 2018, Trahan met with Defendant Nancy Lazar and her husband, Defendant George Zachar, to discuss the future of Cornerstone Macro.  Trahan had reached the point where he no longer wanted to remain in a partnership with Lazar and Zachar, particularly in light of the events and issues noted above.  Trahan explained that the Partnership

23

had become unworkable and suggested that either he or Lazar exit amicably.  To accomplish

this, Trahan proposed that the exiting Partner receive $27.5 million while the remaining Partner

would be given control over the Partnership.  Trahan's proposal was consistent with the letter

and obligations of the partners under their written agreements—if one partner wanted to take

control over another partner's business, that partner had to buyout the other one and could not

simply steal the business.

57.     Defendant Nancy Lazar rejected Trahan's buyout proposal, but in or around the

same time, she and the other Defendants launched a secret plan of their own.  Knowing that

Trahan no longer wanted to continue on in the same partnership, and that Trahan's Market

Strategies Advisory Business and related intellectual property were critical to Cornerstone

Macro's (and therefore their own) continued profitability, Lazar and the other Defendants

engaged in a scheme to take over his business and intellectual property.  Lazar was also

motivated to steal Trahan's business because her own business was declining and she wanted

complete power over the firm.  As alleged in greater detail below, Defendants agreed to attempt

to deceive Trahan into granting them rights to his business, employees, and intellectual

property—worth tens of millions of dollars—for a fraction of their value, and, if that failed, to

take them by outright theft.

58.     Defendant Nancy Lazar's bitterness towards Trahan deepened in April 2018,

when Lazar made a pitch to become Cornerstone Macro's Managing Partner, which Trahan

opposed.  Instead of designating Lazar as the managing partner, Cornerstone Macro held a "Key

Employees" meeting on April 17 to determine how to improve Cornerstone Macro's

atmosphere.  Lazar spoke out against holding this meeting.  Despite her opposition, the meeting

went forward and, as a result of the meeting, the employees requested that Cornerstone Macro's

technical analyst be made "interim" CEO.  Because FINRA rules did not permit this analyst to occupy this role due to his lack of experience, the Partners agreed to make him an unofficial partner and interim CEO (hereinafter "Interim CEO").

59.     After his elevation, the Interim CEO took actions that Trahan found objectionable and Trahan voiced his concerns.  For example, on May 2, 2018, the Interim CEO proposed that Cornerstone Macro hire a person whom he recently met to be the firm's chief operating officer.  At some point Trahan learned that the candidate was the Interim CEO's brother's college roommate.  Cornerstone Macro's Chief Compliance Officer objected to hiring the person because he failed to meet FINRA's qualification to be COO.  In an effort to maintain professionalism and ensure there was no perception of partiality, Trahan intervened.  Trahan proposed that Cornerstone Macro take time to define the new position—and ensure that the role was necessary—and then interview qualified candidates.  This upset the Interim CEO.  On April 29, 2018, Trahan was warned that the Interim CEO had been badmouthing Trahan to the salespeople, perhaps in retaliation.  After Trahan left, the Interim CEO's brother's college roommate was hired.

### 4.     The Limited Partner Defendants Scheme with Kantrowitz to Elevate Kantrowitz, Remove Trahan, and Pilfer Trahan's Business and Intellectual Property

60.     In late February, Trahan and Defendant Michael Kantrowitz had discussed a three-year plan that would eventually place Kantrowitz in a more senior role.  Notwithstanding, those discussions, in or around the end of April 2018, Kantrowitz aggressively confronted Trahan about Trahan's compensation and argued that he deserved more money.  Trahan explained that he had been attempting to secure a larger role for Kantrowitz within the Market

Strategies Advisory Business, but that Kantrowitz required more managerial experience before any further steps could be taken.

61.     Shortly thereafter, Trahan and Defendant Michael Kantrowitz agreed to meet on April 30, 2018, to discuss the future.  Just before the meeting was to begin, Kantrowitz invited the Interim CEO to join.  Baffled, Trahan called the Interim CEO to ask why he had been invited and what the meeting was about, but the Interim CEO, at least claimed, he did not know.  At the meeting, Trahan was blindsided.  Kantrowitz argued that he should lead the Market Strategies Advisory Business and that it was time for Trahan to step down.  Before walking out, Kantrowitz audaciously demanded that Trahan guarantee in writing a certain compensation within a week. Kantrowitz's behavior during the meeting was erratic and aggressive.

62.     After the meeting, Trahan met with the Interim CEO privately to discuss Defendant Michael Kantrowitz's demand.  The two talked about the rumors that Kantrowitz was considering a job offer at another firm.

63.     Only a few days later, on May 2, 2018, Defendant Michael Kantrowitz walked into Trahan's office with drastically changed demands.  Rather than guaranteed compensation in writing, Kantrowitz assured Trahan that he would be placated if he were simply made co-head of the Market Strategies Advisory Business.  When Trahan told Kantrowitz that he would need to speak with the Limited Partner Defendants before any decision could be made, Kantrowitz snapped.  He demanded that it happen right away and gave Trahan until the end of the week to comply.

64.     Over the following days, the Interim CEO and Defendant Roberto Perli separately pressured Trahan to promote Defendant Michael Kantrowitz.  Notably, on May 3, 2018, Perli warned Trahan that Trahan had to make Kantrowitz the Co-Head of the Market Strategies

26

Advisory Business because Defendants Nancy Lazary and Andrew Laperriere needed Kantrowitz to be promoted.  Defendants' pressure on Trahan to promote Kantrowitz was contrary to the letter and spirit of the Partnership agreements.  Nonetheless, their tactics eventually worked, and on May 8, 2018, Trahan agreed to promote Kantrowitz to Co-Head of the Market Strategies Advisory Business.  The conspiracy to oust Trahan was well under way.

65.    In the weeks following Defendant Michael Kantrowitz's elevation, the Limited Partner Defendants and Kantrowitz continued to take various actions in furtherance of their scheme, including by freezing Trahan out from some firm operations and client relationships and development:  they did not respond to several of Trahan's emails concerning the firm's operations; they caused Cornerstone Macro employees not to make meetings between Trahan and clients or potential clients; and, to a large extent, they attempted to ignore Trahan.  At the same time, Trahan also had to ask the Interim CEO to refrain from raising the issue of Kantrowitz's compensation, which was solely within Trahan's control, and specifically his July bonus installment, as an agenda item on Partner calls.  It was highly improper for internal compensation issues of the Market Strategies Advisory Business to be reviewed and considered by the Limited Partner Defendants.  Moreover, Trahan has learned that at or around this time, Defendant Michael Kantrowitz and others used an email distribution list that omitted Trahan, cutting him out of important discussions relating to Trahan's business.

66.    During this time, Defendant Michael Kantrowitz continued his erratic and improper behavior.  On May 21, 2018, Kantrowitz confronted Trahan in front of the employees of the Market Strategies Advisory Business claiming that he, not Trahan, should provide "voice blasts" to clients—weekly recorded voice messages that deliver financial advice.  When Trahan reminded Kantrowitz that the sales division had requested Trahan appear prominently in their

27

work during the period when *Institutional Investor* evaluated analysts for their rankings, Kantrowitz ominously questioned whether that time was over. Kantrowitz also attempted to assume other responsibilities that had historically belonged to Trahan, such as drafting the cover page of reports, and prioritized drafting his personal client reports rather than punctually complete those distributed by the Market Strategies Advisory Business.

67.     On June 6, 2018, Trahan met with Defendant Nancy Lazar and the Interim CEO, and Trahan offered to give Lazar that year something that she had demanded and insisted upon for several years—a fixed formula in the attribution of revenues. Trahan was stunned when Lazar declined his offer and merely stated that the process should take its course. Unbeknownst to Trahan, planning to remove Trahan entirely, Lazar no longer needed to worry about Trahan's division's superior performance.

68.     Between on or about June 6, 2018 and June 11, 2018, Trahan weighed whether to fire Defendant Michael Kantrowitz. Upon information and belief, the Limited Partner Defendants learned that Trahan was thinking about whether to fire Kantrowitz, and they accelerated their plan to steal Trahan's business before Trahan had any chance to actually fire Kantrowitz. Indeed, an officer of Cornerstone Macro told Trahan that Trahan could not fire Kantrowitz without the permission of the Limited Partner Defendants because Kantrowitz was an officer of the firm. That representation was not, in fact, true pursuant to the LPA and the LLC Agreement. As the owner of the Market Strategies Advisory Business, Trahan had the complete authority to fire Kantrowitz.

69.     In furtherance of their conspiracy, on June 18, 2018, Defendants served Trahan with the Required Withdrawal notice pursuant to Section 3.7(d) of the LPA and Section 6.5 of the LLC Agreement. Present for this meeting were the Limited Partner Defendants, the Interim

CEO, and the Chief Compliance Officer.  During the meeting, Defendant Roberto Perli told Trahan that the Interim CEO and the Chief Compliance Officer would explain things to Trahan about the withdrawal.  In a subsequent meeting, on June 20, 2018, the Interim CEO and the Chief Compliance Officer met with Trahan and directly told Trahan that this was a "no cause" removal, meaning that Cornerstone Macro had no good cause to remove Trahan from the partnership, and Trahan was being removed pursuant to the provision that allowed the Partners to vote him out of the Partnership.  On July 9, 2018, the Interim CEO and the Chief Compliance Officer asked Trahan what they should do now in terms of how to handle his departure.  Trahan made clear that he would offer employment to Market Strategies Advisory Business employees but, at the same time, he wanted to keep all lines of communication open.

70.     On July 24, 2018, Trahan again discussed his imminent departure from Cornerstone Macro with the firm's Interim CEO and Chief Compliance Officer.  At that meeting, he explained that there were two options in terms of a way forward: Either Trahan could "leave with my IP and my team and start my own firm or join another sell-side operation, so essentially compete, or on the other hand I can leave my team and my IP at Cornerstone, for the firm to continue the business, which I would consider under the right circumstances."  Trahan explained that pursuing the latter option would require reopening the conversation he had with Defendant Nancy Lazar on March 6, 2018, in which Trahan proposed a buyout.

71.     Trahan also reiterated that, under the partnership agreement, Cornerstone Macro was not permitted to discuss employment with members of Trahan's Market Strategies Advisory Business for six months and that Trahan was permitted to take his entire business, including his broadly defined intellectual property, with him when he left.  Trahan explained that the partners "can't expect me to walk away" from his business and "leave it for the partners for nothing when

the partnership agreement gives me the right to leave with it. You want my company, I should be compensated for that and that's black-and-white in this agreement."

72. The Limited Partner Defendants, however, were convinced that Trahan was boxed in. As a result, rather than a buyout, they offered to pay Trahan $7 million as part of the withdrawal, so long as he did not compete over an 18-month period and then $5.5 million so long as he did not compete over a 9-month period. Defendants also wanted the right to jointly and indivisibly own Trahan's intellectual property free of royalty and any duty to account. The combination of getting a covenant not-to-compete and free access to Trahan's intellectual property would enable Defendants to complete their theft of Trahan's business. Defendants were betting that Trahan would agree to a buyout severance payment and give up his right to his intellectual property. Moreover, if Trahan refused, Defendants were prepared to steal Trahan's intellectual property and cover up the theft.

**E. Unbeknownst to Trahan at the Time, Defendants Were Sabotaging Him Throughout the Spring of 2018 in an Effort to Position Themselves to Steal His Business and Intellectual Property**

73. Although Trahan was given withdrawal notice on June 18, 2018, Defendants had carefully placed events in motion well before that date to ensure that they would retain Trahan's clients and business, including the Market Strategy Advisory Business, after Trahan's departure. Central to the scheme was Defendants' misappropriation of Trahan's intellectual property rights, including (i) the intellectual property subject to Section 3.7(f)(i) of the LPA that Cornerstone Macro was required to assign over to Trahan; and (ii) any and all other intellectual property otherwise owned by Trahan that is in Cornerstone Macro's files, possession, custody, or control (collectively, the "Trahan IP").

74.     The conspiracy to steal the Trahan IP dates back at least to the spring of 2018.  In March and April, Trahan had begun to work with CC-1, and another employee in the Market Strategies Advisory Business division ("MSAB Employee-2"), on a new project that sought to apply Trahan's career-long knowledge of the business cycle to a new macro-driven quantitative analysis.  In essence, the project sought to create a stock-picking framework that would incorporate the business cycle, a unique offering on Wall Street.  The starting point was to identify the current state of the economy as one of six defined phases of the business cycle.  The project then sought to identify the top performing stocks in each of the six phases of the business cycle across history.  The analysis then focused on identifying the common attributes among these top performers.  The goal was for the end product to list the company characteristics (e.g., quantitative factors) that a portfolio manager should focus on when picking stocks in a given phase of the business cycle.  CC-1 stalled, made excuses, would offer availability when he knew Trahan was unavailable, and complained that the system kept crashing when performing routine back testing on historical data, which effectively stalled the project's completion.  CC-1's statements and excuses to Trahan, however, in hindsight were patently false.  CC-1 deliberately sabotaged Trahan's project to both ensure that Trahan would not be able to access the data after his departure, and to attempt to segregate this project from the Trahan IP—all the while planning to finish the project and use it to attract clients after Trahan's departure.

75.     Unsatisfied with stealing Trahan's intellectual property and business, the Limited Partner Defendants also took steps to ensure that Trahan would leave with significantly less money than that to which he was contractually entitled.  During a Partner meeting on June 8, just two weeks before Trahan was removed, Defendants Nancy Lazar, Roberto Perli and Andrew Laperriere overruled Trahan and instituted a policy that prevented any Partner from disputing the

upcoming attribution results of the sales team, which, as discussed above, affected the amount of revenue to which each division—and Partner—was entitled.

76.     With the stage set to steal the Trahan IP and business, the Limited Partner Defendants and Cornerstone Macro conducted the last attribution that would affect Trahan's profits in July 2018.  As part of the attribution process, each division was required to submit detailed information to the sales team, to help inform the proper distribution, by June 30, 2018. Trahan asked CC-1 to create a list of the special reports and analyses that the Market Strategies Advisory Business prepared at the specific request of clients.  Instead of preparing this list as the business had done in past years, CC-1 engaged in overt acts in furtherance of the conspiracy to sabotage the list of special reports at client requests and thereby lessen the attribution to the Market Strategies Advisory Business.  While normally it would have been in CC-1's financial interests as an employee of the Market Strategies Advisory Business to enhance the attribution to that business, CC-1's overt acts to sabotage the attribution to the Market Strategies Advisory Business were in furtherance of the conspiracy to steal Trahan's business and the Trahan IP.

77.     In furtherance of the conspiracy, CC-1 first attempted to delay production of the list of special projects and analyses at client requests, stating that CC-1 could not begin the project until the beginning of July—past the deadline when the sales team needed the information for the attribution process.  When, for unrelated reasons, the deadline was extended, CC-1 completed a list of special reports and analyses at client requests that amounted to little more than raw, unorganized data.  With that sabotaged data in hand, Trahan did what he could to salvage and submit the information to the sales team.  As a result of these efforts, and likely others unbeknownst to Trahan at this time, Trahan's Market Strategies Advisory Business was not afforded the proper attribution.  Although in the past, the Market Strategies Advisory

Business division's attribution averaged approximately 41.13% of Cornerstone Macro's profits, the July 2018 process attributed only approximately 33.22% of Cornerstone Macro's profits to Trahan's business.  In addition, while the process had sometimes taken weeks to complete, this cycle was finished in a matter of hours in record time.  While the decline in Trahan's attribution and short time in which the project was completed would be enough to raise the specter of foul play, the newly minted policy passed by the Limited Partner Defendants in furtherance of the conspiracy effectively prevented Trahan from challenging the results, thereby cementing Defendants' sabotage of the attribution process.

78.     Finally, to handicap Trahan's future business prospects and simultaneously ensure that Cornerstone Macro could complete the theft of Trahan's business, Defendants embarked on a plan to preemptively poach key employees from Trahan's Market Strategies Advisory Business through bribes, intimidation, and threats.  On June 22, 2018, Trahan sent Cornerstone Macro a letter notifying the firm of his intention to exercise his contractual rights and offer employment to six employees within the Market Strategies Advisory Business.  Prior to and after this date, Defendants conspired to bribe, intimidate, and threaten the employees in Trahan's Market Strategies Advisory Business to remain employed with Cornerstone Macro, not to speak with Trahan, and not to depart with Trahan.  Instead of honoring their contractual obligations by refraining from offering employment to employees of the Market Strategies Advisory Business, Defendants did precisely the opposite.

79.     Prior to and after Trahan's departure, Defendants took numerous steps in furtherance of their conspiracy to ensure that the employees of the Market Strategies Advisory Business did not leave the firm.  Among other things, Defendants met with and told certain employees of the Market Strategies Advisory Business that they would be compensated and earn

more in bonuses if they stayed with the firm rather than leave with Trahan.  In addition,

Defendants threatened certain employees of the Market Strategies Advisory Business.  For

example, Defendants told certain employees that they were prohibited from communicating with

Trahan in any manner.  Certain employees became frightened of interacting with and contacting

Trahan due to such intimidation and threats.  Defendant Michael Kantrowitz assured certain

employees in words and substance that Defendants had a plan in place to preserve Cornerstone

Macro's clients and the Market Strategies Advisory Business and that the future of the business

was secure; and that if such employees remained at Cornerstone Macro, they would make

significantly more money.

80.     Similarly, in furtherance of the conspiracy to steal Trahan's business and the

Trahan IP, and with the knowledge, reckless disregard, oversight, and approval of Defendants,

CC-1 told a Cornerstone Macro employee on August 8, 2018, and again on September 13, 2108,

that there were going to be positive management changes in the Market Strategies Advisory

Business.  With the knowledge, reckless disregard, oversight, and approval of Defendants, CC-1

further instructed the employee not repeat this information, telling the employees that the

information was confidential because CC-1 knew that what Defendants and CC-1 were doing

through bribes, intimidation, and threats to the Market Strategies Advisory Business employees

was wrong and improper.  Finally, with the knowledge, reckless disregard, oversight, and

approval of Defendants, CC-1 also threatened the Market Strategies Advisory Business

employee not to contact Trahan.

81.     In furtherance of the conspiracy to steal Trahan's business, intellectual property

and employees, although Defendants did not formally change Defendant Michael Kantrowitz's

title to head of the Market Strategies Advisory Business, Kantrowitz was told he would head the

business and acted as the head in everything but name.  Defendants viewed and conveyed to others that Kantrowitz's actions to undermine Trahan were part of a "battle" to attack and steal Trahan's intellectual property and business.  In fact, on or about December 6, 2018, at a holiday party for the firm, after Defendants Nancy Lazar, Andrew Laperriere, and Roberto Perli gave speeches as Partners of the firm, Kantrowitz stood up and gave a speech as the head of the Market Strategies Advisory Business.  During his speech, Kantrowitz stated in part that he had "battled" with Trahan during the year and emerged "victorious" which meant that Kantrowitz and the other Defendants had successfully stolen Trahan's business.  During the speech, Kantrowitz disparaged Trahan in furtherance of the conspiracy to undermine and steal Trahan's business.

82.     Unsatisfied with merely assuming Trahan's role as head of the Market Strategies Advisory Business, Defendant Kantrowitz has publically claimed credit for Trahan's achievements.  Kantrowitz's biography on Cornerstone Macro's website states that, "Michael [Kantrowitz] heads the portfolio strategy team at Cornerstone Macro."  As defined on Cornerstone Macro's website, the "team" excludes Trahan.  Nonetheless, the biography continues to assert that "Institutional Investor magazine has ranked the team's Portfolio Strategy work as #1 for eight of the past 10 years."  *Institutional Investor* magazine, however, did *not* rank the "team" that excluded Trahan, and did *not* rank the "team's Portfolio Strategy work" that excluded Trahan.  Rather, *Institutional Investor* magazine ranked Cornerstone Macro number 1 for 8 of the past 10 years due to the votes Trahan received.  Cornerstone Macro's statement, therefore, creates the false and misleading impression that the Market Strategy Advisory Business "team," as it currently exists, was ranked 8 of the past 10 years.  This constitutes further proof that Kantrowitz's was elevated pursuant to the scheme to steal Trahan's business and that

the theft goes well beyond stealing Trahan's business; it extends to stealing Trahan's accolades as well.

83.    Further, Defendants repeatedly disparaged and maligned Trahan with false and misleading statements to the employees of the Market Strategies Advisory Business and others as part of the scheme to threaten, intimidate, and steal Trahan's Market Strategies Advisory Business.

84.    In fact, on October 17, 2018, Defendants filed a form U5, Uniform Termination Notice for Securities Industry Registration, that falsely and misleadingly implied that Trahan had been fired and removed from the Partnership due to wrongdoing.  In particular, the U5, filed without Trahan's knowledge, states that the "Reason for Termination" is "Discharged"—rather than the appropriate category of "Other"—and goes on to say that "Mr. Trahan was a partner of the Firm and was required to withdraw as a partner due to business reasons."  Defendants amplified the false and misleading implication that Trahan had been fired for performance reasons by declining to answer "Yes" or "No" to the U5's "Disclosure Questions" (listed as Questions 7A through 7F), which ask, *inter alia*, whether the individual currently is, or at termination was: (A) "the subject of an investigation or proceeding by a domestic or foreign governmental body or self-regulatory organization with jurisdiction over investment-related businesses;" or (B) "under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct;" (C) whether the individual, while associated with the firm, was "charged with," "convicted of," or "plead guilty or nolo contendere to," any felony or certain misdemeanors; and (F) whether the individual resigned or was discharged or permitted to resign "after allegations were made that accused the individual of: 1. violating investment-related statutes, regulations, rules or industry standards of

conduct[;] 2. fraud or the wrongful taking of property[; or] 3. failure to supervise in connection

with investment-related statutes, regulations, rules or industry standards of conduct[.]"

85.     Defendants declined to answer these questions despite knowing that the accurate

and correct answer to each is "No."  In fact, Cornerstone Macro's Chief Compliance Officer has

admitted that Trahan was accused of no wrongdoing.  They did so with intent to malign and

harm Trahan as he seeks to set up his business and career independent of Cornerstone Macro,

well aware that their failure to answer the disclosure questions, combined with their false

"disclosure" that Trahan had been "discharged," would create the damaging misimpression that

Trahan had been fired or removed due to wrongdoing of some kind.

86.     After Defendants informed Trahan of the U5's filing, he immediately objected.

Only after threatening to add claims arising from Defendants causing a false and misleading U5

to be filed did Defendants cause an amended U5 to be filed on October 26, 2018 that correctly

lists the "Reason for Termination" as "Other," and accurately explains that "[p]ursuant to his

withdrawal as a limited partner from the Cornerstone Limited Partnership Agreement, Mr.

Trahan was contractually required to withdraw from the Cornerstone broker-dealer."  However,

the amended U5 again fails to provide any answer to the Disclosure Questions, despite

Defendants' knowledge that the correct and accurate answer to each is "NO."  This amended

filing is further evidence of Defendants' intent to tarnish Trahan's reputation with clients and the

public in furtherance of their scheme to steal his clients and business.  Had Defendants in fact

had any reason to believe that the answer to FINRA's termination-related questions were "Yes",

Defendants would be obligated to tell FINRA the truth.  Thus, it is readily apparent that

Defendants left the answers to these questions open as a means to further their scheme to steal

Trahan's business and IP, and to intimidate and threaten Trahan if he brought claims against them for their wrongful actions.

**F.      After Trahan's Removal, Defendants Steal, Misappropriate, and Pass Off as Their Own the Trahan IP, While Audaciously Trying to Cover Their Electronic Tracks**

87.     On August 3, 2018, after being informed of his removal, Trahan demanded, as was his right under the LPA, that Cornerstone Macro return the Trahan IP.  In response, Cornerstone Macro engaged Katten Muchin Rosenman LLP ("Katten Muchin") and, by letter, acknowledged the contractual right of a removed partner "to certain 'Intellectual Property' to the extent it is, among other things:  (a) 'owned by the Partnership' and (b) utilized solely by the business managed by the departing partner."  It went on, however, to assert (incorrectly) that some of the materials Trahan sought were "outside the definition of Intellectual Property and/or [were] not capable of ownership by Cornerstone LP."  To date, Cornerstone Macro has failed to return all of the Trahan IP to Trahan, as a result of which Trahan does not have access to all of his intellectual property.

88.     Upon information and belief, certain Cornerstone Macro representatives have instructed the firm's employees not to use Trahan's preexisting models and files.  Despite that rule, as described below, Trahan's preexisting content has continued to be openly and flagrantly copied and used by the Market Strategies Advisory Business since his departure.  The sales staff has also told Cornerstone Macro's clients that the firm returned all of Trahan's prior reports to Trahan, such that none of Trahan's prior reports were available any longer, as a result of which the firm's Market Strategies Advisory Business had to start over in producing new reports.  However, as discussed below, the Market Strategies Advisory Business in fact has openly and rampantly continued to access and use Trahan's preexisting content.

89.     With the provision of Trahan's withdrawal notice, from mid-August through the end of September 2018, the parties began negotiating the terms of Trahan's separation.  Through Katten Muchin, Defendants tried to ensure that they had access to and could use Trahan's intellectual property, and attempted to get a license from Trahan to use Trahan's intellectual property in perpetuity.  Defendants were wrongfully betting that Trahan would not want to litigate and that he would agree to their demands and terms, including a long-term covenant not to compete.  However, Trahan refused to agree to grant joint ownership to Cornerstone Macro of all Trahan IP, free of any royalty or duty to account, for a token payment far below its value.  And when the negotiations failed and Defendants could not acquire access to the Trahan IP through a contractual license, Defendants turned to their alternative plan—to steal the Trahan IP outright through deception and misrepresentations.  Although Defendants had succeeded in their first phase of deception—promoting Defendant Michael Kantrowitz to Co-Head of the Market Strategies Advisory Business—Defendants lacked the ability to generate any new and original material required to continue the Market Strategies Advisory Business on their own, and certainly lacked the ability to generate any new and original material promptly and in response to the ongoing and continued expectations of clients.  Thus, knowing that Trahan was not going to agree to let them continue to use the Trahan IP, Kantrowitz and others took numerous steps to copy as much of the Trahan IP as possible.

90.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants' trade secret misappropriation has been rampant and brazen.  At the time of Trahan's withdrawal, Cornerstone Macro and Defendants were obligated to cease using and to transfer to Trahan all Trahan IP and delete all such Trahan IP from its possession.  However, at least as early as October 8, 2018, employees of Cornerstone Macro (including at least Defendant

Michael Kantrowitz) began to copy the contents of certain of the Trahan IP electronic documents into newly created files, fearful that at some point access to the Trahan IP may be cut off.  On or about October 10, 2018, Defendants sent a letter through their counsel at Katten Muchin to Trahan claiming that they had turned over all of the Trahan IP to him.  But a careful review of what has been turned over demonstrates that Defendants have not, in fact, returned all of the Trahan IP to him and concealed certain critical Intellectual Property from him for the purposes of completing their theft of Trahan's Market Strategies Advisory Business.  For example, Defendants failed to turn over certain computer code files to Trahan knowing full well that Trahan would not be able to use the Trahan IP without such code.  By letter dated October 11, 2018, Trahan so notified Cornerstone Macro and expressly demanded that Cornerstone Macro cease and desist all use of the Trahan IP and, upon confirmation of their return, "delete and destroy any and all copies thereof in its possession."  Cornerstone Macro did not do this.  In fact, as of October 28, 2018, all of the Trahan IP was still on Cornerstone Macro's drive for all to see, and the Trahan IP was regularly and repeatedly being used by Kantrowitz and others at Cornerstone Macro.

91.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants have maintained copies of all Trahan IP on both the Cornerstone Macro servers, and there is reason to believe that some and/or all of the Trahan IP resides on the local drives of certain Cornerstone Macro employees.  Defendants have additionally maintained copies of all Trahan IP on Cornerstone Macro's backup servers and on FactSet, the firm's data provider.  Moreover, upon information and belief, certain Defendants have, in fact, kept copies of some or all of the Trahan IP on their own personal servers in their private residences.

92.     In or around November 2018, Cornerstone Macro blocked access to the "Publications" folder on its server—a folder containing all final reports, report drafts, and client facing presentations that had been previously disseminated to clients.  However, all other preexisting files remained accessible, including all of the computer code, models, spreadsheets and databases that were used to create those published reports in the first instance.  Moreover, many of the preexisting Market Strategy Advisory Business models were not saved directly to the Cornerstone Macro server, but rather housed with FactSet, which was available to everyone at Cornerstone Macro to continue being used, and was used.  In addition, Defendant Michael Kantrowitz and others kept files containing the Trahan IP on their personal computers.  The blocking of access to the "Publications" folder, albeit entirely ineffective in limiting access to or use of the Trahan IP, was taken under the purported and facially non-credible belief that only material that had been published—i.e., previously sent to clients—constituted Trahan's intellectual property that could not be used by Cornerstone Macro after his departure.  Relying on this purported belief, CC-1 told Cornerstone Macro employees that they could run Trahan's preexisting models and look at the outputs, because so long as the output was not previously disseminated to clients, it was "just research."

93.     In furtherance of the scheme to steal Trahan's Market Strategies Advisory Business, Defendants have engaged in overt acts of theft, conversion, and misappropriation of the Trahan IP since Trahan's departure.  Cornerstone Macro's remaining Partners and its Chief Compliance Officer are aware of, or willfully blind to, this practice.  In a brazen example, Defendants have embarked on a policy of stealing and misappropriating Trahan's trade secrets embodied in the raw computer code of, and as embodied in, the Quant Models (discussed below as among the Quant Trade Secrets), while making every effort to cover their electronic tracks so

they can claim they are "rebuilding"—albeit unlawfully—his trade secret computer code and models from scratch.

94.     On October 8, 2018, Defendant Michael Kantrowitz and CC-1 told members of the Market Strategies Advisory Business that they had to rebuild all of Trahan's prior models and charts from scratch.  That, however, is not what happened.  While there was a superficial effort to build new files and databases, the complicated models have not been recreated or completed, as Cornerstone Macro lacks the know-how to do so.  For example, CC-1 purported to build a new version of one of Trahan's preexisting models, but when he could not successful recreate it, he created a nonfunctioning model and sent clients outputs using Trahan's preexisting model.

95.     Even if CC-1 had or acquired the skills to create such models, his actions would have constituted misappropriation.  CC-1 was involved in the development of the preexisting models under Trahan's supervision, and yet, after Trahan's departure, CC-1 was responsible for creating the supposed "new" models.  In addition to this knowledge acquired from Trahan, Gregory also had complete access to the preexisting models and databases, which were, in fact, used when attempts to create these supposed new models were made.

96.     These shortcuts still proved too much.  On October 17, 2018, CC-1 complained to other members of the Market Strategy Advisory Business that "we're killing ourselves" trying to recreate Trahan's models, when, if Trahan was going to sue, such efforts were a waste of time. In that meeting, CC-1 also complained that, because the Limited Partner Defendants did not publish as many reports and charts, they did not understand why the Market Strategies Advisory Business needed to continue to use Trahan's materials.

97.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants have themselves subsequently, knowingly, intentionally, unlawfully, and brazenly used, and authorized Cornerstone Macro employees to use, the Trahan IP.  In an attempt to cover up and conceal their illegal and improper theft of the Trahan IP, Defendants have taken numerous steps to try not to leave a "paper trail" of their misconduct.  For example, Defendants directed employees to open the Trahan IP electronic files, read and use the Trahan IP in those files, and then close the files without saving them in an attempt to avoid leaving an electronic trail of evidence reflecting their use of the Trahan IP.  Defendants have also knowingly and intentionally directed others not to alter or save the files of the Trahan IP in a way that would evidence the continued access to the documents and information.  Such steps of opening files without making changes and opening files without saving them for purposes of attempting to avoid leaving an electronic footprint of inculpatory evidence are the blatant actions of thieves and swindlers, and most certainly direct and unimpeachable evidence of Defendants' knowing and intentional scheme and conspiracy to steal Trahan's Market Strategies Advisory Business including the Trahan IP, to defraud Trahan, and to illegally convert and misappropriate the Trahan IP.

98.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants copied electronic pages of the Trahan IP and then pasted the contents into a new file in an attempt to avoid leaving electronic evidence reflecting their use of the Trahan IP.

99.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants printed out code from the Trahan IP in order to use it to "recreate" the Trahan IP in a way that would avoid leaving an electronic footprint reflecting their misconduct.

100.    In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, certain individuals under the supervision and direction of Defendants have taken photographs of the Trahan IP using their personal phones in an attempt to avoid leaving an electronic trail of evidence at Cornerstone Macro reflecting their use of the Trahan IP.

101.    In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants have engaged in blatant copying and pasting of Trahan IP into the information and reports that they are required to provide to clients.  Defendants have, among other things, used the Trahan Quant Models to generate quant reports for their clients.  For example, and by no way limiting the allegations herein of this Complaint, on October 18, 2018, a client requested a report generated from the Trahan IP "Short Model."  In response, Defendants used the Trahan IP—the Short Model trade secret computer code as it existed prior to his withdrawal from the Partnership, as evidenced by the file's 2013 creation date—to generate the report and provided the resulting report to the client.  Although Defendants created a placeholder folder for this Quant Model at the time on the company's databases—Cornerstone Macro created folders on a new server directory of various files and computer programs it intended to copy from the Trahan IP files—that placeholder file contained no model or code.  Defendants resorted to merely using the original Trahan IP "Short Model" to generate a report and then sent that to the client.  Defendants' misappropriation and theft of the Trahan IP "Short Model" on October 18 is just one example of many demonstrating Defendants' per se intent and actual actions to steal, defraud, illegally convert, and misappropriate the Trahan IP.

102.    Similarly, on November 21, CC-1 sent a client a stock list created using one of Trahan's preexisting models.  In an attempt to conceal this fact, CC-1 changed the name of the

output file, but the email file clearly identified the preexisting model used to create the output—a model created in 2013.

103.    In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, to fulfill their obligations to clients and produce weekly strategic marketing reports, Defendants have been taking Trahan's prior reports and recycling the Trahan IP in an attempt to create the perception of issuing a "new" report.  Defendants, however, are doing little more than copying and pasting analysis and charts from various reports Trahan and his Market Strategies Advisory Business created (prior to Trahan's withdrawal) in an attempt to conjure something that appears to be novel, but in fact, contains no original content.  This blatant copying has occurred in virtually every report Cornerstone Macro has published since Trahan's departure based on a review of available reports.


[Remainder of page intentionally blank.]

104.    For example, in the first report Cornerstone Marco published after Trahan's departure, on October 8, 2018, the firm included a "Global PMI Below 50" chart (second image) that had previously been published in Trahan's February 2, 2016 report (first image):

*February 2016 (Trahan's work):[6]*



*October 8, 2018 (post Trahan's departure):*



105.    On October 9, 2018, Cornerstone Macro published a global PMI versus 10-year bond yield chart (bottom) that had been previously published in Trahan's January 17, 2018 report (top):

*January 2018 (Trahan's work):*



*October 9, 2018 (post Trahan's departure):*



---

6   Arrows and circles in red in ¶¶ 104 to 124 were added by plaintiff to aid the Court in comparing images.

47

106.    On October 10, 2018, Cornerstone Macro published the following charts in its

report:[7]



Even a cursory comparison to the March 1, 2018 Cornerstone Macro presentation—rightfully

created using the Trahan IP while Trahan was still a Partner—reveals the misuse of the Trahan

intellectual property.  The top right chart of the October presentation is almost identical to the

chart Trahan previously created on page four of a March 2018 presentation depicting the results

of the underlying proprietary Quant Project analysis:

---

[7]   Client information has been redacted.



In addition, the chart in the middle of the October 2018 presentation is copied from page six of the March 2018 presentation:



Finally, the chart on the bottom of the October 2018 presentation replicates the chart found on page 4 of the presentation issued in March 2018:



49

107.    All of these images demonstrate use of the Trahan IP, and in particular, the use of the Trahan IP in the form of proprietary data compilations and the use of trade secret models and data manipulation that is not known to the public.  The first image was entirely created by Trahan's team, prior to his withdrawal, using the resulting information derived from the proprietary Quant Project, and unquestionably qualifies as Trahan IP.  For example, without the use of the Trahan IP gained by Defendants through their employment by Trahan's Market Strategies Advisory Business, and the use of the underlying proprietary trade secret models employed by the Market Strategies Advisory Business of Cornerstone Macro (Trahan IP), Cornerstone Macro and Defendants could not represent where in the proprietary representation of business cycle it believes the current market is positioned—such conclusion is derived from the Trahan IP.  While the series appearing in the middle chart is purportedly available on Bloomberg, Trahan and his team manipulated that data (using proprietary analytics) to demonstrate the relationship between the series—the continued use of the underlying data compilation and proprietary data manipulation is Trahan IP.  Thus, Cornerstone Macro's continued publication of these images after Trahan's departure and assignment of the Trahan IP is improper.


[Remainder of page intentionally blank.]

108.   The October 10, 2018 report also contained a chart titled "The Six Leadership Phases of The Market Cycle In Our Framework" (bottom) which was a thinly-veiled copy of a chart of Trahan's, published in an April 2018 report and titled "The Six Leadership Phases of The Business Cycle" (top):

*April 2018 (Trahan's work)*:



*October 10, 2018 (post Trahan's departure)*:



109.   On October 11, 2018, Cornerstone Macro published a "High vs low beta plotted with ISM New Orders Chart" (bottom) that had previously been published in Trahan's April 2018 report (top):

*April 2018 (Trahan's work)*:



*October 11, 2018 (post Trahan's departure)*:



110.    On October 15, 2018, Cornerstone Macro published an NAHB versus ISM new orders index chart (bottom)[8] that had previously appeared in Trahan's February 27, 2018 report (top):

*February 2018 (Trahan's work)*:



*October 15, 2018 (post Trahan's departure)*:



111.    On October 17, 2018, Cornerstone Macro published a growth relative P/E versus value relative P/E chart (bottom) that had previously appeared in Trahan's May 23, 2018 report (top):

*May 2018 (Trahan's work)*:



*October 17, 2018 (post Trahan's departure)*:



---

8    Client information has been redacted.  The date in the footer indicates the date the client opened the document, not the publication date.

112.   On October 18, 2018, Cornerstone Macro published a chart outlining the number of stocks with topline growth greater than 15 percent (bottom) that had previously appeared in Trahan's May 23, 2018 report (top):

*May 2018 (Trahan's work)*:



*October 18, 2018 (post Trahan's departure)*:



55

That same October 18, 2018 report also included a "Valuation vs. Buy Ratings" chart (right) that

had previously appeared in Trahan's April 11, 2018 report (left):

*Trahan's Work*:                                              *Post Trahan's departure*:

        

113.    On October 19, 2018, Cornerstone Macro published a global manufacturing PMI

versus global financial conditions chart (right) which is very similar to a chart published in

Trahan's June 2018 report (left):

*Trahan's Work*:                                              *Post Trahan's departure*:



56

114.    On October 22, 2018, Cornerstone Macro published a global PMI versus global

PMI input prices chart (bottom)[9] that was published in Trahan's January 8, 2018 report (top):

*January 2018 (Trahan's work):*



*October 22, 2018 (post Trahan's departure):*



---

[9] Client information has been redacted.  The date in the footer indicates the date the client opened the document, not the publication date.

115.    On October 23, 2018, Cornerstone Macro published a chart similar to the one it published on October 10, 2018, *see* Paragraph 108, now titled "The Six Leadership Phases of The Market Cycle" (bottom), that yet again copied from Trahan's April 2018 report (top):

*April 2018 (Trahan's work)*:



*October 23, 2018 (post Trahan's departure)*:



The graphical representation, and the data underlying it, was created entirely by Trahan's team, prior to his withdrawal, using the proprietary Quant Project, which is undeniably Trahan IP.  Without the use of the underlying proprietary trade secret models employed by the Market Strategies Advisory Business of Cornerstone Macro (including the Quant Project), Cornerstone Macro and Defendants could not represent where in the proprietary representation of business cycle it believes the current market is positioned.  *Compare* October 23, 2018 position in the "Stability" phase (represented by a car), *with* the April 2018 position in the "Growth" phase (designated with text and an arrow).  Moreover, prior to Trahan's departure, Trahan and his team designed its reports to convey this particular information through a specific combination of overlaid text, graphs and charts.  This combination included: (1) a bell curve showing the relationship and correlation of the six identified business/market phases; (2) the use of six descriptive phase titles overlaid on the bell curve to indicate certain characteristics of the market during those phases (of which Cornerstone Macro continues to use five of those six verbatim); (3) the bell curve starting at the "speculation" phase and ending at the "Defense" phase; (4) a line graph overlaid on the bell curve demonstrating the correlation of the six phases to when the PMIs are above or below 50; and (5) indications of "Risk-On" and "Risk-Off" associated with the six phases.  Trahan and his team designed this model to portray the above-described information pictorially to its clients.  These pictorial representations are not purely functional, but also include aesthetic and non-functional considerations when taken as a whole.  These elements taken together create a distinctive, visual impression constituting a protectable and valid trade dress under federal law.  When Trahan rolled out his new Quant Project analysis and pictorial representation, clients immediately expressed strongly favorable opinions regarding the new report form and its format.  The customers expressed particular appreciation for the

pictorial representations of historical results and prospective analysis.  Trahan's distinctive analysis and reporting format has come to symbolize Trahan's unique delivery of his high quality quant and analytical financial services.  Trahan's trade dress in his report format has thus become, and is, a valuable asset of Trahan symbolizing Trahan, his high quality services, and his goodwill.

116.    Defendants, having recognized the consumer awareness and goodwill associated with Trahan's trade dress, conspired to usurp that goodwill for themselves by designing, marketing and/or offering, without the permission of Trahan, confusingly similar reports (for example, the October 10 and October 23, 2018 reports) that copy Trahan's trade dress.

[Remainder of page intentionally blank.]

117.    In an October 24, 2018 report, Cornerstone Macro published a page titled

"Insurance Companies Offering Protection" (right)[10] which closely mirrored a page from

Trahan's May 9, 2018 report (left):

*Trahan's Work*:                                                    *Post Trahan's departure*:

   

[Remainder of page intentionally blank.]

---

10   Client information has been redacted.

118.    On October 29, 2018, Cornerstone Macro published an ISM new orders index versus 10-year treasury yield chart (bottom) that was previously published in Trahan's May 23, 2018 report (top):

*May 2018 (Trahan's work):*



*October 29, 2018 (post Trahan's departure):*



119.   On October 31, 2018, Cornerstone Macro published a "Performance of Low P/E In Corrections" chart (bottom)[11] which had previously appeared in Trahan's March 8, 2018 report (top):

*March 2018 (Trahan's work)*:



*October 31, 2018 (post Trahan's departure)*:



That same October 31, 2018 report also included a "Performance of Low Beta In Corrections" chart (bottom)[12] which previously appeared in Trahan's March 8, 2018 report (top):

*March 2018 (Trahan's work)*:



*October 31, 2018 (post Trahan's departure)*:



---

11   Client information has been redacted.  The date in the footer indicates the date the client opened the document, not the publication date.

12   Client information has been redacted.  The date in the footer indicates the date the client opened the document, not the publication date.

120.    On November 5, 2018, Cornerstone Macro published a global PMI versus global

PMI input prices index chart (bottom) that had previously been published in Trahan's January 9,

2018 report (top):

*January 2018 (Trahan's work):*





*November 5, 2018 (post Trahan's departure):*



121.   On November 6, 2018, Cornerstone Macro published an index of earnings growth (YoY) chart (right) that had previously been published in Trahan's February 26, 2018 report (left):

*Trahan's Work*:                                          *Post Trahan's departure*:





[Remainder of page intentionally blank.]

122.    On November 8, 2018, Cornerstone Macro published a table ranking factors

(bottom)[13] that had previously appeared in Trahan's January 18, 2018 report (top):

*January 2018 (Trahan's work)*:



*November 8, 2018 (post Trahan's departure)*:



---

[13]   Client information has been redacted.  The date in the footer indicates the date the client opened the document, not the publication date.

123.    On November 9, 2018, Cornerstone Macro published a graph titled "How Will Mobility And Homeownership Behave In A World Of Rising Rates?" (bottom) that had previously been published in Trahan's April 2018 report (top):

*April 2018 (Trahan's work)*:



*November 9, 2018 (post Trahan's departure)*:



124.    Most recently, on November 12, 2018, Cornerstone Macro published a chart titled "Fed Policy Impacts Economic Prospects and Equity Market Volatility With A Lag" (bottom) that had previously been published in Trahan's January 9, 2018 report (top):

*January 2018 (Trahan's work)*:



*November 12, 2018 (post Trahan's departure)*:



125.    Additional examples of Defendants' theft and misappropriation of Trahan IP are set forth in the specific counts below.

126.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants used Trahan's preexisting chartbooks—Excel files with formatted charts based on proprietary model outputs built on FactSet—to create the charts in the reports they published to clients.

127.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants have stolen and misappropriated the Trahan IP in other client presentations since Trahan's departure.  In a presentation the firm released on October 12, 2018, Defendant Michael Kantrowitz took a picture of one of Trahan's prior charts—derived from a compilation of data not otherwise available to the public (and derived through considerable expense)—and simply pasted it directly into the new presentation.  There is no data linked to the chart in the new presentation.  In an attempt to cover their infringement, Defendants attributed the source to Bloomberg and FactSet, but the metadata belies this representation and the evidence will prove Defendants' misappropriation of the Trahan IP.  For example, neither Bloomberg, nor FactSet, has data relating back to the time period attributed by Defendants—they used Trahan IP instead.

128.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, and as further evidence of Defendants' use and misappropriation of Trahan IP, Defendants' "Portfolio Strategy Thoughts," dated October 12, 2016, misappropriates Trahan IP in its use of Trahan IP underlying the graphical representation of information derived from Trahan IP.  For example, the graph presented on slide 7 of the presentation is derived from use of non-public information and proprietary data compilations and trade secret calculations.  The evidence will show that the graphical representation of data was derived from a proprietary compilation of data and trade secret use of data manipulation and calculations that Trahan held as trade secret and that had not been disclosed outside of Cornerstone Macro.  Defendants could

not obtain the graphical representation of the historical data without using the underlying Trahan IP.

129.    In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants have also been using, and continue to use, Trahan IP to cut corners in responding to other client requests promptly.  Instead of doing the work themselves, Defendants steal and use the Trahan IP to generate other client reports.  For example, rather than recreate a new "sell-model" without using Trahan IP and Trahan trade secrets, on October 18, 2018, Defendants used Trahan's 2013 model to run screens and to provide accurate and fast answers to their clients' financial questions.  In addition, Defendants are using a unique tool/chart plug-in built by one of Trahan's employees which Trahan had developed and used while employed at Cornerstone Macro and is part of the Trahan IP for purposes of creating new charts.  This Trahan IP is a tool that allows for quick creation of standardized charts to demonstrate complex concepts and that has significant value to the Market Strategies Advisory Business.  Defendants have stolen this unique tool from the Trahan IP and misappropriated it as part of an unlawful and improper effort to steal Trahan's Market Strategies Advisory Business.  Finally, in furtherance of their scheme to steal the Trahan IP, Defendants have copied and are in the process of continuing to copy Trahan's electronic files containing all of the underlying code and data which Trahan has collected, aggregated, and organized over many years for purposes of concealing their continued reliance and use of the Trahan IP to generate reports and other information for clients for the Market Strategies Advisory Business.  One of the methods by which Defendants have used to cover the electronic trail of evidence of their copying of the Trahan IP has been, and continues to be, copying the intellectual property data into a new file and then copying the intellectual property data into a second file and then deleting the original file and the first copy.

130.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants have illegally copied and derived other Trahan IP Quant Models and Market Strategy Models ("Quant Trade Secrets" and "Market Strategy Trade Secrets" each described below), using and employing trade secrets that are owned by Trahan.

131.     In furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants' unlawful and improper use of the Trahan IP further extends to Cornerstone Macro's facilitation of client conference calls.  On Wednesday October 17, 2018, for example, just prior to Cornerstone Macro's deadline to create slides for a significant client conference call with hundreds of clients dialing in, Defendants brazenly directed employees to steal Trahan IP as they did not have time to create their own original presentation.

132.     Upon information and belief, contrary to directives from Katten Muchin and the Chief Compliance Officer, Defendants, along with certain employees, have attempted to publish and circulate documents with misappropriated material, or through use of misappropriated Trahan IP, behind their legal counsels' backs in order to circumvent legal review and the inevitable advice not to proceed.

133.     During the week of October 29, 2018, Defendants conveyed in words and substance to certain employees of the Market Strategies Advisory Business that the Trahan IP would remain open and available for now but at some point they would have to lock it down and prevent people from using it.  In furtherance of the conspiracy, by and through this message and other actions, Defendants telegraphed to certain Market Strategies Advisory Business employees that they should use and copy whatever Trahan IP they needed in the future for purposes of preparing reports before they had to remove it from their servers.

134.    These are but a few examples of the many instances of Defendants' blatant theft, infringement, conversion, and misappropriation of the Trahan IP done in a desperate effort to divert and retain its clients after Trahan's departure.

135.    Not only that, in furtherance of their scheme to steal Trahan's Market Strategies Advisory Business, Defendants have made every effort to avoid detection and cover their electronic tracks regarding their blatant copying of Trahan's intellectual property.  As discussed above, these shocking acts include instructing employees to open the Trahan IP code and transcribe it into a new document, and otherwise recreating Trahan IP in new documents, and instructing employees not to "save" the Trahan IP after opening it in order to copy its content into a seemingly new original file in an attempt to avoid any electronic trace that the file was opened and copied from.

136.    These actions to evade detection—which Defendants engaged in despite being well aware of Trahan's assertion of rights and the existence of impending litigation—confirm Defendants' awareness that they are infringing, stealing, unlawfully converting, and misappropriating the Trahan IP by using, copying, or recreating his code and other proprietary Trahan IP.  They also clearly and undeniably prove that Defendants' wrongdoing is part of a premediated, intentional scheme.

137.    To the extent any relevant files that would reveal Defendants' misconduct and efforts to evade detection are deleted and/or altered, any of Defendants' computers or electronic devices are destroyed or discarded, and/or any electronic evidence is otherwise manipulated or written over, such acts would constitute evidence-tampering and spoliation, and would justify an adverse inference and sanctions against Defendants.

## LIABILITY FOR THE ACTIONS OF OTHERS

138.    Defendants are liable for their own actions and for the actions of Cornerstone

Macro's employees, the actions of the other Defendants, and, for the entity defendants, the

actions of their respective partners, members, agents, and/or representatives.

### Respondeat Superior

139.    Each Defendant is liable for the actions of Cornerstone Macro's employees under

a doctrine of respondeat superior.  Under this doctrine, an employer is liable for the tortious acts

of its employees if they were committed in furtherance of the employer's business and within the

scope of employment.  *Riviello v. Waldron,* 47 N.Y.2d 297, 302–03 (1979).  Each Defendant is

an employer for the purposes of respondeat superior.  Cornerstone Macro employees (and those

in the Market Strategies Advisory Business in particular) were acting in furtherance of

Cornerstone Macro's business and within the scope of their employment—providing financial

market analysis, strategies, and advice to clients—when accessing, copying, and using the

Trahan IP to publish reports and respond to client inquiries after Trahan's departure.  Each

Defendant is therefore strictly liable for the actions of Cornerstone Macro's employees alleged

herein, whether or not each Defendant had actual knowledge of the misconduct.

### Duty to Supervise

140.    Separate and apart from the doctrine of respondeat superior, each Defendant had a

duty to supervise Cornerstone Macro's employees, and failed to adequately do so.

141.    Defendants oversaw the actions of Kantrowitz, CC-1, and other Cornerstone

Macro employees in their blatant copying and use of the Trahan IP after Trahan's departure (and,

with respect to Kantrowitz, he personally engaged in this copying and use and oversaw all other

Market Strategies Advisory Business employees).  Each Defendant therefore had knowledge of,

or should have known of, these actions.  Each Defendant also had the authority and duty to prevent further misconduct by those under their supervision, and failed to do so.

Willful Blindness

142.     Even if certain Defendants were to claim that they did not know of others' wrongdoing, they were at the very least willfully blind to it.  Willful blindness requires that "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact."  *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011).  "Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts."  *Id*.

143.     Assuming (arguendo) that any Defendant did not have direct knowledge of the blatant copying and use of the Trahan IP by Cornerstone Macro employees after Trahan's departure, each Defendant became aware of the high probability that misappropriation was occurring, including when Trahan sent numerous letters to Cornerstone Macro demanding the return of his intellectual property and expressing concern that Cornerstone Macro was still, in fact, using his intellectual property.  In addition, CC-1 complained that the Limited Partner Defendants did not understand why the Market Strategies Advisory Business needed the continue to use the Trahan IP—again indicating that the Limited Partner Defendants were aware of the continued use of the Trahan IP after his departure, and that there was at least a high probability of misappropriation.  Finally, the shocking similarity between the materials published to clients before and after Trahan left should have raised a red flag and put Defendants on notice. It is inconceivable that Defendants were not aware of the substantial risk that Trahan's rights were being infringed.

144.    Defendants, moreover, took deliberate actions to avoid learning the details of their employees' misappropriation and misuse of the Trahan IP.  Indeed, there was no oversight or training over the Market Strategies Advisory Business employees as to the permissible use of Trahan's preexisting materials.  Nor were those employees ever questioned as to how they were creating the published works.

Civil Conspiracy

145.    Defendants are liable for their own actions individually as well as the actions of their fellow Defendants because each Defendant was party to a civil conspiracy with the other Defendants to steal Trahan's business and misappropriate his intellectual property by committing the torts alleged in the Causes of Action below.

146.    Once an independent tort is established, a "plaintiff may plead the existence of a conspiracy . . . to demonstrate that each defendant's conduct was part of a common scheme." *Frazier v. Turning Stone Casino*, 254 F. Supp. 2d 295, 313 (N.D.N.Y. 2003) (citations and quotations omitted).  "To establish a claim of civil conspiracy, a plaintiff must demonstrate the primary tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Id*. (citations and quotations omitted).

147.    As alleged above, Defendants planned and executed a scheme to steal Trahan's business and misappropriate his intellectual property through the commission of each of the independent, primary torts or wrongful acts detailed herein.  Defendants entered into an agreement regarding these torts and wrongful acts, whereby each Defendant agreed to take part in the execution of the scheme and to individually or collectively commit each of the torts and

wrongful acts alleged herein.  To the extent any individual Defendant has not personally

committed each of the torts or wrongful acts alleged, each Defendant has at a minimum taken

overt acts, including those alleged herein, in furtherance of Defendants' agreement and common

scheme to commit the tort or wrongful act, and has intentionally participated in the furtherance

of the plan.  Each Defendant is therefore liable for each of the torts or wrongful acts alleged

herein.

<u>Entity Liability for Actions of Natural Persons</u>

148.    Finally, each entity defendant is liable for the actions of its natural person

employees, partners, members, agents, and representatives taken within the scope of their

employment, partnership, membership, agency, or representation.

**CAUSES OF ACTION**

**FIRST CLAIM FOR RELIEF**
**(Unfair Competition—Against All Defendants)**

149.    Trahan repeats and realleges the allegations set forth above as though fully set

forth herein.

150.    At all relevant times, Trahan has maintained a property right in his labor, skill,

expenditure, name, and reputation in connection with the Trahan IP.

151.    The Trahan IP includes, but is not limited to: (i) weekly strategy reports published

and/or created by Cornerstone Macro and/or anyone within the Market Strategies Advisory

Business; (ii) all Market Strategies Advisory Business materials, published in any media, that

attribute authorship to Cornerstone Macro and/or Trahan; (iii) any and all of the Market

Strategies Advisory Business's trade secret screens and models ("Market Strategy Trade

Secrets," discussed below); (iv) all of the Market Strategies Advisory Business's other screens

and models, including without limitation those used by the Market Strategies Advisory Business

to generate screens and/or reports (e.g., the tool/chart plug-in built by MSAB Employee-3 for purposes of creating new charts); (v) the Market Strategies Advisory Business's Quant Models (Quant Trade Secrets, discussed below); (vi) the Market Strategies Advisory Business's Quant analysis Models (e.g., all computer code, spreadsheets, databases, back testing, reports, drafts, meeting minutes, or other associated data); and (vii) any and all tangible expressions of the methodologies and "know-how" developed by the Market Strategies Advisory Business to analyze the financial market, and the content thereof.

152.    The Trahan IP includes a vast amount of Intellectual Property, in various forms, that Trahan brought with him to Cornerstone Macro.  Much of this intellectual property was used by Cornerstone Macro while Trahan was a Cornerstone Macro Partner, and has been improperly retained by Defendants.

153.    The Trahan IP was utilized solely by the Market Strategies Advisory Business managed by Trahan.

154.    The Trahan IP is owned by Trahan.  Upon Trahan's withdrawal from the partnership, Cornerstone Macro has no rights in, or right to use, such intellectual property.

155.    In a letter dated October 11, 2018, Trahan demanded that Cornerstone Macro immediately cease all use of the Trahan IP; confirm that Cornerstone Macro had provided to Trahan all physical instances of, and any electronic copies of, Trahan's intellectual property in Cornerstone Macro's possession, custody, or control (as promised by Cornerstone Macro); and immediately provide Trahan a formal assignment of all rights in, title to, and ownership of the Intellectual Property subject to Section 3.7(f)(i) of the LPA.

156.    To secure an unfair competitive advantage against Trahan, Defendants falsely agreed not to make use of Trahan's intellectual property and not to circumvent Trahan's rights to

use and monetize his intellectual property, including in Section 3.7(f)(i) of the LPA and in communications made by Defendants' counsel on Defendants' behalf.

157.   Defendants secretly schemed to misappropriate the Trahan IP and use it to publish newsletters, models, and strategies, answer client questions, develop and publish reports, hold conference calls with clients, and develop and further customer relationships, all while presenting it in their own names and as their own, without acknowledging Trahan's intellectual property rights.  Defendants also secretly schemed to misappropriate the Trahan IP and present it as their own in an attempt to alienate Trahan's customers and harm his reputation.

158.   Defendants' overt acts of misappropriation of Trahan's intellectual property since he's left the company include:

     a.   Stealing his raw code, while making every effort to cover their electronic tracks so they can claim they are "building" the models from scratch.

     b.   Sending out reports that contain charts and diagrams that are identical to the ones he generated based on his intellectual property, including in some instances still retaining the old date from his prior report (in other words, directly copied and pasted).

     c.   Using proprietary Trahan IP data compilation and trade secret data manipulation models to create "new" or updated financial reports published to clients.

     d.   A conference call with clients at which they provide Trahan's intellectual property but pass it off as their own.

     e.   Using Trahan's intellectual property to generate almost immediate responses to client requests for models/information.

     f.   Using the plug-in created by Trahan's employee at his request to create charts and diagrams.

159.   Defendants acted in bad faith in misappropriating Trahan's intellectual property. Defendants' bad faith misappropriation the Trahan IP is evidenced by, *inter alia*, Defendants' continued use of Trahan's intellectual property after he advised them of his rights under the LPA, demanded that they cease and desist from using his intellectual property, and Defendants

expressly "confirmed" through counsel, in an October 16 letter to Trahan's counsel, that Cornerstone Macro "has no intention to use" Trahan's Market Strategies Advisory Business "screens and reports."  Defendants' schemes and efforts to avoid detection of their blatant copying of his intellectual property include copying screens and models from the Trahan IP as "new" files, taking photographs of Trahan IP computer code so that it could be retyped at a later date without leaving an electronic trail, instructing employees not to delete his raw code, and instructing employees to open his raw code and transcribe it into a new document, but not "save" the original file, in an attempt to avoid any electronic trace that the file was opened and copied from.  These actions all demonstrate Defendants' bad faith, as does the misconduct alleged throughout this Complaint, including the specific misconduct alleged at Paragraph 221.

160.    Defendants' misconduct was willful, and constitutes willful misconduct under Section 7.3(a) of the LPA and the LLC Agreement.

161.    As a direct and proximate result of each Defendants' bad faith misappropriation, Trahan has been damaged in an amount to be proven at trial.

162.    Trahan is also being irreparably harmed by Defendants' wrongful acts, including with respect to his reputation, the unquantifiable impairment to the value of his intellectual property and brand, his goodwill with clients, customers, and potential clients and customers, and spoliation of evidence in Defendants' possession, custody, and control.  Trahan is therefore entitled to: (A) preliminary injunctive relief (i) enjoining Defendants, and all those acting in concert with them, from further accessing, using, or disclosing the Trahan IP, including any work product derived therefrom, and any raw code copied, derived, or recreated from Trahan's code, during the pendency of this action; and (ii) compelling Defendants to immediately provide to Trahan copies of any of Trahan's intellectual property in their possession, custody, or control not

already provided to him; and (B) permanent injunctive relief, upon a decision in his favor in this case, compelling Defendants to return any of Trahan's intellectual property in their possession, custody, or control, and, upon certification of complete return, to subsequently destroy any duplicate records or copies.

## SECOND CLAIM FOR RELIEF
### (Violation of the Economic Espionage Act, as Amended by the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836—Against All Defendants)

163. Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

164. Defendants have misappropriated Trahan's intellectual property, including trade secrets, related to products and/or services used in, or intended for use in, interstate commerce. *See* 18 U.S.C. § 1836(b)(1).

165. Both before and during his time at Cornerstone Macro, Trahan made significant investments—including in terms of time and monetary commitments—in the research of the financial markets. Trahan's research investments resulted in several forms and types of financial, business, and economic information, including proprietary screens, models, data compilations, data manipulation models, formulas, methods, techniques, processes, procedures, programs, and computer codes, tangible and intangible, that were and are still stored, compiled, and memorialized (physically, electronically, graphically, photographically, and in writings) at Cornerstone Macro.

Representative examples of Trahan IP Quant Models include:

1) The Factor series: refers to all of the factors used in all chartbooks, throughout the Market Strategies Advisory Business reports, presentations, handouts and conference calls; these factors are proprietary in construction and are the building blocks of the Market Strategies Advisory Business models.

2)   "WhiteBox" model: a prominent model that incorporates the business cycle into stock screening.

3)   Business Cycle Model (BCM): an early version of the "Whitebox" model.

4)   "Growth" model: an industry-praised model that calculates the return spectrum across proprietary growth measures.  The Growth model can be used in conjunction with the G-Score model.

5)   "G-Score" model: an improved proprietary version of Trahan's famous "Growth" model.

6)   "Value" model:  an industry-praised model that calculates the return spectrum across proprietary value measures.

7)   "F-Score" model: an improved proprietary version of Trahan's famous "Value" model.

8)   "Sell" Model: a prominent model used to identify short candidates.

9)   "Short" model: a proprietary model similar to the "Sell" model.

10)   "Ability-To-Pay" (ATP) model: a model used for Dividend stocks.

11)   Credit Rating Model: a model used to identify stocks likely to see a change in credit ratings.

12)   Value Traps: a unique proprietary model used to identify value traps.

13)   "QOR Score" model: a quality of reporting score that is a proxy way of measuring the quality of management.

14)  "Material Misstatement" model: a model similar to the "QOR Score" model.

15)  "Life Cycle" model: a model that identifies where a company is in its lifecycle.

16)  "Pricing Power" model: a model that identifies companies that outperform alongside inflation using market share metrics.

17)  The Quant Project: a model that uses several business cycle models used in the research for the Business Cycle "Factor" model.

18)  Georev World data model: a model that organizes sales globally by custom-built regions and then provides fractiled returns for each respective area.

19)  "Classic Strategies" model: a comprehensive model implementing proprietary formula to create factors used by the Market Strategies Advisory Business, such as "Buffett," "Dre man," "Miller," and "Lynch."

20) "Long" model: created to be the opposite of the "Short" model; derived from the "WhiteBox" and "BCM" models and includes over 500 rows of formula.

21) "Blend" model: an early version of the "Long" model.

22) "Foreign Sales PMI" model: a model that calculates global PMIs relative to total foreign sales and generates return data corresponding to degrees of foreign exposure.

23) "O-Z Score" model: a bankruptcy model that implements numerous proprietary factors and formula.

24) "Altman Z-Score" model: another bankruptcy model that implements numerous proprietary factors and formulas.

25) "Correlation Volatility Sector" model: a model that calculates company return correlation to benchmark and sector benchmarks, and then fractiles the return data.

26) "Macro Select" Model: a proprietary "equal weight" model that implements and combines several proprietary factors.

27) "Single-Index" model: a model that creates a company score based off of proprietary factors.

28) "SP&500 return ex FANG" model: a model that recalculates the S&P5OO Index excluding the FANG stocks using proprietary formula and data manipulation.

29) "Dividends > 10-Year Treasury" model: a model that creates return fractiles across customized and proprietary factors relating to dividend values and events.

30) "Bellwethers" model: a model that generates a company scoring based on several proprietary, custom factors.

31) "Buybacks" model: a model that creates a buyback yield factor using various proprietary formulas and generates return data.

32) "Equity Duration" model: a model that calculates "Equity Duration" for each stock and then compiles return data across a duration curve; model used for independent analysis and in the "WhiteBox" model.

33) "Estimate" models: a collection of proprietary models implementing several proprietary sell-side analyst factors, including "Price Target," "Long-Term Growth," and "Earnings Revisions."

34) "East v. West" model: a proprietary model that calculates returns based on company-specific information.

35) "Dogs of the Dow" model: a proprietary compilation of data and analysis that identifies, lists and returns beaten down stocks.

36) "Profitability Analysis" model: a model comprised of numerous proprietary factors and proprietary analysis that measures profitability, including multi-factor rankings.

37) "Projected Earnings Yield" model: a model that uses proprietary analysis to calculate company, industry and sector level estimates factors, and generates fractiled for returns data.

38) "Zombie Companies" model:  a model that identifies companies that should have gone out of business, but remain in business because of subsidies and/or extremely low interest rates.

166.   The models described in the prior paragraph, as well as any additional Trahan IP

Quant Trade Models not specifically described herein, are collectively and individually referred

to as the "Quant Trade Secrets."

167.   Representative examples of Trahan IP Market Strategy Models include:

- Macro accommodation barometer model (MAB):  a model that incorporates various anticipatory indicators of the business cycle to help identify the stage of the business cycle for financial markets.

- Modified Taylor Rule:  proprietary version of the Federal Reserve's Policy Reaction Function.

168.   The models described in the prior paragraph, as well as any additional Trahan IP

Market Strategy Models not specifically described herein, are collectively and individually

referred to herein as the "Market Strategy Trade Secrets."

169.   Trahan, and his Market Strategies Advisory Business prior to his withdrawal, took

reasonable measures, including those reasonable under the circumstances, to keep such Quant

Trade Secrets and Market Strategy Trade Secrets a secret.  The Quant Trade Secrets and Market

Strategy Trade Secrets are not publicly known by, or available to, the public.

170.    Trahan, and his Market Strategies Advisory Business prior to his withdrawal, implemented the Quant Trade Secrets and Market Strategy Trade Secrets internal to Cornerstone Macro and the Market Strategies Advisory Business.  Access to the Quant Trade Secrets and Market Strategy Trade Secrets is and was limited to specific Cornerstone Macro employees, each subject to nondisclosure and confidentiality obligations.

171.    To protect its business interests, the confidentiality of its business operations, and the secrecy of the Quant Trade Secrets and Market Strategy Trade Secrets, Trahan, and his Market Strategies Advisory Business prior to his withdrawal, took affirmative measures, including the utilization of restrictive covenants in its employment contracts, computer user ID and passwords protection and firewalls, limiting access to information safeguards and other measures, and restricting unauthorized use of data.  Trahan also took special steps to make sure that the Trahan IP was not improperly distributed.  For example, Trahan hired a third-party technology specialist to secretly embed a microscopic identification to track the improper re-distribution of Trahan IP.

172.    Trahan, and his Market Strategies Advisory Business prior to his withdrawal, implemented a strictly enforced policy not to disclose the Quant Trade Secrets and Market Strategy Trade Secrets to clients or anyone else.  While Trahan and his Market Strategies Advisory Business published screens and reports to clients that were generated as the results of use of the Quant Trade Secrets and Market Strategy Trade Secrets, the Quant Trade Secrets and Market Strategy Trade Secrets, including the proprietary data analysis, methodologies, data models, and computer code, were not disclosed to clients or anyone else.

173.    The Quant Trade Secrets and Market Strategy Trade Secrets derive independent economic value, actual and potential, from not being generally known to, and not being readily

ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of such information.

174.    The independent economic value of each of the Quant Trade Secrets and Market Strategy Trade Secrets is evidenced through the tremendous success of Trahan and Market Strategies Advisory Business as well as the efforts taken by Defendants to misappropriate and steal these trade secrets.  Each year, clients pay millions of dollars for the analysis, screens and reports generated from Trahan and the use of the Quant Trade Secrets and Market Strategy Trade Secrets.

175.    The independent economic value of each of the Quant Trade Secrets and Market Strategy Trade Secrets is further exemplified by the failed attempts of Trahan's competitors to create competing financial analysis on par with the analysis generated from the Quant Trade Secrets and Market Strategy Trade Secrets, despite the strong economic incentives in doing so.

176.    Trahan's Quant Trade Secrets and Market Strategy Trade Secrets provide Trahan with a unique product and service offering, unlike any other, which further helps Trahan to maintain his leadership position in the financial industry.  For example, the Quant Trade Secrets enable Trahan and his Market Strategies Advisory Business to generate client-specific financial analysis generated from any and all of the Quant Trade Secrets his and its clients request.  The Market Strategy Trade Secrets enable Trahan and his Market Strategies Advisory Business to generate unique, one-of-a-kind historical analysis coupled with future market indicator financial analysis.

177.    The Quant Trade Secrets and Market Strategy Trade Secrets constitute protectable trade secrets, including under 18 U.S.C. § 1836.

178.    Each of the Quant Trade Secrets and Market Strategy Trade Secrets were utilized solely by Trahan's Market Strategies Advisory Business.

179.    The Quant Trade Secrets and Market Strategy Trade Secrets were not utilized by any Cornerstone Macro business other than Trahan's Market Strategies Advisory Business.

180.    Trahan owns each of the Quant Trade Secrets and Market Strategy Trade Secrets.

181.    Each of the Quant Trade Secrets and Market Strategy Trade Secrets were (i) developed by Trahan prior to his co-founding of Cornerstone Macro and which he brought with him to Cornerstone Macro; and (ii) developed and/or improved upon by Trahan and his Market Strategies Advisory Business prior to Trahan's withdrawal.

182.    Each of the Defendants had access to, and/or did receive, prior to Trahan's withdrawal, the Quant Trade Secrets and Market Strategy Trade Secrets.

183.    Each of the Defendants had a contractual obligation to not use the Quant Trade Secrets and Market Strategy Trade Secrets following Trahan's withdrawal.

184.    Defendants, individually and collectively, have used the Quant Trade Secrets and Market Strategy Trade Secrets following Trahan's withdrawal for their own individual and collective benefit.  At the time of each such use, Defendants knew or should have known that the Quant Trade Secrets and Market Strategy Trade Secrets were Trahan's trade secrets and were acquired and used by improper means and without Trahan's consent.

185.    Defendants, individually and collectively, have misappropriated, and continue to misappropriate, the Quant Trade Secrets and Market Strategy Trade Secrets, including as alleged in Paragraphs 87–137 and in the First Cause of Action above.

186.    For example, Defendants are using the Quant Trade Secrets and Market Strategy

Trade Secrets to generate screens, models, analysis and reports and to provide to clients such

materials derived from the Quant Trade Secrets and Market Strategy Trade Secrets.

187.    Defendants continue to publish to clients screens and reports generated by

Defendants' use of the Quant Trade Secrets.

188.    As one example, on October 18, 2018, CC-1 emailed client Mutual of America

screens generated from use of the "Short" model Quant Trade Secrets.  Specifically, in his

October 18, 2018 email, CC-1 attached two such screens in Excel spreadsheet form, stating in his

email, "Pleasure speaking with you.  Attached is the short model screen I had mentioned.  I

included a R2k and SPX version.  Please let me know if you have any questions."  As discussed

above, at the time CC-1 sent these screens to the client, Cornerstone Macro had yet to even copy

over to a new local server the Trahan IP "Short" model into the placeholder folder, and thus

simply used the original Trahan IP "Short" model, as indicated the 2013 file creation date—

impermissibly retained in Defendants' files—to generate the report sent to the client.

189.    Defendants have used the "Short" model, and the other Quant Trade Secrets to

generate screens and reports that Defendants then sent to clients after Trahan's withdrawal.

190.    Defendants also continue to publish to clients screens and reports generated by

Defendants' use of the Market Strategy Trade Secrets.

191.    As one example, Defendants used Trahan IP data in creating a presentation titled

"Portfolio Strategy Thoughts, Beware Of The 'Sweet 16' Value Trap," dated October 12, 2018,

and published to clients at or around October 12, 2018.  More specifically, at least slides 3, 4, 7,

and 10 present data analysis that was generated by Defendants using Trahan IP data.  Slide 3

presents data dating back to 1954 and attributes the source of such data to "Bloomberg, Factset";

however, these alleged sources do not have the underlying data presented back to 1954—the Trahan IP data was compiled through years of exhaustive research from numerous hard-to-find resources, and such data was then manipulated through use of Trahan's proprietary trade secret analysis and formulas.  Slides 7 and 10 present data generated using the Trahan IP data.  While slides 7 and 10 attribute the source of the information as "Bloomberg, French And Fama," the data was actually generated from Trahan IP data and its proprietary trade secret data analysis models.  The representations on the October 12, 2018 report that the data comes from Bloomberg is a lie.  This data is not available on Bloomberg prior to 1984.

192.    On information and belief, Defendants, without authorization, accessed Trahan IP data, impermissibly retained in Defendants' files, which was last saved in April 2018.  Defendants then copied Trahan IP data to a new file, with the proprietary calculations of data through March 2018 hardcoded into that new file.  Defendants then downloaded new underlying public data from April 2018 to October 2018, applied Trahan's proprietary trade secret data analysis and formulas to the new data to update the new, copied file, and then generated the data as presented in the October 12, 2018 presentation using this copied version of the Trahan IP data.

193.    On information and belief, the version of the Trahan IP data Market Strategy used to generate information published in the October 12, 2018 presentation, was created by Defendant Kantrowitz on October 8, 2018.

194.    Additional instances of actual and threatened misappropriation of the Quant Trade Secrets and Market Strategy Trade Secrets likely will be discovered during the course of this action.

195.    The Quant Trade Secrets and Market Strategy Trade Secrets are used to generate reports, screens, models, and other things published and provided to clients, and thus relate to

products and/or services used in, or intended for use in, interstate or foreign commerce.  In particular, the Quant Trade Secrets and Market Strategy Trade Secrets are used in, and intended for use in, strategy reports, screens, and other communications with clients that are transmitted via email, teleconference, and other means across state lines, and that clients use in making investment decisions in the course of interstate commercial activities.  The Quant Trade Secrets and Market Strategy Trade Secrets, moreover, relate to investment strategy services provided to clients in connection with interstate commercial activities.

196.    The Quant Trade Secrets and Market Strategy Trade Secrets are important to Trahan's business and reputation as a leading financial analyst, and if Defendants' use of these trade secrets is not stopped, Trahan stands to suffer irreparable harm.

197.    In particular, unless Defendants are restrained and enjoined from using the Quant Trade Secrets and Market Strategy Trade Secrets, Trahan will suffer immediate and irreparable injury in that Defendants will continue to have access to and make use of the Quant Trade Secrets and Market Strategy Trade Secrets, including the actual and threatened use in generating the screens and reports that have been associated with Trahan in the financial industry, thereby damaging Trahan's goodwill and devaluing Trahan's future use of the Quant Trade Secrets and Market Strategy Trade Secrets.

198.    Trahan has no adequate remedy at law to protect against the actual, continued, and threatened misappropriation of the Quant Trade Secrets and Market Strategy Trade Secrets by Defendants.  Injunctive relief is, therefore, necessary and appropriate to restrain the continued misappropriation of such trade secrets pursuant to 18 U.S.C. § 1836(b)(3).

199.    As a direct and proximate result of each Defendants' trade secret misappropriation, Trahan has been damaged in an amount to be proven at trial, including attorneys' fees and costs, and Defendants have been unjustly enriched.

200.    As a direct and proximate result of each Defendants' trade secret misappropriation, Defendants have obtained unjust enrichment through their continued use of the Quant Trade Secrets and Market Strategy Trade Secrets.

201.    The Court should accordingly award: (i) damages to Trahan for the actual loss caused by Defendants' misappropriation of Trahan's trade secrets, in an amount to be determined at trial, together with damages for the unjust enrichment caused by Defendants' misappropriation of Trahan's trade secret that is not addressed in computing damages for actual loss in an amount to be determined at trial; or (ii) in lieu of damages measured by other methods, the damages caused by Defendants' misappropriation measured by imposition of liability for a reasonable royalty for Defendants' unauthorized disclosure or use of Trahan's trade secrets, in an amount to be determined at trial.  *See* 18 U.S.C. § 1836(b)(3)(B).

202.    Defendants willfully and maliciously misappropriated Trahan's trade secrets. Accordingly, the Court should award exemplary damages of twice the amount of the damages awarded under the prior paragraph.  *See* 18 U.S.C. § 1836(b)(3)(C).  Defendants' misconduct also constitutes willful misconduct under Section 7.3(a) of the LPA and the LLC Agreement.

203.    Trahan is also being irreparably harmed by Defendants' misappropriation of Trahan's trade secrets, including with respect to his reputation, the unquantifiable impairment to the value of his trade secrets and brand, his goodwill with clients, customers, and potential clients and customers, and spoliation of evidence in Defendants' possession, custody, and control.  The Court should therefore issue preliminary and permanent injunctions to prevent the

actual and threatened misappropriation of Trahan's trade secrets on such terms as the court

deems reasonable, including enjoining Defendants, and all those acting in concert with them,

from further accessing, using, or disclosing Trahan's trade secrets, including any work product

derived therefrom, and any raw code copied, derived, or recreated from Trahan's code.  The

Court should also require Defendants to take any and all appropriate affirmative actions

necessary to protect Trahan's trade secrets.  *See* 18 U.S.C. § 1836(b)(3)(A).

### THIRD CLAIM FOR RELIEF
**(Common Law Misappropriation of Trade Secrets—Against All Defendants)**

204.    Trahan repeats and realleges the allegations set forth above as though fully set

forth herein.

205.    Trahan's intellectual property, including the Trahan IP, Quant Trade Secrets, and

Market Strategy Trade Secrets, consists of confidential, proprietary, and trade secret information

that is not public, not readily created or discoverable by others, and which is the product of

extensive investment by Trahan, both in terms of time and money.  Trahan has undertaken

extensive efforts to maintain the confidentiality of his trade secret intellectual property (including

the Quant Trade Secrets and Market Strategy Trade Secrets), none of which is in the public

domain.

206.    Defendants, individually and with the assistance of other Cornerstone Macro

employees, have obtained, misappropriated, utilized, and disclosed Trahan's intellectual property

for their own benefit, for the purpose of competing against Trahan unfairly and for the purpose

of soliciting Trahan's actual and prospective customers, including as alleged in Paragraphs 87–

137 and the First and Second Claims for Relief above.

207.    The means used by Defendants in effectuating this misappropriation were

intentional, malicious, unlawful, unfair, and otherwise improper.

208.    Defendants' misconduct was willful, and constitutes willful misconduct under Section 7.3(a) of the LPA and the LLC Agreement.

209.    As a direct and proximate result of each Defendants' wrongful acts, Trahan has been damaged, and will incur further damages, in an amount to be proven at trial.

210.    Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

211.    The irreparable harms caused by Defendants' action, and that are likely to continue to occur, include unquantifiable damage to the value of Trahan's trade secrets, his goodwill, reputation, customer relationships, and competitive advantage.  Trahan has no adequate remedy at law for these ongoing harms.

**FOURTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty—Against All Defendants Other Than Cornerstone Macro Research LP and George Zachar)**

212.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

213.    As a matter of law, by their contractual relationships, and through their interactions, course of conduct, and longstanding personal and business relationships, Trahan and each of Defendants Nancy Lazar, Andrew Laperriere, Roberto Perli, Michael Kantrowitz, and Cornerstone Macro Holdings LLC (the "Fiduciary Duty Defendants") entered into a fiduciary relationship, in which the Defendant became, and acted as, Trahan's fiduciary.

214.    As a matter of law and by their contractual relationships, each of the Fiduciary Duty Defendants owed Trahan a fiduciary duty, either as employee to employer—for example, Kantrowitz was Trahan's employee directly as an employee of his business division and through his employment by Cornerstone Macro, of which Trahan was a Partner—as general partner (or member in a general partner) to a limited partner, or as limited partner or LLC member to a

93

fellow limited partner or LLC member.  *See, e.g.*, *Shamrock Power Sales, LLC v. Scherer*, 2015 WL 5730339, *20-22 (S.D.N.Y. Sept. 30, 2015); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521–22 (S.D.N.Y. 2011); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008); *Maillet v. Frontpoint Partners, L.L.C.*, 2003 WL 21355218, at *3 (S.D.N.Y. June 10, 2003).

215.    In addition, as a matter of fact, the nature of Trahan's relationship with the Limited Partner Defendants, Kantrowitz, and the General Partner, was one of trust and confidence, in which Trahan reposed trust and confidence in them and expected that they would act towards him as his fiduciary.

216.    In order to enable Cornerstone Macro to conduct its business, Trahan entrusted the Fiduciary Duty Defendants with substantial intellectual property created and owned by him, as well as confidential and proprietary business and investment strategy information.  The Fiduciary Duty Defendants expressly committed to hold this information in strict confidence and not to use Trahan's intellectual property without his authorization.

217.    Trahan provided Kantrowitz with this information so he could effectively perform the Market Strategies Advisory Business's tasks and duties under Trahan's direction—including performing research and analysis tasks, preparing reports for distribution to clients and at the request of clients, and interfacing with clients and potential clients—in order to maximize the Market Strategies Advisory Business's profits and build up its reputation in furtherance of Trahan's best interest.

218.    Trahan provided the Limited Partner Defendants and the General Partner with this information so they and the shared sales team could effectively market the Strategy group's services, prepare marketing materials, resolve client questions, oversee Cornerstone Macro's

finances, maximize Cornerstone Macro's profits, and fairly divide Cornerstone Macro's profits, in furtherance of Trahan's best interests.

219.    The Limited Partner Defendants and General Partner were also in a position of superior knowledge and access to information than Trahan with respect to Cornerstone Macro's finances, including with respect to the relative contributions of each of the Limited Partners' business divisions.  Trahan reasonably relied on the Limited Partner Defendants' and the General Partner's superior knowledge and information, and trusted that they would fully and honestly disclose the relative contributions of each of the Limited Partners' business groups in the course of the attribution process.

220.    As a result, each of the Fiduciary Duty Defendants owed Trahan fiduciary duties, including, *inter alia*, duties of loyalty, absolute candor, good faith, and to avoid self-dealing and conflicts of interest.

221.    Each Fiduciary Duty Defendant violated his, her, or its fiduciary duties towards Trahan by acting adversely to Trahan's interests, engaging in self-dealing, obtaining an improper advantage at Trahan's expense, and failing to fully disclose all material facts to Trahan, including interests and events that would naturally influence the Defendant's conduct in performing obligations to Trahan in a manner adverse to Trahan's best interests, including by:

  a.  Failing to disclose, and taking numerous steps to formulate, plan, initiate, perpetrate, further, execute, and complete, Defendants' scheme and conspiracy to elevate Michael Kantrowitz to co-head of Market Strategies Advisory Business, remove Trahan from that position and from the Cornerstone Macro Partnership, steal Trahan's intellectual property, block Trahan from hiring his own employees, and use his intellectual property intentionally and in bad faith to establish a competing business and falsely convince clients that Cornerstone Macro could and would continue to perform Trahan's proprietary Market Strategies Advisory Business without Trahan;

  b.  Sabotaging Trahan's valuable projects and business prospects, and—once Trahan was removed from the partnership—using the information and intellectual

property obtained from Trahan to complete its plan and conspiracy to steal Trahan's business and intellectual property;

c.   Misappropriating Trahan's intellectual property, including as alleged in Paragraph 87-137 herein, and sharing his intellectual property with third parties for Defendants' benefit;

d.   Using Trahan's resources, time, facilities, and proprietary or confidential information in order to highjack Trahan's business relationships, establish a competing business, and engage in transactions for the benefit of Defendants' competing business, including copying Trahan's client lists, client information, and other business records for their own use, charging expenses to Trahan (directly or through Cornerstone Macro) which were incurred while acting on behalf of their own interests, communicating with and soliciting Trahan's clients, and diverting Trahan's business for their own personal benefit or the benefit of others;

e.   Obtaining the benefits of their ruse, including continuing business relationships with clients and significant fees;

f.   Attempting to ruin Trahan's reputation internally at Cornerstone Macro—even with his own Market Strategies Advisory Business employees—and externally with clients; and

g.   Failing to disclose the true nature and amount of the other Limited Partner Defendants' contributions, and failing to accurately value and calculate Trahan's contributions, in the course of under-attributing the contributions of Trahan's Market Strategies Advisory Business and over-attributing business the contributions of the other Limited Partner Defendants' business divisions.

222.   This misconduct was willful, and constitutes willful misconduct and breach of fiduciary duty under Section 7.3(a) of the LPA and the LLC Agreement.

223.   Trahan has suffered damages as a direct and proximate result of the Fiduciary Duty Defendants' breaches of fiduciary and related duties, in an amount to be proved at trial.

224.   Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

## FIFTH CLAIM FOR RELIEF
### (Aiding and Abetting Breach of Fiduciary Duty—Against All Defendants)

225.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

226.    To the extent that any Defendant did not owe fiduciary duties to Trahan, or did not breach any fiduciary duties owed to Trahan, each of the Defendants had knowledge of the other Defendants' fiduciary duties to Trahan.  They obtained this knowledge through their positions, duties, responsibilities, and experience at Cornerstone Macro, and in the case of the Contract-Party Defendants, through their access to the LPA and LLC Agreement.

227.    Each Defendant knowingly and substantially assisted the other Defendants' breaches of their fiduciary duties to Trahan detailed above, and each performed wrongful acts that caused injury to Trahan in aid of those breaches of fiduciary duty, representative examples of which are pleaded herein.

228.    Each Defendant was aware of its respective role as part of the overall illegal and tortious activity towards Trahan at the time each provided assistance to the other Defendants.

229.    Defendants' misconduct was willful, and constitutes willful misconduct under Section 7.3(a) of the LPA and the LLC Agreement.

230.    As a direct and proximate result of each Defendant's aiding and abetting the other Defendants' breaches of their fiduciary duties to Trahan, Trahan has been damaged in an amount to be proven at trial.

231.    Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

**SIXTH CLAIM FOR RELIEF**
**(Faithless Servant Doctrine—Against All Defendants Other Than Cornerstone Macro**
**Research LP and George Zachar)**

232.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

233.    For the reasons alleged above, as a matter of law, by their contractual relationships, and through their interactions, course of conduct, and longstanding personal and business relationships with Trahan, each of Defendants Nancy Lazar, Andrew Laperriere, Roberto Perli, Michael Kantrowitz, and Cornerstone Macro Holdings LLC (the "Faithless Servant Defendants") entered into an agency or employment relationship with Trahan, in which Defendants became, and acted as, Trahan's agent or employee.

234.    As a result, each Faithless Servant Defendant owed Trahan duties of loyalty, absolute candor, good faith, and to avoid self-dealing and conflicts of interest.

235.    Each Faithless Servant Defendant violated his, her, or its duties towards Trahan by acting adversely to Trahan's interests, engaging in self-dealing, obtaining an improper advantage at Trahan's expense, and failing to fully disclose all material facts to Trahan, including interests and events that would naturally influence the Defendant's conduct in performing their obligations to Trahan in a manner adverse to Trahan's best interests, including as herein.

236.    Accordingly, each Faithless Servant Defendant has acted as a faithless servant towards Trahan.

237.    Each Faithless Servant Defendant received compensation, payment, distributions, or other remuneration for their services to Trahan, either directly or through Cornerstone Macro, including compensation that, by being paid to the Faithless Servant Defendant, reduced Trahan's compensation or share of Cornerstone Macro's profits.

238.    Faithless Servant Defendants must forfeit and disgorge to Trahan all compensation, payments, distributions, commissions, or other remuneration, all partnership or other property interests, and all business opportunities, received from Trahan or Cornerstone Macro, whether or not derived from transactions as to which the Defendant was disloyal, in an amount to be determined at trial.  Such forfeiture and disgorgement includes, but is not limited to, all salaries and bonuses, commissioners, reimbursements, and other compensation received by Kantrowitz while employed at Cornerstone Macro, from the day he was hired through the entry of judgment in this matter; all partnership distributions and other payments, reimbursements, and compensation received by the Limited Partner Defendants from Cornerstone Macro's founding through the entry of judgment in this matter, including all Partnership and LLC interests; and all fees, payments, reimbursements, and other compensation received by the General Partner at any point in time through the entry of judgment in this matter. *See Mahn v. Major, Lindsey, & Africa, LLC*, 159 A.D.3d 546, 547 (1st Dep't 2018) (affirming arbitrator's award of "disgorgement of [faithless servant's] past salary and commissions"); *Soam Corp. v. Trane Co.*, 202 A.D.2d 162, 163-64 (1st Dep't 1994) (affirming "New York's strict application of the forfeiture doctrine which mandates the forfeiture of all compensation, whether commissions or salary, where, as here, one who owes a duty of fidelity to a principal is faithless in the performance of his services").

239.    At a minimum, each Faithless Servant Defendant must forfeit and disgorge all compensation, payments, distributions, commissions, or other remuneration, all partnership or other property interests, and all business opportunities, received from Trahan or Cornerstone Macro subsequent to each Defendant's first disloyal act, whether or not derived from transactions as to which the Defendant was disloyal, in an amount to be determined at trial.

While the Faithless Servant Defendants have hidden their disloyal acts, and as a result only they know their initial disloyal acts, it is clear that each Faithless Servant Defendant's first disloyal act took place no later than early 2018—and for Kantrowitz, in 2014—and on information and belief (to be developed and identified further in the discovery process) was significantly earlier than that date.  For example, Trahan has recently discovered that Kantrowitz was disloyal throughout his time working as Trahan's employee.

240.    Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

**SEVENTH CLAIM FOR RELIEF**
**(Breach of Contract—Against all Defendants who were Parties to the LPA and LLC Agreement)**

241.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

242.    The LPA and LLC Agreement are valid and enforceable contracts between Trahan and each of Defendants Nancy Lazar, Andrew Laperriere, Roberto Perli, Cornerstone Macro Holdings LLC, and Cornerstone Research LP  (the "Contract-Party Defendants").

243.    Trahan has performed all of the material conditions, covenants, and promises required to be performed by him under the LPA and the LLC Agreement.

244.    Pursuant to Section 5.2(a) and Schedule A of the LPA, each partner was entitled to receive the Net Cash Flow associated with their respective divisions.  The Net Cash Flow included the division's revenue, the calculation of which was based on an attribution process conducted by members of the sales team.

245.    Section 3.7(f) of the LPA requires that Partnership grant a Leaving Partner with "all rights in, title to and ownership of" his or her IP and assign "all rights in, title to, and ownership of" such IP "within a reasonable period of time."

246.     Section 13.4 of both the LPA and the LLC Agreement prohibit the General

Partner "from making, or causing the Partnership or any Operating Entity to make, any counter

offer to" a Leaving Partner's team member, if the Leaving Partner has provided written notice of

his or intent to offer such team member employment.

247.     Section 3.7(b) of the LPA and Section 3.7(a) of the LLC Agreement state that the

Leaving Partner is "entitled to receive" certain payments intended to transfer the value of the

Leaving Partner's business back to him or her, including, "within a reasonable period after

resignation or withdrawal, the Accrued Net Cash Flow Distribution."[14]

248.     The Contract-Party Defendants repeatedly and materially breached the LPA and

the LLC Agreement, including, but not limited to:

- Breaching Sections 5.2(A) and Schedule A of the LPA, and Section 5.3 of both
  the LPA and the LLC agreement, regarding distribution of profits, by outvoting
  Trahan to institute a policy preventing any Partner from disputing the attribution
  results in June 8, 2018 and conducting an attribution process in July 2018 that
  unfairly and incorrectly attributed a small percentage of Cornerstone Macro's
  revenue to Trahan's division.

- Breaching Section 3.7(f) of the LPA regarding treatment of the leaving partner's
  intellectual property by failing to honor its obligation to return and not use
  Trahan's intellectual property and instead stealing Trahan's code, reusing
  Trahan's preexisting presentations and charts in purportedly new presentations,
  using Trahan's models to respond to client inquiries, using a plug-in created by
  Trahan's employee to create new charts, and using Trahan IP to facilitate client

---

[14]  The Accrued Net Cash Flow Distribution is defined under Article I of the LPA for Trahan's
Market Strategies Advisory Business as Trahan's "Share of Net [Market Strategies Advisory
Business] Cash Flow, if any, determined for the period ending on the effective date of his
resignation or withdrawal," plus his "Share of the Common Pool, if any, determined taking
into account the operating results of each of the Businesses for the period ending on the
effective date of his resignation or withdrawal," minus expenses incurred or reasonably
expected to be incurred by the Partnership or other operating entities resulting from Trahan's
resignation or withdrawal and/or the discontinuation of the Market Strategies Advisory
Business.  Article I of the LLC Agreement defines Accrued Net Cash Flow Distribution
similarly.

conference calls.  While Trahan was a Partner at Cornerstone Macro, the Trahan IP was utilized solely by the Market Strategies Advisory Business.

- Breaching Section 13.4 of the LPA and the LLC Agreement regarding non-solicitation of the leaving party's team by offering employment to members of Trahan's division and warning such employees not to speak with Trahan after Trahan had notified Cornerstone Macro of his intent to offer employment to those individuals.

- Breaching Section 3.7(b) of the LPA and Section 3.7(a) of the LLC Agreement by failing and refusing to make the full required Accrued Net Cash Flow Distribution within a "reasonable period" of Trahan's withdrawal.  Although Trahan received a payment, in the last week of 2018, of $630,456, which Cornerstone Macro's counsel characterized as the balance of Trahan's first and second quarter earnings, this was not the full amount due to him as the Accrued Net Cash Flow Distribution, including because it does not comprise the amounts owed Trahan for the second half of 2018.

249.    The Contract-Party Defendants' breaches of the LPA and LLC Agreement were willful, and constitute willful misconduct and material breaches of the LPA and LLC Agreement under Section 7.3(a) of those agreements.

250.    Trahan has suffered damages as a direct and proximate result of the Contract-Party Defendants' breaches of the LPA and the LLC Agreement, in an amount to be proven at trial.

251.    Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

### EIGHTH CLAIM FOR RELIEF
#### (Breach of Covenant of Good Faith and Fair Dealing—Against the Contract-Party Defendants)

252.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

253.    There is implied in the LPA and LLC Agreement a covenant of good faith and fair dealing such that the Contract-Party Defendants are forbidden from taking any action that will have effect of destroying or injuring Trahan's right to receive the fruits of those agreements.

The Contract-Party Defendants were bound by these implied covenants to perform their obligations under the LPA and LLC Agreement in good faith, and not to take any action that would have the effect of depriving or impeding Trahan of the right to receive the benefits of its bargains.

254.    To the extent that the Contract-Party Defendants' conduct did not violate express contractual provisions of the LPA and LLC Agreement, the Contract-Party Defendants failed to exercise good faith and deal fairly with Trahan in the course of fulfilling their implied obligations under those agreements or their implied extra-contractual duties.

255.    Trahan reasonably understood that the LPA and LLC Agreement included duties not to conspire with Trahan's employees to remove Trahan as a Partner and steal his intellectual property and proprietary analytical tools and methodology; to fairly and accurately calculate attributions in calculating compensation, and not to rig that process; not to disclose Trahan's confidential business information to third parties and not to use Trahan's confidential business information for Defendants' benefit and to Trahan's detriment.

256.    Absent these duties, Trahan would be deprived of the right to receive the full benefits of his bargains.

257.    The Contract-Party Defendants breached the implied covenants of good faith and fair dealing towards Trahan by, *inter alia*, taking the actions set forth herein.

258.    These breaches were willful, and constitute willful misconduct under Section 7.3(a) of the LPA and the LLC Agreement.

259.    Trahan has suffered damages as a direct and proximate result of the Contract-Party Defendants' breaches of their covenants of good faith and fair dealing in an amount to be determined at trial.

260.     Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

### NINTH CLAIM FOR RELIEF
### (Tortious Interference with Contract—Against Kantrowitz and Zachar)

261.     Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

262.     At all relevant times, Trahan and the Contract-Party Defendants were parties to valid contracts, namely the LPA and LLC Agreement.

263.     Defendants Michael Kantrowitz and George Zachar had knowledge of Trahan's contracts with the Contract-Party Defendants.

264.     The Contract-Party Defendants breached their contracts with Trahan.

265.     Defendants Kantrowitz and Zachar intentionally, maliciously, foreseeably, directly, and proximately, without justification, and through improper means, induced and facilitated the Contract-Party Defendants' breaches of their contract with Trahan by, *inter alia*, actively participating in the orchestration, planning, perpetration, and execution of the scheme to defraud and steal from Trahan detailed herein, which involved in part the Contract-Party Defendants' breaching of those contracts.

266.     Representative examples of the wrongful acts engaged in by Defendants Kantrowitz and Zachar that constituted tortious interference are set forth herein.

267.     This misconduct was willful, and constitutes willful misconduct under Section 7.3(a) of the LPA and the LLC Agreement.

268.     Trahan has suffered damages in an amount to be determined at trial as a direct and proximate result of Defendants Kantrowitz's and Zachar's tortious interference with Trahan's contracts.

269.    Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

## TENTH CLAIM FOR RELIEF
### (Fraud—Against All Defendants)

270.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

271.    Each Defendant intentionally and misleadingly failed to disclose material information to Trahan, including Defendants' scheme to defraud Trahan and steal his business and intellectual property.  Defendants had a duty to disclose this material information to Trahan as a result of their superior knowledge about the information they were providing Trahan; because they made numerous partial representations that triggered a duty to disclose additional information to make them non-misleading; and, for the Fiduciary Duty Defendants, as a result of their fiduciary duties to Trahan.

272.    With respect to the Contract-Party Defendants, each Defendant owed duties to Trahan separate from, and in addition to, its duty to perform under the contract, including as a result of their fiduciary duties to Trahan.

273.    Many of the Defendants also made knowingly false, material misstatements to Trahan in the course of carrying out their scheme, as detailed herein, including assuring him that they would not use his intellectual property after the date of his separation from Cornerstone Macro (despite knowing at the time they made this representation that they planned to continue to use his intellectual property after his departure).

274.    Defendants made these false statements and material omissions with knowledge of their falsity and materiality and with the intent to defraud Trahan and induce reliance.

275.    Trahan reasonably and justifiably relied on Defendants' material misrepresentations and omissions.

276.    Defendants' misconduct was willful, and constitutes willful misconduct and fraud under Section 7.3(a) of the LPA and the LLC Agreement.

277.    As a direct and proximate result of each Defendants' fraud, Trahan has been damaged in an amount to be proven at trial.

278.    Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

## ELEVENTH CLAIM FOR RELIEF
### (Negligent Misrepresentation—Against All Defendants Other Than Cornerstone Macro Research LP and George Zachar)

279.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

280.    Trahan and each of Defendants Nancy Lazar, Andrew Laperriere, Roberto Perli, Michael Kantrowitz, and Cornerstone Macro Holdings LLC (the "Negligent Misrepresentation Defendants") had a special or privity-like relationship that imposed a duty on the Negligent Misrepresentation Defendants to disclose and impart full, correct, and accurate information to Trahan.  In particular, the Negligent Misrepresentation Defendants' relationship with Trahan was characterized by an expectation of trust and confidence, including because Michael Kantrowitz served as Trahan's long-time employee, and because Trahan was a partner with Nancy Lazar, Andrew Laperriere, and Roberto Perli (as Limited Partners), and Cornerstone Macro Holdings LLC (as General Partner), which employment and partnership Trahan entered into with the understanding and expectation that his employee and partners would deal honestly and truthfully with him.  Trahan was also in privity of contract with each Negligent Misrepresentation Defendant, where the agreements at issue were not arm's length in nature.

281.     As a result, the Negligent Misrepresentation Defendants had a duty to disclose and impart full, correct, and accurate information to Trahan and not to negligently misrepresent or omit material information or otherwise fail to disclose their misconduct to Trahan.  In addition, the Negligent Misrepresentation Defendants had a duty to disclose to Trahan for the reasons set out above.  For all of these reasons, each the Negligent Misrepresentation Defendant owed duties to Trahan separate from, and in addition to, its duty to perform under the contract.

282.     Despite this relationship of trust, the Negligent Misrepresentation Defendants intentionally, recklessly, carelessly, or negligently failed to disclose material information to Trahan, including Defendants' scheme to defraud Trahan and steal his business and intellectual property.  The Negligent Misrepresentation Defendants had a duty to disclose this material information to Trahan as a result of their privity-like relationship to Trahan; as a result of Defendants' superior knowledge about the information they were providing Trahan; because they made numerous partial representations that triggered a duty to disclose additional information to make them non-misleading; and due to their fiduciary duties to Trahan.

283.     Despite this relationship of trust, the Negligent Misrepresentation Defendants also intentionally, recklessly, carelessly, or negligently made multiple false, material misstatements to Trahan in the course of carrying out their scheme, as alleged herein, including assuring him that they would not use his intellectual property after the date of his separation from Cornerstone Macro (despite knowing at the time they made this representation that they planned to continue to use his intellectual property after his departure).

284.     Trahan reasonably and justifiably relied on Defendants' material misrepresentations and omissions.

285.   Defendants' misconduct was willful, and constitutes willful misconduct and gross negligence under Section 7.3(a) of the LPA and the LLC Agreement.

286.   As a direct and proximate result of each Defendants' negligent misrepresentation, Trahan has been damaged in an amount to be proven at trial.

287.   Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

## TWELFTH CLAIM FOR RELIEF
### (Unjust Enrichment—Against All Defendants)

288.   Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

289.   To the extent the express terms of the LPA and LLC Agreement do not cover the subject matter of the instant claim, and/or to the extent some Defendants are not parties to the LPA and LLC Agreement, Trahan alleges that as a result of Defendants' misconduct, each Defendant has been enriched at Trahan's expense.

290.   In particular, Defendants have been (and continue to be) unjustly enriched through exploitation of Trahan's intellectual property, including in obtaining fees and reaping the benefits of customer goodwill in exchange for reports, analysis, responses to inquiries, and conference calls that illegally, improperly, and without authorization copy from, use, are based on, or rely on Trahan's intellectual property.

291.   The circumstances are such that it would be against equity and good conscience to permit Defendants to retain their ill-gotten gains from Trahan.

292.   Defendants have failed to make restitution to Trahan for their ill-gotten gains, despite an obligation to do so.

293.     Defendants' misconduct was willful, and constitutes willful misconduct under Section 7.3(a) of the LPA and the LLC Agreement.

294.     Trahan's unjust enrichment claim arises out of extra-contractual duties (*i.e.*, agreements or understandings of the parties that were not expressly covered by the parties' formal contracts).

295.     Restitution should therefore be made by Defendants to Trahan in an amount to be proven at trial.

296.     Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

### THIRTEENTH CLAIM FOR RELIEF
### (Conversion—Against All Defendants)

297.     Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

298.     As set forth above, Trahan spent his entire career developing the Trahan IP, of which he is the legal owner.  The Trahan IP consists of electronic documents and files containing his original property.

299.     Trahan brought his intellectual property to Cornerstone Macro and continued to develop and use the Trahan IP while he was a Partner at the firm.

300.     After Trahan's departure from Cornerstone Macro, Trahan demanded the return of the Trahan IP.  Defendants did not return all of the Trahan IP and continue to use the Trahan IP in their business endeavors.  Defendants thereby wrongfully withheld, and wrongfully barred Trahan's access to, his documents and files.

301.     Trahan never authorized Defendants to continue to use the Trahan IP after his departure and exercise rights properly held by an owner over property belonging to him.

302.     Defendants knowingly took the Trahan IP and proceeded to use it for their own benefit.  By refusing to return all of the Trahan IP, Defendants excluded Trahan from his rights in the property.

303.     Trahan has been damaged by Defendants' conversion in an amount to be determined at trial.

304.     Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

### FOURTEENTH CLAIM FOR RELIEF
### (Declaratory Judgment Regarding Indemnification—Against the Contract-Party Defendants)

305.     Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

306.     Under Section 7.4 of the LPA, "the Partnership [*i.e.*, Cornerstone Macro Research LP] shall indemnify and hold harmless each of the Covered Persons," including Trahan, "from and against any and all liabilities, obligations, losses, damages, . . . costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever . . . which may be imposed on, incurred by or asserted at any time against such Covered Person in any way related to or arising out of th[e Limited Partnership] Agreement, the Partnership or the management or administration of the Partnership or in connection with the business or affairs of the Partnership or the activities of such Covered Person on behalf of the Partnership," provided that, as relevant here, a Covered Person is not entitled to indemnification for claims and expenses that are "incurred by such Covered Person as plaintiff in any action, suit or proceeding brought by such Covered Person against the Partnership or any Partner."

307.     Under Section 7.4 of the LLC Agreement, "the Company [*i.e.*, Cornerstone Macro Holdings LLC] shall indemnify and hold harmless each of the Covered Persons," including Trahan, "from and against any and all liabilities, obligations, losses, damages, . . . costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever . . . which may be imposed on, incurred by or asserted at any time against such Covered Person in any way related to or arising out of th[e LLC] Agreement, the Company or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of such Covered Person on behalf of the Company," provided that, as relevant here, a Covered Person is not entitled to indemnification for claims and expenses that are "incurred by such Covered Person as plaintiff in any action, suit or proceeding brought by such Covered Person against the Company or any Member."

308.     On October 9, Trahan's counsel notified the Partnership and Cornerstone Macro Holdings LLC, through their counsel, that they are obligated to indemnify Trahan under Section 7.4 of both the LPA and the LLC Agreement for his fees and expenses arising out of the parties' dispute, including attorneys' fees, except insofar as those fees and expenses are incurred by Trahan as plaintiff in an action, suit, or proceeding brought by Trahan against the Partnership, Cornerstone Macro Holdings LLC, or any Member or Partner under those agreements.

309.     On October 16, Defendants' counsel responded that the Partnership and Cornerstone Macro Holdings LLC "den[y] any obligation to indemnify Francois Trahan for his legal fees and expenses."

310.     Accordingly, a justiciable controversy exists among the parties with regard to whether the Cornerstone Macro Research LP and Cornerstone Macro Holdings LLC are

obligated to indemnify Trahan for the costs and expenses incurred in connection with this dispute (other than those incurred by Trahan "as a plaintiff" in this action).

311.    Trahan seeks a declaration that the Partnership is responsible for Trahan's expenses relating to this dispute, except those incurred by him "as plaintiff" in this action, in an amount no less than $77,474.19.

312.    Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

### FIFTEENTH CLAIM FOR RELIEF
**(Declaratory Judgment Regarding Capital Account Balance Payments—Against the Contract-Party Defendants)**

313.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

314.    Pursuant to Section 3.7(b) of the LPA, and 3.7(a) of the LLC Agreement, the Leaving Partner is "entitled to receive" certain payments intended to transfer the value of the Leaving Partner's business back to him or her, including "an amount equal to the aggregate Capital Account balance(s) of the Withdrawing FP . . . on the effective date of resignation/withdrawal" (after debiting any Accrued Net Cash Flow Distribution already paid), which balance must be determined by the General Partner "in accordance with this Agreement." The Capital Account balance payment "shall become payable on the thirtieth (30th) day following the date on which the Partnership's financial statements for the Fiscal Year during which the resignation/withdrawal occurred first become available."

315.    Section 5.3 of the LPA instructs that the "capital account balance" for each Partner "shall be determined on the basis of an account maintained for that Partner as part of the books of account of the Partnership," which "Partner's Capital Account shall be equal to the aggregate amount of cash *or other property* contributed or deemed contributed to the Partnership

by that Partner," and "shall be increased by that Partner's share of Profits of the Partnership, and shall be decreased by the aggregate amount of cash or other property distributed to that Partner and that Partner's share of Losses of the Partnership . . .." (emphasis added).

316.    Section 5.3(b) of the LPA makes clear that "upon the redemption of the Interest of a Limited Partner . . . the then prevailing Asset Values of the Partnership will be adjusted to equal their respective gross Fair Value and *any increase in the net equity value of the Partnership (Asset Values less Liabilities) will be credited to the Capital Accounts of the Limited Partners* . . . (or any decrease in net equity value of the Company will be charged in the same manner as Losses . . .).  Accordingly, as of any time Asset Values are adjusted pursuant to this Section 5.3(b), the Capital Accounts of Partners will reflect both realized and unrealized gains and losses through such date *and the net equity value of the Partnership as of such date*." (emphasis added).  Under Article I of the LPA, moreover, "Fair Value" as applied to "any assets other than cash or cash equivalents, will be the fair market value of such assets, as determined by the General Partner, which will take into account any factors that it deems relevant."[15]

317.    Accordingly, in calculating the Capital Account balance payment "in accordance with this Agreement," Cornerstone Macro was required to include—and pay Trahan—the fair market value of Trahan's Market Strategies Advisory Business, which third-party valuations have valued at many tens of millions of dollars.

318.    Trahan has demanded that, at the time Cornerstone Macro calculates and makes the Capital Account balance payment, it include the gross Fair Value of Trahan's Market Strategies Advisory Business.  Cornerstone Macro, acting at the direction of the Limited Partner

---

[15]   Section 5.3 and Article I of the LLC Agreement define "Capital Account," "capital account balance," and "Fair Value" in a substantively identical manner with respect to the books of accounts of the General Partner.

Defendants, has refused to include the gross Fair Value of Trahan's Market Strategies Advisory Business in the calculation of the Capital Account balance.

319.    Accordingly, a justiciable controversy exists among the parties with regard to the amount of Cornerstone Macro's payment to Trahan of the Capital Account balance.

320.    Trahan seeks a declaration that the Partnership must include the gross Fair Value of Trahan's Market Strategies Advisory Business in the calculation of the Capital Account balance, which must be calculated accurately and in good faith according to the LPA's and LLC Agreement's terms, and paid to Trahan "on the thirtieth (30th) day following the date on which the Partnership's financial statements for the Fiscal Year during which the resignation/withdrawal occurred first become available."

321.    Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

**SIXTEENTH CLAIM FOR RELIEF**
**(Violation of New York Labor Laws Regarding Accrued Net Cash Flow Distribution—**
**Against the Contract-Party Defendants)**

322.    Trahan repeats and realleges the allegations set forth above as though fully set forth herein.

323.    Trahan was an "employee" of Cornerstone Macro, as that term is defined in New York Labor Law § 190(2).

324.    Cornerstone Macro was an "employer," as that term is defined in New York Labor Law § 190(3).

325.    The Accrued Net Cash Flow Distribution, alleged above, constitutes "wages" as that term is defined in New York Labor Law § 190(1).

326.     Defendants' willful failure to pay, and withholding of, wages due to Trahan within a reasonable period after the conclusion of his employment constitutes an unauthorized deduction from wages and failure to pay wages in violation of New York Labor Law § 193.

327.     Defendants' actions constitute willful misconduct under Section 7.3(a) of the LPA and the LLC Agreement.

328.     As a result thereof and pursuant to Section 198 of the New York Labor Law, Trahan is entitled to recover from Defendants double the amount of unpaid and due and owing wages as well as his reasonable attorneys' fees and costs.

329.     Trahan is also being irreparably harmed by Defendants' wrongful acts, and is therefore entitled to preliminary and permanent injunctive relief, as set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Trahan prays for judgment against Defendants on all claims, and requests a judgment providing the following relief:

A.     General and compensatory damages in an amount to be determined at trial;

B.     Forfeiture, disgorgement, and restitution in an amount to be determined at trial;

C.     Damages for the actual loss caused by Defendants' misappropriation of Trahan's trade secrets, together with damages for the unjust enrichment caused by Defendants' misappropriation of Trahan's trade secret that is not addressed in computing damages for actual loss, in an amount to be determined at trial; or in lieu of damages measured by other methods, the damages caused by Defendants' misappropriation measured by imposition of liability for a reasonable royalty for Defendants' unauthorized disclosure or use of Trahan's trade secrets, in an amount to be determined at trial.

D.  Exemplary damages for Defendants' willful and malicious misappropriation of Trahan's trade secrets;

E.  Payment of the Capital Account Balance and the outstanding Accrued Net Cash Flow Distribution in an amount to be determined at trial;

F.  Payment of the value of Trahan's Market Strategies Advisory Business in an amount to be determined at trial;

G.  Payment of double the amount of unpaid and due and owing wages in an amount to be determined at trial;

H.  Punitive damages against Defendants under each of the asserted causes of action for their intentional bad acts resulting in public harm;

I.  Declarations that Defendants have committed each of the torts alleged here, breached the LPA and the LLC Agreement in the manners alleged herein, and must make the payments sought herein at the time and in the manner alleged;

J.  Necessary and appropriate equitable and injunctive relief, including on order preliminarily and permanently enjoining Defendants, and all those acting in concert with them, from further accessing or using the Trahan IP, including any work product or computer code copied, derived, or recreated from Trahan's code.

K.  Trahan's costs and expenses, including reasonable attorneys' fees, incurred in this action;

L.  Prejudgment interest; and

M.  Such other and further relief as the Court may deem just and proper.

Dated:                                    New York, New York
February 6, 2019
                                          GIBSON, DUNN & CRUTCHER LLP


                                          By: /s/ Reed Brodsky_____
                                               Reed Brodsky
                                                  RBrodsky@gibsondunn.com
                                               Scott R. Roe
                                                  SRoe@gibsondunn.com
                                               Akiva Shapiro
                                                  AShapiro@gibsondunn.com
                                               Ashley Fernandez
                                                  AFernandez@gibsondunn.com
                                               200 Park Avenue
                                               New York, NY 10166-0193
                                               Telephone: 212.351.4000
                                               Facsimile: 212.351.6235

                                          *Attorneys for Plaintiff Francois Trahan*