```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  4/30/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FRANCOIS TRAHAN,                                :
                                                :
                                  Plaintiff,    :
                                                :               1:19-cv-01131-GHW
           -against-                            :
                                                :               MEMORANDUM OPINION
NANCY LAZAR, ANDREW LAPERRIERE,                 :                   AND ORDER
ROBERTO PERLI, MICHAEL KANTROWITZ,              :
GEORGE ZACHAR, CORNERSTONE MACRO                :
HOLDINGS LLC, and CORNERSTONE                   :
MACRO RESEARCH LP, f/k/a Cornerstone            :
Macro LP,                                       :
                                                :
                                  Defendants.   :
-------------------------------------------------------------X

GREGORY H. WOODS, District Judge:

        Plaintiff Francois Trahan ("Trahan" or "Plaintiff") is an extraordinarily successful portfolio

strategist.  In 2016, he joined forces with three partners—Nancy Lazar, Andrew Laperriere and

Robert Perli—to create a new firm, Cornerstone Macro.  In 2018, Defendants allegedly engaged in a

sweeping scheme to oust Plaintiff and steal his valuable intellectual property, which included both

intellectual property Trahan brought with him to Cornerstone Macro and intellectual property he

developed while he was at Cornerstone Macro.  Plaintiff now asserts sixteen claims against

Defendants covering a wide swath of subject matter.  His claims range from breaches of

Cornerstone Macro's formative contracts to misappropriation of trade secrets under federal and

state law, from breaches of fiduciary duties to fraud, and a host of other miscellaneous claims.

        Defendants have moved to dismiss all but the breach of contract claim.  Plaintiff's claim for

misappropriation of trade secrets under the Defend Trade Secrets Act survives in part, but fails with

respect to the intellectual property developed while at Cornerstone Macro because the intellectual

property at issue was properly within the possession of Cornerstone Macro.  Plaintiff adequately

states a claim for breach of fiduciary duties against Lazar, Laperriere, and Perli as a result of fiduciary duties arising out of their partnership relationship, but fails to state a fiduciary duty claim against Michael Kantrowitz, a Cornerstone Macro employee and Trahan's successor.   For these reasons and those that follow, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. Facts[1]

Plaintiff is a renowned financial portfolio strategist and quantitative analyst with "unparalleled" credentials.  AC ¶ 18.  *Institutional Investor* named him the number one portfolio strategist at least ten times and he is the only portfolio strategist to have been inducted into the "All-America Research Team Hall of Fame."  *Id.* ¶ 22.  "Trahan has developed a unique and recognizable approach to both portfolio market strategy and quantitative analysis," analyzing the stages of the business cycle and how that translates to the stock market.  *Id.* ¶ 21.  Over the course of 12 years, Trahan, "has developed models that rank stocks and provide recommendations on which to buy, and when, while incorporating the business cycle."  *Id.*  This unconventional approach has been "extraordinarily successful"—these models are "worth many millions of dollars" because of their "ability to translate complex macroeconomic concepts into distillable and unique charts and graphs that are quickly digestible."  *Id.* ¶¶ 21, 23.

In February 2007, Defendant Nancy Lazar ("Lazar") asked Trahan to join her at International Strategy & Investment Group ("ISI"), where she was a partner.  *Id.* ¶ 19.  Trahan joined ISI, heading the firm's investment committee as the company's Executive Director and Chief Investment Strategist.  *Id.*  While at ISI, Trahan hired Defendant Michael

---

[1] The facts are drawn from the Amended Complaint ("AC"), Dkt. No. 80 and are accepted as true for the purposes of this motion to dismiss.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Kantrowitz ("Kantrowitz") as the most junior member of his team and taught him "his trade secrets and proprietary methods, which Kantrowitz understood to be highly confidential." *Id.* ¶ 42. Trahan left ISI after about three years to join another firm—to be renamed Wolfe Trahan & Co. ("Wolfe")—where he continued to utilize and develop his intellectual property. *Id.* ¶ 20. Shortly thereafter, Kantrowitz left ISI to join Trahan at Wolfe. *Id.* ¶ 42. "It was understood and agreed that Trahan would retain ownership of trade secrets and other intellectual property he and his team developed" while at both ISI and Wolfe. *Id.* ¶¶ 19–20.

### 1. Formation Of Cornerstone Macro

In January 2013, Trahan met with Lazar, Defendant Andrew Laperriere ("Laperriere"), and Defendant Roberto Perli ("Perli") (the "Limited Partner Defendants" and, collectively with Kantrowitz, the "Individual Defendants") to discuss the formation of a new firm. *Id.* ¶ 24. Trahan, Lazar, Laperriere, and Perli (the "Partners") agreed to form a partnership and created Defendant Cornerstone Macro Research LP ("Cornerstone Macro LP" or the "Partnership") by executing two governing agreements, the LLC Agreement and the Limited Partnership Agreement (the "LPA" and, collectively with the LLC Agreement, the "Agreements"). *Id.* ¶ 26. The LLC Agreement, entered into between Trahan and the Limited Partner Defendants, created Defendant Cornerstone Macro Holdings, LLC ("Cornerstone Macro Holdings" and, together with the Partnership, "Cornerstone Macro"). LLC Agreement, Dkt. No. 88-2. The LPA, entered into between the Partners and Cornerstone Macro Holdings, created the Partnership. LPA, Dkt. No. 88-1. The Partnership had one General Partner, Defendant Cornerstone Macro Holdings, and four Limited Partners—Trahan, Lazar, Perli, and Laperriere. AC ¶ 26. Trahan and Lazar each owned 33.33 percent of the Partnership, while Perli and Laperriere each owned 16.67 percent of the Partnership. *Id.* The Partners eventually amended the LPA to create a Managing Partner position, appointing Trahan as

Cornerstone Macro's first Managing Partner. *Id.* ¶ 31. And as Managing Partner, Trahan spent approximately half of his time managing Cornerstone Macro's day-to-day operations and the responsibilities of its CFO, which he assumed after Cornerstone Macro's previous CFO passed away. *Id.* ¶ 39.

The Partnership was organized into three distinct divisions which were run separately by at least one of the Partners. *Id.* ¶¶ 27–28. Trahan ran the Market Strategies Advisory Business ("MSAB"), Lazar ran the Economic Advisory Business, while Perli and Laperriere jointly ran the Policy Advisory Business. *Id.* ¶ 27. Under this organizational structure, "[e]ach Partner had complete control over his or her own division, including hiring and firing employees, setting compensation, and determining the extent of their own expenditures." *Id.* ¶ 28. Further, Partnership profits were distributed to each Partner in relation to the net cash flow associated with their respective divisions. *Id.* ¶ 29. Cornerstone Macro employees would, independent of the Partners, calculate the percentage of revenue attributable to each division, which would determine the respective Partner's compensation. *Id.* ¶ 30. Should a Partner disagree with the attribution, he or she could question the results. *Id.*

In drafting the LPA, the Partners sought to ensure that any Partner could take his or her business with them should they leave the Partnership. *Id.* ¶ 32. Thus, the LPA provided that "the Leaving Partner was entitled to have assigned him or her upon his or her departure any intellectual property belonging to the Partnership and used solely by his or her division." *Id.* Section 3.7(f)(i) of the LPA specifically provides that:

> The Partnership shall grant to a Leaver all rights in, title to, and ownership of all Intellectual Property owned by the Partnership which is utilized solely by the Business managed by such Leaver and the Partnership shall take all reasonable steps necessary to assign to such Leaver all rights in, title to, and ownership of any such Intellectual Property within a reasonable period of time following the Leaver's withdrawal from the Partnership.

LPA § 3.7(f)(i). "Intellectual Property" is defined as:

> patents, patent applications, inventions and discoveries (whether or not patentable), registered and unregistered copyrights in both published works and unpublished works, copyrightable works, copyright registrations, moral rights, computer software and systems, source code, object, executable or binary code, objects, screens, user interfaces, report formats, files, data, manuals, design notes, user documentation, know-how, trade secrets, confidential or proprietary information, client lists, databases, database rights, business and marketing plans and analyses, utility models, technical information, operating procedures, process technology, formulas, rights in internet web sites and internet domain names and other commercial intellectual property rights whether registered or capable of registration and all applications for registration or protection of any of the foregoing.

*Id.* at 11.  The intellectual property at issue here broadly falls into two categories:  the IP Trahan created and owned prior to the founding of Cornerstone Macro (the "Pre-Cornerstone IP") and the IP that was created at Cornerstone Macro (the "Cornerstone IP"). "Almost all" of the intellectual property at issue is Pre-Cornerstone IP.  AC ¶ 186.  Trahan never transferred or assigned the Pre-Cornerstone IP to Cornerstone Macro, but he did allow it to be used by MSAB while he was at Cornerstone Macro.  *Id.* ¶ 37.  The Cornerstone IP is intellectual property that Trahan or his employees developed for use by MSAB and that was allegedly required to be assigned to Trahan upon his departure.  *Id.*

### 2. The Conspiracy

#### a. Pushing Trahan Out

Kantrowitz followed Trahan from Wolfe to Cornerstone Macro.  *Id.* ¶ 42.  In February 2018, Trahan discovered that Kantrowitz had been publishing, in Kantrowitz's name, reports generated using Trahan's trade secrets.  *Id.* ¶ 47.  Specifically, some of these reports incorporated the MSAB's proprietary Macro Accommodation Barometer model, which Trahan had directed Kantrowitz not to use or disseminate without his prior approval. *Id.* ¶ 48.  Trahan confronted Kantrowitz about the misconduct, but subsequently allowed Kantrowitz to publish his thoughts under certain conditions—Kantrowitz could not use any materials published in the MSAB reports, could only publish original material, could only

publish once every two weeks, and he had to provide drafts to Trahan for review prior to their distribution. *Id.* ¶ 49. But Kantrowitz continued to send out reports in contravention of Trahan's conditions. *Id.* ¶¶ 49–50.

On March 6, 2018, Trahan met with Lazar and her husband George Zachar to discuss the fact that Trahan no longer wanted to remain in the Partnership with her. *Id.* ¶ 56. Trahan's desire to split with Lazar stemmed from disagreements over Cornerstone Macro's operations, including sales team compensation, *id.* ¶ 51, and the attribution process. *Id.* ¶¶ 52–55. Trahan proposed, in accordance with the LPA, that he, as the exiting partner, receive $27.5 million in exchange for control over the Partnership. *Id.* ¶ 56. Lazar rejected Trahan's buyout proposal, and instead, along with the other defendants, allegedly "launched a secret plan" to "deceive Trahan into granting them rights to his business, employees, and intellectual property . . . for a fraction of their value, and, if that failed, to take them by outright theft." *Id.* ¶ 57.

The alleged scheme commenced when Kantrowitz began pushing Trahan to elevate him to a more senior role. *Id.* ¶ 60. Trahan and Kantrowitz agreed to meet on April 30, 2018 to discuss the future. *Id.* ¶ 61. At the last minute, Kantrowitz invited Cornerstone Macro's interim CEO to join the meeting, where Kantrowitz "argued that he should lead the [MSAB] and that it was time for Trahan to step down," and "demanded that Trahan guarantee in writing a certain compensation within a week." *Id.* Trahan met with the interim CEO privately after the meeting to discuss rumors that Kantrowitz was considering a job offer at another firm. *Id.* ¶ 62.

On May 2, 2018, Kantrowitz "drastically changed demands" and "assured Trahan that he would be placated if he were simply made co-head of the MSAB." *Id.* ¶ 63. Perli and the interim CEO subsequently pressured Trahan to promote Kantrowitz. *Id.* ¶ 64.

Specifically, on May 3, 2018, "Perli warned Trahan that Trahan had to make Kantrowitz the Co-Head of the [MSAB] because [Lazar] and [Laperriere] needed Kantrowitz to be promoted." *Id.* On May 8, 2018, Trahan agreed to promote Kantrowitz to Co-Head of the MSAB, prompting the Limited Partner Defendants and Kantrowitz to begin "freezing Trahan out from some firm operations and client relationships and development," which included using "an email distribution list that omitted Trahan, cutting him out of important discussions relating to Trahan's business." *Id.* ¶¶ 64–65.

In his new position, Kantrowitz "continued his erratic and improper behavior," *id.* ¶ 66, causing Trahan to consider firing him. *Id.* ¶ 68. This allegedly induced the Limited Partner Defendants to "accelerate[] their plan to steal Trahan's business before Trahan had any chance to actually fire Kantrowitz." *Id.* Indeed, Cornerstone Macro's Chief Compliance Officer ("CCO") "told Trahan that Trahan could not fire Kantrowitz without the permission of the Limited Partner Defendants because Kantrowitz was an officer of the firm." *Id.*

On June 18, 2018, Defendants removed Trahan from the partnership, serving him with the withdrawal notice needed to remove him pursuant to the LPA and LLC agreements. *Id.* ¶ 69. Cornerstone Macro's interim CEO and CCO subsequently met with Trahan and explained "that this was a 'no cause' removal, meaning that [Cornerstone Macro] had no good cause to remove Trahan from the [P]artnership, and Trahan was being removed pursuant to the provision that allowed the Partners to vote him out of the Partnership." *Id.* In response, Trahan offered two exit options, stating, "[I could] leave with my IP and my team and start my own firm or join another sell-side operation, so essentially compete, or on the other hand I can leave my team and my IP at [Cornerstone Macro], for the firm to continue the business, which I would consider under the right circumstances."

*Id.* ¶ 70.  The latter required re-opening Trahan's March 6, 2018 proposed buyout.  *Id.*

Trahan explained that he owned the intellectual property and trade secrets he brought from

Wolfe to Cornerstone Macro, which allegedly were "substantially all of his trade secret

models."  *Id.* ¶ 70.  He also stated that he had a right to take any intellectual property owned

by the Partnership and used solely by the MSAB—which allegedly was "substantially all of

the relevant IP"—and that he was permitted to take his entire business, along with any

MSAB employees, with him pursuant to the LPA.  *Id.* ¶¶ 70–71.

Rather than a buyout, the Limited Partner Defendants offered Trahan "$7 million as

part of the withdrawal, so long as he did not compete over an 18-month period and then

$5.5 million so long as he did not compete over a 9-month period.  Defendants also wanted

the right to jointly and indivisibly own Trahan's intellectual property free of royalty and any

duty to account."  *Id.* ¶ 72.  Allegedly, "if Trahan refused, [d]efendants were prepared to steal

Trahan's intellectual property and cover up the theft."  *Id.*

### b. The Conspiracy To Steal Trahan's Business

Prior to giving Trahan his withdrawal notice, Defendants had allegedly "carefully

placed events in motion well before that date to ensure that they would retain Trahan's

clients and business."  *Id.* ¶ 73.  For example, in March and April 2018, Stephen Gregory, an

MSAB employee, worked closely with Trahan on a MSAB business cycle model; rather than

work to finish the project, however, Gregory actively stalled to prevent its completion in

order to "ensure that Trahan would not be able to access the data after his departure," and

to "segregate this project from the Trahan IP—all the while planning to finish the project

and use it to attract clients after Trahan's departure."  *Id.* ¶ 74.  The Limited Partner

Defendants also allegedly sought to "ensure that Trahan would leave with significantly less

money than that to which he was contractually entitled."  *Id.* ¶ 75.  Additionally, the Limited

Partner Defendants allegedly attempted to preemptively convince key MSAB employees to stay at Cornerstone Macro following Trahan's departure "through bribes, intimidation, and threats." *Id.* ¶¶ 78–80.

While the Limited Partner Defendants did not change Kantrowitz's title to head of the MSAB, he "was told he would head the business and acted as the head in everything but name." *Id.* ¶ 81.  On December 6, 2018, at a Cornerstone Macro holiday party, Kantrowitz "gave a speech as the head of the [MSAB]" where he stated "that he had 'battled' with Trahan during the year and emerged 'victorious' which" allegedly meant that Defendants "had successfully stolen Trahan's business." *Id.*

### 3. Misappropriation Of Trahan's Intellectual Property

On August 3, 2018, after being informed of his removal, Trahan demanded that Cornerstone Macro return his intellectual property.  *Id.* ¶ 87.  Cornerstone Macro responded through its counsel and acknowledged that Trahan had a contractual right to the return of certain intellectual property, including intellectual property owned by the Partnership and utilized solely by the business managed by the departing Partner.  *Id.*  However, Cornerstone Macro's counsel also asserted that some other materials sought by Trahan were "outside the definition of Intellectual Property and/or were not capable of ownership by Cornerstone LP," and failed to address any intellectual property that Trahan had created prior to Cornerstone Macro.  *Id.*  While "certain Cornerstone Macro representatives have instructed the firm's employees to not use Trahan's preexisting models and files," this preexisting content allegedly "has continued to be openly and flagrantly copied and used by the [MSAB] since his departure." *Id.* ¶ 88.

Because Defendants "lacked the ability to generate any new and original material required to continue the [MSAB] on their own," Kantrowitz and others allegedly "took

numerous steps to copy as much of the Trahan IP as possible." *Id.* ¶ 89. On October 10, 2018, Defendants notified Trahan through their counsel that they had turned over all of his intellectual property to him; however, certain essential code files which are required to use the intellectual property were not turned over. *Id.* ¶ 90. Trahan expressly demanded in two separate letters that Cornerstone Macro formally assign, pursuant to the LPA, all rights to the intellectual property to him. *Id.* ¶¶ 90–93.

Defendants allegedly maintained copies of Trahan's intellectual property on Cornerstone Macro servers, on local drives of certain Cornerstone Macro employees, on Cornerstone Macro's data provider, and on Defendant's "own personal servers in their private residences." *Id.* ¶ 94. They "directed employees to open the Trahan IP electronic files, read and use the Trahan IP in those files, and then close the files without saving them" to "avoid leaving an electronic trail of evidence reflecting their use of the Trahan IP." *Id.* ¶ 100. Defendants also "directed others not to alter or save the files of the Trahan IP in a way that would evidence the continued access to the documents and information." *Id.* Moreover, Defendants "copied and pasted" information from electronic pages of Trahan intellectual property, and printed out or took photographs of the code to aid them in re-creating the intellectual property without leaving a digital footprint. *Id.* ¶¶ 101–03.

Defendants used this copied intellectual property to provide clients information and reports. *Id.* ¶¶ 104–05. Further, Defendants have been "recycling" Trahan's prior reports "which constitute intellectual property under the LPA (though not trade secrets)" "in an attempt to create the perception of issuing a 'new' report" to clients. *Id.* ¶¶ 106–30. This copying "has occurred in virtually every report Cornerstone Macro has published since Trahan's departure." *Id.* ¶ 106. And in addition to the use of old reports, Defendants have allegedly continued to use Trahan's intellectual property and trade secrets by using Trahan's

models (the "Models") to "provide accurate and fast answers to their clients' financial questions" and to use Trahan's "tool[s] that allow[] for quick creation of standardized charts to demonstrate complex concepts." *Id.* ¶¶ 132–34. Finally, Defendants allegedly informed certain MSAB employees that "the Trahan IP would remain open and available for now but at some point they would have to lock it down and prevent people from using it," and "that they should use and copy whatever Trahan IP they needed in the future for purposes of preparing reports before they had to remove it from their servers." *Id.* ¶ 136.

### B. Procedural History

Trahan filed the complaint that initiated this case on February 6, 2019. Dkt No. 1. On February 25, 2019, Plaintiff filed a motion for a preliminary injunction, Dkt. No. 27, which the Court denied on April 29, 2019. Dkt. No. 55. On June 7, 2019, Defendants filed a motion to dismiss the Complaint. Dkt. No. 72. In response, Plaintiff filed the Amended Complaint ("AC") on June 28, 2019. Dkt. No. 80. In the Amended Complaint, Plaintiff asserts sixteen claims. Defendants filed this motion to dismiss the Amended Complaint on July 19, 2019. Dkt. Nos. 87–89. Plaintiff subsequently filed his opposition on August 9, 2019, Dkt Nos. 93–94, and Defendants filed their reply on August 27, 2019, Dkt. No. 100.

Defendants argue that Plaintiff fails to state a claim with respect to the following claims: (1) unfair competition; (2) violation of the Defend Trade Secrets Act ("DTSA"); (3) common law misappropriation of trade secrets; (4) breach of fiduciary duty; (5) aiding and abetting breach of fiduciary duty; (6) faithless servant; (8) breach of the implied covenant of good faith and fair dealing; (9) tortious interference with contract; (10) fraud; (11) negligent misrepresentation; (12) unjust enrichment; (13) conversion; (14) declaratory judgment regarding indemnification for fees; (15) declaratory judgment regarding capita account balance payments; and (16) violation of New York Labor Law. Defendants did not move to dismiss Claim 7, breach of contract.

## II. LEGAL STANDARD

### A. Rule 12(b)(6)

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However, a defendant may move to dismiss a plaintiff's claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all inferences in the plaintiff's favor. *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 810, 165 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)); *Chase Grp. All. LLC v. City of N.Y. Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In determining the adequacy of a claim under Rule 12(b)(6), a court is generally limited to "facts stated on the face of the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation marks omitted). However, "extrinsic documents may be considered as part of the pleadings if they either are (1) attached to the complaint; (2) incorporated into the complaint by reference; or (3) integral to the complaint." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010). For a document to be integral to a complaint, "the plaintiff must have (1) 'actual notice' of the extraneous information and (2) 'relied upon th[e] documents in framing the complaint.'" *Id.* (alteration in original) (quoting *Chambers*, 282 F.3d at 153). While the Court must accept the facts as alleged in the complaint, "when any allegations contradict the evidence contained in the documents relied upon by a plaintiff, the documents control, and the Court need not accept the allegations contained within the complaint as true." *Rozsa v. May Davis Group, Inc.*, 187 F. Supp. 2d 123, 128 (S.D.N.Y. 2002).

### B. Rule 9(b)

Under Rule 9(b), a party alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Under Rule 9(b), allegations of fraud must '(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 402–03 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004)). Where the fraud is based on an omission and "the plaintiff is unable to specify the time and place because no act occurred, the complaint must still allege: (1) what the omissions were; (2) the person responsible for the failure to disclose; (3) the context of the omissions and the manner in which they misled the plaintiff, and (4) what defendant obtained through the fraud." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*,

85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 109 (2d Cir. 2001).  "Courts are especially

vigilant in applying Rule 9(b) where a complaint is made against multiple defendants. . . .  [A]

complaint may not rely upon blanket references to the acts of all of the defendants without

identifying the nature of each defendant's participation in the fraud."  *Scone Invs., L.P. v. Am. Third*

*Mkt. Corp.*, No. 97 CIV. 3802 (SAS), 1998 WL 205338, at *4 (S.D.N.Y. Apr. 28, 1998).

## III. DISCUSSION

### A.  DTSA (Claim 2)

Plaintiff has successfully stated a DTSA claim with respect to the intellectual property

Plaintiff brought with him to Cornerstone Macro but fails to state a claim with respect to the IP

developed at Cornerstone.  The DTSA provides that "[a]n owner of a trade secret that is

misappropriated may bring a civil action under this subsection if the trade secret is related to a

product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C.

§ 1836(b)(1).  Defendants move to dismiss on the grounds that the intellectual property at issue did

not qualify as trade secrets, that Defendants did not misappropriate the trade secrets within the

meaning of the statute, and that Plaintiff was not the owner of the trade secrets at issue.

#### 1. Status As Trade Secrets

Plaintiff has adequately pleaded that the IP at issue qualifies as trade secrets within the

meaning of DTSA.  "The DTSA defines 'trade secret' to include 'all forms and types of financial,

business, scientific, technical, economic, or engineering information, including patterns, plans,

compilations, program devices, formulas, designs, prototypes, methods, techniques, processes,

procedures, programs, or codes,' so long as:  (1) 'the owner thereof has taken reasonable measures

to keep such information secret'; and (2) 'the information derives independent economic value . . .

from not being generally known to, and not being readily ascertainable through proper means by,

another person who can obtain economic value from the disclosure or use of the information.'"

*Iacovacci v. Brevet Holdings, LLC*, No. 18cv8048, 2020 WL 528059, at *8 (S.D.N.Y. Feb. 3, 2020) (quoting 18 U.S.C. § 1839(3)).  New York courts consider the following factors as guideposts in determining whether information qualifies as a trade secret, although no one factor is dispositive: "(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others."  *Id.* (internal quotation marks omitted) (quoting *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990)).

Here, Plaintiff alleges that Trahan's IP was very valuable and developed through great effort.  AC ¶ 23 ("[H]is intellectual property was the product of extensive research, sweat equity, and ingenuity, and worth many millions of dollars.").  Competitors allegedly tried and failed to create successful competing models.  *Id.* ¶ 180.  Plaintiff also alleges that he took reasonable measures to keep the Models secret.  With respect to his time prior to Cornerstone, Plaintiff alleged that he "repeatedly took steps to protect his intellectual property.  Among other things, for example, Trahan has filed lawsuits against various infringers of his intellectual property and has been successful in stopping those infringers."[2]  *Id.* ¶ 23.  While at Cornerstone, Plaintiff took a number of protective measures, including:  (1) requiring restrictive covenants in employment contracts; (2) using computer password protection and firewalls; (3) limiting access to information; (4) establishing restricting unauthorized use of data; (5) tracking improper re-distribution of the outputs of the trade secrets

---

[2] Defendants submitted a declaration intended to show that Plaintiff did not file lawsuits against various infringers, asserting that the Court may take judicial notice of court filings.  Declaration of Sean Askin in Support of Defendants' Motion to Dismiss the Amended Complaint, Dkt. No. 99.  However, the declaration is based on a non-exhaustive list of docket searches, and the Court accepts Plaintiff's allegation as true for purposes of this motion to dismiss.

models; and (6) implementing a strictly enforced policy not to disclose the Models to "clients or anyone else." *Id.* ¶¶ 176–77. The Models were used only by MSAB employees, who were subject to nondisclosure and confidentiality obligations. *Id.* ¶ 174. Because Plaintiff has adequately pleaded the value of the information, importance of its secrecy, and the reasonable measures taken to keep it secret, he has adequately pleaded that the Models qualify as trade secrets.

Plaintiff has also met his burden to "describe[] the alleged trade secret with adequate specificity to inform the defendants what it is alleged to have misappropriated." *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05 Civ. 9292 (DLC), 2008 WL 463884, at *11 (S.D.N.Y. Feb. 20, 2008). Plaintiff does not merely generally describe the trade secrets at issue. *Next Commc'ns, Inc. v. Viber Media, Inc.*, No. 14-cv-8190 (RJS), 2016 WL 1275659, at *3 (S.D.N.Y. Mar. 30, 2016) ("[A] plaintiff must, 'at minimum, generally identify the trade secrets at issue.") (quoting *Alexander Interactive, Inc. v. Leisure Pro Ltd.*, No. 14-cv-2796 (PKC), 2014 WL 4651942, at *5 (S.D.N.Y. Sept. 16, 2014)). Instead, he provides a name and description of each of the 38 models he alleges as trade secrets. AC ¶¶ 169, 171.

### 2. Misappropriation

Plaintiff has adequately pleaded that Defendants "misappropriated" the Pre-Cornerstone IP, but has not adequately pleaded misappropriation with respect to the Cornerstone IP.

### a. Pre-Cornerstone IP

Plaintiff's DTSA claim with respect to the Pre-Cornerstone IP survives Defendants' motion to dismiss because Defendants' only argument is that Plaintiff fails to allege "that any supposed misappropriation under DTSA was obtained by 'improper means.'" "Misappropriation" under the DTSA is a defined term which encompasses two separate categories of conduct. Under 18 U.S.C. § 1839(5)(A) ("Section 5(A)"), misappropriation is defined as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by

improper means."  Under 18 U.S.C. § 1839(5)(B) ("Section 5(B)"), misappropriation includes

"disclosure or use of a trade secret of another without express or implied consent."  Where the

misappropriation is based on disclosure or use without consent under Section 5(B), the disclosure or

use must be by a person who:

> (i) used improper means to acquire knowledge of the trade secret;
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge
> of the trade secret was--
>> (I) derived from or through a person who had used improper means to
>> acquire the trade secret;
>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy
>> of the trade secret or limit the use of the trade secret; *or*
>> (III) derived from or through a person who owed a duty to the person
>> seeking relief to maintain the secrecy of the trade secret or limit the use of
>> the trade secret; *or*
> (iii) before a material change of the position of the person, knew or had reason to
> know that--
>> (I) the trade secret was a trade secret; and
>> (II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5)(B) (emphasis added).  Therefore, there are two routes to a finding of

misappropriation under Section 1839(5), only one of which, Section 5(A), can be satisfied only if the

information was acquired by improper means.  Disclosure or use under Section 5(B) can constitute

misappropriation even where the information has not been acquired by improper means.  *See*

18 U.S.C. § 1839(5)(B)(ii)(II) and (III).  Nonetheless, Defendants' motion attacks only Plaintiff's

asserted failure to plead acquisition of the trade secrets by improper means.

Improper means "includes theft, bribery, misrepresentation, breach or inducement of a

breach of a duty to maintain secrecy, or espionage through electronic or other means" and does not

include "lawful means of acquisition."  18 U.S.C.A. § 1839(6).  Plaintiff does not adequately allege

that the trade secrets were acquired by improper means because the Amended Complaint alleges

that the IP was willingly given into Cornerstone Macro's possession by Trahan.  AC ¶¶ 37, 155, 174,

186; *Prominence Advisors, Inc. v. Dalton*, No. 17 C 4369, 2017 WL 6988661, at *4 (N.D. Ill. Dec. 18,

2017) (finding acquisition not through improper means where defendant acquired information in the course of his official duties while employed by plaintiff).

However, as described above, acquisition by improper means under Section 5(A) is not the end of the analysis, although Defendants treat it as such.  As relevant here, misappropriation under Section 5(B) can also be established through disclosure or use without consent if, *inter alia,* "at the time of disclosure or use, [Defendants] knew or had reason to know that the knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of trade secret."  18 U.S.C. § 1839(5)(B)(ii)(II).  Here, Plaintiff argues that "Trahan has pleaded that Defendants improperly used his trade secrets."  Opp. at 9 n.5.  The Amended Complaint contains detailed allegations of how Defendants allegedly used the trade secrets.  *See, e.g.*, AC ¶¶ 104–06.  Defendants do not address the use prong of the analysis under Section 1839(5)(B)(ii)(II) and (III), which allows for misappropriation without improper means.  Therefore, Plaintiff has adequately alleged misappropriation with respect to the Pre-Cornerstone IP.

### b. Cornerstone IP

Plaintiff has not adequately pleaded that Defendants have "misappropriated" any trade secrets embodied in the Cornerstone IP.  Misappropriation requires acquisition, disclosure, or use of "a trade secret *of another*."  18 U.S.C. § 1839(5) (emphasis added).  Plaintiff concedes that the Cornerstone IP was owned by the Partnership.  P.'s Mem. Law. Opp. Mot. Dismiss ("Opp."), Dkt. No. 93, at 6 (referring to Models "Trahan developed while he was a Partner at Cornerstone Macro (which were owned by the Partnership . . . )").  Because the Partnership was still the legal owner of the Cornerstone IP, it could not have misappropriated the Cornerstone IP because misappropriation requires the trade secret at issue to be the "trade secret *of another*."  18 U.S.C. § 1839(5) (emphasis added).  The remaining defendants were all involved in using the Models for the purposes of advancing the Partnership's business—and, allegedly, Defendants' scheme—and therefore were not

using the trade secrets of another without the express or implied consent of the Partnership, as required for misappropriation on the basis of disclosure or use.  18 U.S.C. § 1839(5)(B).

### 3. Ownership

Plaintiff adequately alleges ownership of the Pre-Cornerstone IP because the Amended Complaint alleges that "[i]t was understood and agreed that Trahan would retain ownership of trade secrets and other intellectual property he and his team developed at Wolfe Trahan & Co."  AC ¶ 20.  In response, Defendants argue that Plaintiff's previous employment contract did not grant him ownership of intellectual property.  In support, Defendants attach to their motion to dismiss an employment contract between Trahan and Wolfe Research, LLC.  Defs.' Mot. Dismiss, Ex. G, Dkt. No. 88-7.  This evidence is not properly before the Court on a motion to dismiss.  Defendants assert that the Court can consider this agreement because it is integral to the Amended Complaint.  Defs.' Mem. Law Supp. Mot. Dismiss ("MOL"), Dkt. No. 89, at 18 n.13.  But the Amended Complaint does not specifically refer to this agreement, instead alleging more broadly that it "was understood and agreed that Trahan would retain ownership . . . ."  AC ¶ 20.  The Court cannot conclude that Plaintiff relied on the agreement attached by Defendants in crafting the Amended Complaint.  Defendants' argument is therefore unable to overcome Plaintiff's well-pleaded allegation that he owned the Pre-Cornerstone IP.

Because Plaintiff has adequately alleged that the Pre-Cornerstone IP qualified as trade secrets, that Defendants misappropriated these trade secrets, and that he owned the Pre-Cornerstone IP, Defendants' motion to dismiss Plaintiff's DTSA claim (Claim 2) is DENIED as to the Pre-Cornerstone IP.  Because Plaintiff has not adequately alleged that the Cornerstone IP was misappropriated, Defendants' motion to dismiss is GRANTED as to the Cornerstone IP.

**B. Breach Of Fiduciary Duties (Claim 4)**

Plaintiff alleges that the Individual Defendants breached fiduciary duties owed to Trahan personally, rather than fiduciary duties owed to the company.  Plaintiff argues these duties arise as a result of Trahan's limited partner relationship with the Limited Partner Defendants, a relationship of trust and confidence with all Individual Defendants, and a "special employee" relationship with Kantrowitz.  Each argument is addressed in turn below.

**1. Fiduciary Duties Between Partners**

The Limited Partner Defendants owed Trahan fiduciary duties based on the role they played in the management of the partnership.  "Passive limited partners do not owe default fiduciary duties, but under certain circumstances can assume fiduciary duties if they take on an active role in the management of the entity."  *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 662 (Del. Ch. 2012).  Fiduciary duties can run to other partners:  "[T]o the extent that a partnership agreement empowers a limited partner discretion to take actions affecting the governance of the limited partnership, the limited partner may be subject to the obligations of a fiduciary, including the obligation to act in good faith as to the other partners."  *KE Prop. Mgmt. Inc. v. 275 Madison Mgmt. Corp.*, No. CIV. A. 12683, 1993 WL 285900, at *9 (Del. Ch. July 27, 1993).

Here, Plaintiff alleges that "[e]ach Partner had complete control over his or her own division" of Cornerstone Macro, thus playing an active role in management.  AC ¶ 28.  Defendants argue that under the LPA, "[n]o Limited Partner, in his or her capacity as such, shall participate in the conduct of, or have any control over, the Partnership business."  LPA § 6.2.[3]  But this argument ignores both the Partners' control over the conduct of their own divisions and the role the Limited Partner Defendants exercised by way of their membership in Cornerstone Macro Holdings, the

---

[3] The Court considers the LPA and LLC Agreement because they are integral to the Amended Complaint.  Defendants had "actual notice" of the agreements and relied on them in framing their complaint because their breach of contract claim arises out of Plaintiffs' alleged violation of certain covenants in the LPA and LLC Agreement.

General Partner of Cornerstone Macro.  AC ¶ 26; *see, e.g.*, LLC Agreement § 6.1 ("The business and affairs of the Company shall be managed under the supervision of a board of managers (the 'Board') comprised, as of the date hereof, of [Lazar, Trahan, Laperriere, and Perli].").  Based on the allegations of the Amended Complaint and the provisions of the LLC Agreement, the Limited Partner Defendants took an active role in the management of the partnership, and therefore owed fiduciary duties to Trahan.

The LPA did not replace these fiduciary duties with contractual duties.  Delaware law "permits [limited partnership agreements] to disclaim fiduciary duties, and replace them with contractual duties."  *Brinckerhoff v. Enbridge Energy Co., Inc.*, 159 A.3d 242, 253 (Del. 2017).  Delaware's Revised Uniform Limited Partnership Act ("DRULPA") provides, in part, "[t]o the extent that, at law or in equity, a partner or other person has duties (including fiduciary duties) to a limited partnership or to another partner . . . the partner's or other person's duties may be expanded or restricted or eliminated by provisions in the partnership agreement."  6 Del. Code Ann. § 17-1101(d). [4]  "[T]he [DRULPA] is intended to give 'maximum effect to the principle of freedom of contract'" so the "analysis here must focus on, and examine, the precise language of the LPA that is at issue in this case."  *Brinckerhoff*, 159 A.3d at 252–53 (quoting *DV Realty Advisors LLC v. Policemen's Annuity and Benefit Fund of Chicago*, 75 A.3d 101, 106–07 (Del. 2013)).

Section 7.2 of the LPA, upon which Defendants rely, does not eliminate the Limited Partner Defendants' fiduciary duties.  It provides:

---

[4] The parties agree that Delaware law governs the fiduciary duties allegedly arising from the partnership agreements, each citing Delaware cases regarding this point.  *Compare* MOL at 9–10, *with* Opp. at 12–13.  Defendants argue, and Plaintiff does not contest, that breach of fiduciary duties must be analyzed under Delaware law because the limited partnership is a Delaware partnership and Cornerstone Macro Holdings is a Delaware LLC.  MOL at 6 n.5.  Moreover, the LPA and LLC Agreement contain Delaware choice of law provisions.  LPA § 13.9; LLC Agreement § 13.9.  However, the parties each analyze all other state law claims, including the alleged "trust and confidence" relationship, under New York law. *Compare* MOL at 9, *with* Opp. at 11.  The Court will do the same.  *UPS Store, Inc. v. Hagan*, 99 F. Supp. 3d 426, 437 n.8 (S.D.N.Y. 2015) ("Both parties rely on New York law for the tort claims, and this Court will do the same.") (citing *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639F.3d 557, 566 (2d Cir. 2011) ("[W]here the parties agree that New York law controls, this is sufficient to establish choice of law.")).

> The Partnership and each Partner agree that the provisions of this Agreement to the extent they restrict, limit or eliminate the duties (including, without limitation, fiduciary duties) or liability of a Covered Person that may otherwise exist at law or in equity, shall replace such other duties and liabilities of such Covered Person to the maximum extent permitted by applicable law.

LPA § 7.2.  This section merely provides that other provisions of the agreement may modify existing duties, including fiduciary duties.  It does not by itself modify these duties.  The only provision of the LPA that actually modifies existing duties is Section 7.9, which applies only to duties owed by the General Partner, not the Limited Partner Defendants.  Therefore, the LPA does not affect the existence of any fiduciary duties owed by the Limited Partner Defendants.[5]

### 2. Fiduciary Duties Arising Out Of Trust And Confidence

Plaintiff has plausibly alleged that the Limited Partner Defendants owe Trahan fiduciary duties on the basis of a relationship of trust and confidence.  "Under New York law, a fiduciary duty arises if 'confidence is reposed on one side and there is resulting superiority and influence on the other.'" *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 503 (S.D.N.Y. 2011) (citing *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991)).  The Second Circuit has "emphasized that '[a] fiduciary relationship involves discretionary authority and dependency' and that 'at the heart of the fiduciary relationship lies reliance, *and de facto control and dominance. . . .*'" *United States v. Brennan*, 183 F.3d 139, 150 (2d Cir. 1999) (emphasis in original) (quoting *Chestman*, 948 F.2d at 568, 569).

The Amended Complaint alleges that a fiduciary relationship existed between Plaintiff and the Limited Partner Defendants, as well as Kantrowitz, because "their relationship was one of trust and confidence, in which Trahan reposed trust and confidence in them and expected that they would act towards him as his fiduciary."  AC ¶ 219.  Plaintiff alleges that the Limited Partner Defendants were "in a position of superior knowledge and access to information than Trahan with respect to Cornerstone Macro's finances, including with respect to the relative contributions of each

---

[5] The LPA also does not affect Kantrowitz's duties because he was not a party to the LPA.

of the Limited Partners' business divisions."  AC ¶ 223.   Though Plaintiff undertook the duties of CFO and served as Managing Partner, *id.* ¶¶ 31, 39, the Court cannot conclude as a matter of law that a relationship of trust and confidence did not exist given Plaintiff's allegations regarding the superior knowledge of the Limited Partner Defendants with respect to the businesses that they operated.  However, Plaintiff does not make similar allegations regarding Kantrowitz.  Therefore, Plaintiff adequately alleges that the Limited Partner Defendants, but not Kantrowitz, owed him fiduciary duties arising out of a relationship of trust and confidence.

### 3. Employment-based Duties Owed By Kantrowitz

Plaintiff asserts that Kantrowitz owed Plaintiff fiduciary duties as Plaintiff's "special employee," but the special employee doctrine does not give rise to fiduciary duties.  "A special employee is described as one who is transferred for a limited time of whatever duration to the service of another."  *Thompson v. Grumman Aerospace Corp.*, 585 N.E.2d 355, 357 (N.Y. 1991).  First, Kantrowitz would not meet this definition of a special employee because he was not "transferred for a limited time" to the service of Trahan.  More fundamentally, Plaintiff points to no authority that suggests the special employee doctrine can be used to create a duty running from the employee to the employer.  In one case cited by Plaintiff, the special employee doctrine arose under worker's compensation law and was used to determine whether the employee could sue the special employer. *See Thompson*, 585 N.E.2d at 359.  In the other two cases, the special employee doctrine was used to allocate liability in negligence actions between the special employer and the general employer. *O'Connell Elec. Co. v. Murnane/Kennedy*, 675 N.Y.S.2d 697 (3rd Dep't 1998); *Rosenberg v. Beth Israel Med. Ctr.*, 669 N.Y.S.2d 40 (1st Dep't 1998).  Nothing cited by Plaintiff suggests this doctrine is relevant to the creation of fiduciary duties.  Therefore, Kantrowitz owed no fiduciary duties to Plaintiff on the basis of a "special employee" relationship between Kantrowitz and Plaintiff.

### 4. Breach Of Fiduciary Duties

Defendants' motion to dismiss for failure to allege breach of the fiduciary duties owed by the Limited Partner Defendants fails. Defendants argue only that all of the alleged violations are either duplicative or occurred after Trahan left Cornerstone, such that any fiduciary duties were no longer owed to Trahan. Plaintiff alleges the Limited Partner Defendants breached their fiduciary duties by, *inter alia*, (1) concealing and executing their scheme to elevate Kantrowitz, remove Trahan, block Trahan from hiring his own employees, and establish a competing business; (2) sabotaging Trahan's projects and business prospects; (3) misappropriating Trahan's trade secrets and IP; (4) using Trahan's resources and proprietary or confidential information to highjack Trahan's business relationships and engage in transactions for the benefit of Defendants' competing business, including copying Trahan's client lists and other business records, as well as charging expenses to Trahan even where they were incurred while acting in their own interests; (5) obtaining the benefits of Defendants' scheme, including continuing business relationships with clients and significant fees; (6) attempting to ruin Trahan's reputation, both internally and externally; and (7) inaccurately disclosing or calculating the Limited Partner Defendants' and Trahan's contributions to the Partnership (which impacts distributions). AC ¶ 225.

Trahan was given notice that he was being removed from the Partnership on June 18, 2018. *Id.* ¶ 69. The parties negotiated the terms of Trahan's separation through the end of September 2018. *Id.* ¶ 89. Cornerstone Macro employees allegedly began copying Trahan's IP "at least as early as October 8, 2018," which post-dated Trahan's departure. *Id.* ¶¶ 90, 107. However, the Amended Complaint alleges that Defendants' scheme was hatched around March 2018. *Id.* ¶ 57. It is rife with allegations that the Limited Partner Defendants' scheme was underway before Trahan's departure,

including Defendants' inducing Trahan to promote Kantrowitz, [6] *id.* ¶¶ 63–64, freezing Trahan out of certain firm operations and client relationships, *id.* ¶ 65, and removing Trahan from the Partnership. *Id.* ¶ 69.  "Defendants had carefully placed events in motion well before [June 18, 2018] to ensure that they would retain Trahan's clients and business . . . ." *Id.* ¶ 73.  These actions all occurred while Trahan was still a partner, when the Limited Partner Defendants owed Trahan fiduciary duties. [7]

These alleged breaches of fiduciary duties are not duplicative of Plaintiff's breach of contract claim. [8]  "It is a well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim.  In that specific context, any fiduciary claims arising out of the same facts that underlie the contract obligations would be foreclosed as superfluous." *Nemec v. Shrader*, 991 A.2d 1120, 1129 (Del. 2010) (dismissing as duplicative a fiduciary duty claim that arose from a dispute regarding the exercise of a right that was "solely a creature of contract").  Plaintiff alleges a sweeping plot in which Defendants schemed to oust Trahan, cut him out of partnership activities, and steal his clients. *See, e.g.*, ¶¶ 64–65.  The broad alleged breaches of fiduciary duties do not relate solely to obligations arising from the provisions of the Agreements, even when looking only at conduct prior to Trahan's departure.  Therefore, because Defendants do not dispute on the merits that the conduct alleged constitutes a breach of fiduciary duties, because certain alleged breaches occurred before Trahan left the partnership, and because the fiduciary duty claims are not duplicative, Plaintiff's fiduciary duty

---

[6] With respect to Defendants' allegedly inducing Trahan to promote Kantrowitz, Defendants also argue a lack of a causal connection between the alleged breach and Plaintiff's damages. Defs.' Reply Supp. Mot. Dismiss ("Reply"), Dkt. No. 100, at 9.  As discussed *infra*, Section III.D.2.b, this is not a winning argument.  Moreover, other alleged fiduciary breaches, such as the alleged secret scheme to oust Trahan, also clearly have a causal connection to damages, and Defendants do not argue otherwise.

[7] The Court does not consider whether any fiduciary duties continued after Trahan's departure.

[8] Plaintiff alleges Defendants breached contractual duties in the following ways:  (1) improper distribution of profits; (2) failure to assign and not use Trahan's intellectual property; (3) solicitation of MSAB employees; and (4) refusing to make Accrued Net Cash Flow payments.

claims survive with respect to the Limited Partner Defendants.  Defendants' motion to dismiss Claim 4 is DENIED with respect to the Limited Partner Defendants and GRANTED with respect to Kantrowitz.

### C. Aiding And Abetting Breach Of Fiduciary Duty (Claim 5)

To the extent certain Defendants did not have or breach fiduciary duties to Trahan—at least Kantrowitz, Cornerstone Macro Holdings and Cornerstone Macro LP—Plaintiff has adequately stated a claim for aiding and abetting breach of fiduciary duties.  The parties cite no law in their briefing regarding this claim, but Delaware and New York law governing aiding and abetting a breach of fiduciary duty are "not materially different."  *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 130 (S.D.N.Y. 1999).  "Under Delaware law, a claim of aiding and abetting a breach of fiduciary duty (sometimes referred to as a claim of civil conspiracy) requires:  (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by the non-fiduciary."  *Id.* at 129–30 (citing *In re Santa Fe Pacific Corp. Shareholder Litig.*, 669 A.2d 59, 72 (Del. 1995)), *aff'd*, 205 F.3d 1321 (2d Cir. 2000).  "Under New York law, third party liability for participation in a breach of fiduciary duty is established by showing:  (1) a breach by a fiduciary, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiff suffered damages as a result of the breach."  *Id.* at 130 n.2 (citing *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843 (2d Cir. 1987)).

Plaintiff has adequately pleaded that the Limited Partner Defendants owed and breached fiduciary duties to Plaintiff.  *See supra* Section III.B.  Therefore, the only remaining element is Defendants' knowing participation in the breach.  Each Defendant allegedly "knowingly and substantially assisted the other Defendants' breaches of their fiduciary duties."  AC ¶ 231. Moreover, each Defendant allegedly had knowledge of the fiduciary duties owed to Trahan "through their positions, duties, responsibilities, and experience at Cornerstone Macro, and in the case of the

Contract-Party Defendants, through their access to the LPA and LLC Agreement." *Id.* ¶ 230.

Therefore, Plaintiff has adequately pleaded a claim for aiding and abetting a breach of fiduciary duty,

and Defendants' motion to dismiss Claim 5 is DENIED.

### D. Fraud (Claim 10)

Defendants' motion to dismiss Plaintiff's fraud claim is granted in part because, in some

instances, Plaintiff fails to allege actionable misstatements or reasonable reliance.  However, some

misstatements and omissions survive the motion to dismiss.

#### 1. Legal Standard

"To state a claim for fraud under New York law, a plaintiff must allege (1) a material

misrepresentation or omission of fact; (2) which the defendant knew to be false; (3) which the

defendant made with the intent to defraud; (4) upon which the plaintiff reasonably relied; and (5)

which caused injury to the plaintiff."  *Fin. Guar. Ins.*, 783 F.3d at 402.

"[S]tatements will not form the basis of a fraud claim when they are mere 'puffery' or are

opinions as to future events."  *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994).  "'[S]peculation and

expressions of hope for the future are not actionable representations of fact under common law

theories of fraud.'"  *Passiglia v. Northwell Health, Inc.*, 252 F. Supp. 3d 129, 138 (E.D.N.Y. 2017)

(quoting *Karakus v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 318, 344 (E.D.N.Y. 2013), *adhered to on

denial of reconsideration*, No. 09–cv–4739 (ENV) (SMG), 2013 WL 3187055 (E.D.N.Y. June 20, 2013)).

"The failure to fulfill a promise to perform future acts is not ground for a fraud action unless there

existed an intent not to perform at the time the promise was made."  *Cohen*, 25 F.3d at 1172.

With respect to reasonable reliance, "[a] plaintiff cannot close his eyes to an obvious fraud,

and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the

ability, through ordinary intelligence, to ferret out the reliability or truth . . . ."  *Crigger v. Fahnestock &

Co.*, 443 F.3d 230, 234 (2d Cir. 2006).  "'In assessing the reasonableness of a plaintiff's alleged

reliance, we consider the entire context of the transaction, including factors such as its complexity

and magnitude, *the sophistication of the parties*, and the content of any agreements between them.  *Id.* at

235 (emphasis added) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189,

195 (2d Cir. 2003)).

"Proximate cause, known in the context of fraud claims as 'loss causation,' requires proof of

a causal nexus between Defendants' breach and/or tortious conduct and the damages incurred.  To

establish loss causation, Plaintiff must furnish facts that the 'subject of the fraudulent statement or

omission was the cause of the actual loss suffered.'  Proximate cause is to be distinguished from

'transaction causation,' also a necessary component of a fraud claim, which is concerned with

whether 'defendant's misrepresentation induced plaintiff to engage in the transaction in question.'"

*Taylor Precision Prods., Inc. v. Larimer Grp., Inc.*, No. 1:15-cv-4428 (ALC), 2018 WL 4278286, at *32

(S.D.N.Y. Mar. 26, 2018) (citations omitted) (quoting *Fin. Guar. Ins.*, 783 F.3d at 402).

### 2. Analysis

Plaintiff alleges four affirmative misrepresentations of material fact:  (1) Perli's statement to

Trahan that "Trahan had to make Kantrowitz the Co-Head of [MSAB] because Defendants Nancy

Lazar and Andrew Laperriere needed Kantrowitz to be promoted"; (2) "Kantrowitz's

contemporaneous assurances to Trahan that he would be satisfied if he were simply promoted to co-

head of [MSAB]"; (3) the CCO's statement that Kantrowitz could not be fired; and (4) Defendants'

statements through counsel on October 16, 2018, that they would not use Trahan's IP.  AC ¶ 280.

Plaintiff also alleges that Defendants fraudulently omitted material facts, including by failing to

disclose "Defendants' scheme to defraud Trahan and steal his business and intellectual

property . . . ."  AC ¶ 278.  None of these misrepresentations or omissions give rise to a fraud claim.

Each is addressed in turn below.

### a. Perli's Statement

Perli allegedly pressured Trahan to promote Kantrowitz.  He allegedly "warned Trahan that Trahan had to make Kantrowitz the Co-Head of [MSAB] because Defendants Nancy Lazar and Andrew Laperriere needed Kantrowitz to be promoted."  *Id.* ¶ 64.  Plaintiff argues that this statement was an actionable misrepresentation because Perli's statement was not a "vague statement of hope[] but contained [a] clear promise[] to continue the Partnership and not to steal his IP or trade secrets."  Opp. at 20 n.13.  But nothing in Perli's statement can be plausibly read as a promise.  It was a warning coupled with no assurances; there is no concrete statement of future intent.  Therefore, Perli's statement to Trahan is not an actionable misstatement.

### b. Kantrowitz's Statement

After Kantrowitz had been demanding certain compensation and arguing that Trahan should step down and Kantrowitz should lead MSAB, Kantrowitz allegedly "assured Trahan that [Kantrowitz] would be placated if he were simply made co-head of [MSAB]" rather than receiving guaranteed compensation in writing.  AC ¶ 63.  Plaintiff has plausibly alleged that Kantrowitz's statement was a promise not to continue seeking to be made the sole head of MSAB and to have Trahan step down if Kantrowitz was promoted to co-head instead.  The allegations that there was a "conspiracy to oust Trahan," *e.g.*, AC ¶ 64, are sufficient to show that Kantrowitz knew he would not be placated merely by being made co-head and would not stop until Trahan was ousted and Kantrowitz was head of MSAB.  Kantrowitz's statement was therefore an actionable misrepresentation, as pleaded, because Plaintiff alleges a promise that Kantrowitz had no intent of performing.  *See Cohen*, 25 F.3d at 1172.

Defendants assert that Trahan did not "have any justification in relying on Kantrwoitz's statement, both because, as an at-will employee, Kantrowitz was entitled to give notice at any time, and because, as a general matter, expressions of emotion states cannot be the basis of reasonable

reliance in a fraud claim."  MOL at 14.  But Plaintiff has plausibly alleged that Kantrowitz's statement was not a mere expression of an emotional state, but a promise which he had no intent to keep, and that this promise induced Trahan to promote Kantrowitz.  And Defendants' argument that Kantrowitz was free to terminate his employment at any time has no bearing on whether Trahan was reasonable in promoting Kantrowitz in light of his allegedly fraudulent statement.  If anything, that Kantrowitz was free to leave Cornerstone Macro if Kantrowitz did not get what he wanted only strengthens Plaintiff's allegation that he was pressured into promoting Kantrowitz.  Thus, Defendants' reliance arguments are unavailing.

Moreover, Plaintiff has adequately pleaded that this alleged misrepresentation was the proximate cause of his injury.  Defendants' scheme allegedly involved "induc[ing] Trahan to elevate Kantrowitz to co-head of [MSAB] . . . in order to better position Defendants to steal Trahan's business and intellectual property after summarily removing him from the partnership."  AC ¶ 2.  The alleged injury as a result of the statement is "Kantrowitz's promotion, Trahan's eventual unjust ousting, and the theft of his intellectual property, trade secrets, and business."  AC ¶ 282.  It is possible that Kantrowitz's subsequent promotion was not the proximate cause of any injury if Defendants would have succeeded in perpetrating their alleged scheme anyway, but that is a factual determination that the Court cannot make on this motion to dismiss.  *See Bank Midwest, N.A. v. Hypo Real Estate Capital Corp.*, No. 10 CIV. 232 (WHP), 2010 WL 4449366, at *4 (S.D.N.Y. Oct. 13, 2010) ("[I]ssues of proximate cause are often 'fact-laden, requiring a fully developed factual record, and not [a] bare-bones motion to dismiss.'") (quoting *In re Sept. 11 Prop. Damage & Bus. Loss Litig.,* 468 F. Supp. 2d 508, 525 (S.D.N.Y. 2006)).

Therefore, Kantrowitz's statement regarding his promotion may form the basis of a fraud claim because Plaintiff has adequately alleged that it was an actionable misrepresentation, upon which Plaintiff reasonably relied, proximately causing Plaintiff harm.

### c. CCO's Statement

The CCO allegedly told Trahan that Trahan "could not fire Kantrowitz without the permission of the Limited Partner Defendants because Kantrowitz was an officer of the firm" and that this representation was not true pursuant to the LPA and LLC Agreement. AC ¶ 68. But this statement was not made by Defendants. In response, Plaintiff argues that this statement was made to Plaintiff "at Defendants' instruction." Opp. at 18. "Under either or both the law of conspiracy and agency, an actor may be held liable for the actions, including the misstatements, of another." *Carroll v. LeBoeuf, Lamb, Greene & MacRae, LLP*, 623 F. Supp. 2d 504, 510 (S.D.N.Y. 2009). However, the Amended Complaint is devoid of any allegation that the CCO was acting at Defendants' instruction, within the scope of any agency relationship, or as part of a conspiracy. AC ¶ 68. The Amended Complaint is also silent as to whether the CCO knew this statement was false. Therefore, as pleaded, this statement does not form the basis of a fraud claim against Defendants.

### d. Defendants' Letter

The final alleged affirmative misstatement was an October 16, 2018 letter in which Defendants, through counsel, told Trahan "that they would not use Trahan's intellectual property (despite knowing at the time they made this representation that they planned to continue to use his intellectual property after his departure), upon which Trahan reasonably relied to his detriment in delaying to bring legal action against Defendants." AC ¶ 280(d). Thus, the only alleged harm as a result of this statement was delaying the initiation of this action from October 2018 to February 2019.

But Plaintiff did not "reasonably rel[y]" on the letter in so delaying this action. *Fin. Guar. Ins.*, 783 F.3d at 402. The October 16, 2018 letter was sent by Defendants in response to a letter in which Trahan explained that his IP included both Pre-Cornerstone IP and Cornerstone IP, and

demanded that Cornerstone Macro cease using and assign to Trahan all Trahan IP. *Id.* ¶158. While Defendants allegedly agreed in the letter not to use Trahan's IP, *id.* ¶159, Defendants "committed to assigning only a single copyright registration to Mr. Trahan, and claimed that there were no 'further actions Cornerstone must take under [Section 3.7 of the LPA].'" *Id.* ¶ 254(c). As alleged, this letter not only failed to resolve all outstanding disputes between the parties, but also highlighted that Defendants' proposed resolution was inconsistent with Trahan's desired outcome. Knowing there was a live dispute as to the disposition of the IP, Trahan was not reasonable in delaying suit in reliance on Defendants' letter, particularly in light of Trahan's sophistication. *See Crigger*, 443 F.3d at 234–35. Therefore, the October 16, 2018 letter does not form the basis of a fraud claim because Plaintiff has failed to plead reasonable reliance.

### e. Failure To Disclose The Scheme To Oust Trahan

"[A] concealment of facts supports a cause of action only if the non-disclosing party has a duty to disclose. Such a duty ordinarily arises where the parties are in a fiduciary or other relationship signifying a heightened level of trust." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483 (2d Cir. 1995) (citations and internal quotation marks omitted). Absent a fiduciary relationship, "a duty to disclose may arise if: (1) one party makes a partial or ambiguous statement that requires additional disclosure to avoid misleading the other party; or (2) one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge," but only "when it becomes apparent to the non-disclosing party that another party is operating under a mistaken perception of material fact." *Id.* (citations and internal quotation marks omitted).

Here, Plaintiff has plausibly alleged that the Limited Partner Defendants owed Trahan fiduciary duties. But Plaintiff either did not allege or did not plausibly allege that the non-Limited Partner Defendants owed him fiduciary duties. Moreover, Plaintiff only conclusorily alleges superior

knowledge and partial representations that could trigger a duty to disclose for the non-Limited Partner Defendants. AC ¶ 278. This is insufficient under Rule 9(b). *Miller v. HSBC Bank U.S.A., N.A.*, No. 13 CIV. 7500, 2015 WL 585589, at *7 (S.D.N.Y. Feb. 11, 2015) ("When attempting to establish a duty to disclose based on partial representations or superior knowledge, the pleader must allege facts giving rise to a duty to disclose with the specificity required by Rule 9(b).") (citations and internal quotation marks omitted). Therefore, while Plaintiff has adequately alleged that the Limited Partner Defendants had a duty to disclose, he has not adequately alleged that the non-Limited Partner Defendants had a duty to disclose.

With respect to the Limited Partner Defendants, Plaintiff has alleged fraudulent concealment with the necessary particularity. Here, Plaintiff has pleaded that "[e]ach Defendant intentionally and misleadingly failed to disclose . . . Defendants' scheme to defraud Trahan and steal his business and intellectual property, as well as each aspect, element, and step of that scheme detailed herein."[9] AC ¶ 278. The Amended Complaint pleads with particularity both what the omission was and the persons responsible—each Defendant, including each of the Limited Partner Defendants. "A complaint may not rely upon blanket references to the acts of all of the defendants without identifying the nature of each defendant's participation in the fraud." *Scone Invs., L.P. v. Am. Third Mkt. Corp.*, No. 97 CIV. 3802 (SAS), 1998 WL 205338, at *4 (S.D.N.Y. Apr. 28, 1998). However, the Amended Complaint adequately puts the three Limited Partner Defendants on notice of their alleged role in the fraudulent scheme. *See DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987) ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.") (citing *Natowitz v. Mehlman,* 542 F. Supp. 674, 676 (S.D.N.Y.1982)). While in many instances all

---

[9] In order to argue the fraud claims are duplicative of the breach of contract claim, Defendants misconstrue Plaintiff's fraudulent omission allegations by arguing that they "merely state[] that Defendants failed to inform Trahan that they were allegedly planning on breaching the [LPA]." MOL at 16.

Defendants are lumped together, in other places the conduct of the three Limited Partner Defendants is specifically identified.  *See*, *e.g.*, AC ¶¶ 2, 65, 69, 72.

The Amended Complaint also alleges context—that the omissions occurred while the conspiracy to oust Trahan was underway, beginning around March 2018,[10] *see* AC ¶ 57, despite a duty disclose that arose "as a result of their superior knowledge about the information they were providing Trahan" and, for the "Fiduciary Duty Defendants," "as a result of their fiduciary duties to Trahan."  *Id.*  ¶ 278.  Plaintiff allegedly relied on these omissions in promoting Kantrowitz, which eventually led to Trahan's "unjust ousting, and the theft of his intellectual property, trade secrets, and business."  *Id.* ¶ 282.

Thus, Plaintiff has adequately pleaded with particularity a fraudulent omission claim against the Limited Partner Defendants.  However, Kantrowitz's statement regarding his promotion is the only affirmative statement that plausibly gives rise to a fraud claim.  Therefore, Defendants' motion to dismiss Claim 10 is GRANTED in part and DENIED in part.

### E. Negligent Misrepresentation (Claim 11)

Plaintiff's negligent misrepresentation claim rises and falls with the fraud claim.  "Negligent misrepresentation 'involves most of the same elements as fraud, with a negligence standard substituted for the *scienter* requirement.'"  *Carroll*, 623 F. Supp. 2d at 510 (quoting *Mia Shoes, Inc. v. Republic Factors, Corp.*, No. 96 Civ. 7974 (TPG), 1997 WL 525401, at *3 (S.D.N.Y. Aug. 21, 1997)).  Here, the outcome of Defendants' motion to dismiss Plaintiff's various fraud claims did not turn on

---

[10] Defendants also argue that there were no omissions because "Defendants informed Plaintiff about their plan to remove him" on June 18, 2018.  Reply at 14.  But the Amended Complaint alleges that the scheme began around March 2018.  AC ¶ 57.  It further alleges that "Defendants had carefully placed events in motion well before [June 18, 2018] to ensure that they would retain Trahan's clients and business, including [MSAB] . . . ."  *Id.* ¶ 73.

scienter.  Therefore, Defendants' motion to dismiss Claim 11 is GRANTED in part and DENIED in part.[11]

### F. Unfair Competition, Misappropriation, and Conversion (Claims 1, 3, and 13)

Plaintiff's tort claims for unfair competition, misappropriation, and conversion are not duplicative of Plaintiff's contract claim, with the exception of Plaintiff's conversion claim with respect to Cornerstone IP.  These are three separate causes of action, but they are addressed together here because Defendants' only arguments with respect to these claims is that they are duplicative of Plaintiff's breach of contract claim.

"'When a valid agreement governs the subject matter of a dispute between parties, claims arising from that dispute are contractual; attempts to repackage them as sounding in fraud, conversion, and other torts, are generally precluded, unless based on a duty independent of the contract.'"  *Bancorp Servs., LLC v. Am. Gen. Life Ins. Co.,* No. 14-cv-9687 (VEC), 2016 WL 4916969, at *9 (S.D.N.Y. Feb. 11, 2016) (quoting *Poplar Lane Farm LLC v. Fathers of Our Lady of Mercy*, 449 F. App'x 57, 59 (2d Cir. 2011)).  "[P]laintiff must allege a breach of 'a duty independent of the duties under the contract.'"  *Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 745 F. Supp. 2d 343, 348, 353 (S.D.N.Y. 2010) (quoting *Carvel Corp. v. Noonan*, 350 F.3d 6, 16 (2d Cir. 2003)).

With respect to Pre-Cornerstone IP, none of these claims can be dismissed as duplicative because the IP-related breach of contract allegations relate only to the IP covered by Section 3.7(f) of the LPA, which refers to IP developed while Trahan worked at Cornerstone.[12]  *Id.* ¶ 254(b), (c); LPA § 3.7(f).  Because the Amended Complaint alleges tortious conduct related to IP not covered by the breach of contract claim, Claims 1, 3, and 13 are not duplicative with respect to the Pre-

---

[11]  Like fraud claims, negligent misrepresentation claims must be pled with particularity under Rule 9(b) where, as here, they are based on the same set of facts as the fraud claims.  *Amusement Indus., Inc. v. Stern*, 786 F. Supp. 2d 758, 771 (S.D.N.Y. 2011).

[12]  For these reasons, the remaining portion of the DTSA claim, which relates only to Pre-Cornerstone IP, cannot be dismissed as duplicative of contract claims.

Cornerstone IP.[13]  Because Claims 1, 3, and 13 also relate to IP covered by the contract, each is addressed in turn below.

### 1. Unfair Competition

Plaintiff's unfair competition claim is not duplicative.  "The essence of an unfair competition claim under New York law is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or confidential relationship."  *Bytemark, Inc. v. Xerox Corp.*, 342 F. Supp. 3d 496, 505 (S.D.N.Y. 2018) (quoting *Telecom Int'l Am., Ltd. v. AT & T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001).  Plaintiff's unfair competition claim alleges that "Defendants secretly schemed to misappropriate the Trahan IP and use it to publish newsletters, models, and strategies, answer client questions, develop and publish reports, hold conference calls with clients, and develop and further customer relationships, all while presenting it in their own names and as their own, without acknowledging Trahan's intellectual  property rights."  AC ¶ 160.  Because these allegations concern a duty not to misappropriate the fruits of Plaintiff's labors through "fraud or deception, or an abuse of a fiduciary or confidential relationship," this claim pleads a breach of a duty beyond the failure to assign to Trahan and discontinue use of the intellectual property under Section 3.7(f) of the LPA, the unfair competition claim is not duplicative.  *See Bytemark*, 342 F. Supp. 2d at 509 (denying motion to dismiss unfair competition claim as duplicative where the contract claim concerned obligations not to use or disclose plaintiff's trade secrets but the unfair competition claim also

---

[13] Defendants contend that an integration clause in the LPA renders the claims duplicative even with respect to the Pre-Cornerstone IP because it stated that the LPA "shall constitute the entire agreement and understanding among the parties hereto with respect to the subject matter hereof."  MOL at 22–23 (citing LPA § 13.5).  But the Pre-Cornerstone IP is not part of the subject matter of the contract, so the integration clause has no effect on the outcome.  Defendants also cite a declaration submitted by Trahan earlier in this action, arguing that Trahan admitted all IP was covered by the LPA when he said "[t]hese contracts were intended to, and did, govern all aspects of Cornerstone Macro, including . . . rights to intellectual property . . . ."  *Id.* at 23.  This statement does not explicitly refer to Pre-Cornerstone IP and could be read to refer only to IP developed at Cornerstone, so the Court cannot interpret the meaning of this statement on a motion to dismiss.

alleged Defendants "led [p]laintiff to disclose its valuable intellectual property . . . under the guise of forming a partnership with [p]laintiff" and used "[p]laintiff's trade secrets to bid on and secure their own contracts," including with one of the plaintiff's customers); *cf Bancorp*, 2016 WL 4916969, at *9 (dismissing unfair competition and misappropriation claims as duplicative where the claim was based entirely on conduct proscribed by an NDA).  Therefore, the unfair competition claim is not duplicative with respect to the Cornerstone IP.

### 2. Misappropriation

For reasons similar to the unfair competition claim, Plaintiff's misappropriation claim as to the Cornerstone IP is not duplicative.  "To state a claim for misappropriation of confidential information, a plaintiff must allege that the defendant used the plaintiff's confidential information for the purpose of securing a competitive advantage." *Reed Const. Data Inc*, 745 F. Supp. 2d at 352. "A claim of misappropriation 'must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract.'" *Id.* at 353 (quoting *Productivity Software Int'l, Inc. v. Healthcare Techs., Inc.,* No. 93 Civ 6949 (RPP), 1995 WL 437526, at *8 (S.D.N.Y. Jul. 25, 1995)).  Plaintiff's misappropriation claim alleges that Defendants "have obtained, misappropriated, utilized, and disclosed Trahan's trade secrets for their own benefit, for the purpose of competing against Trahan unfairly, and for the purpose of soliciting Trahan's actual and prospective customers." *Id.* ¶ 210.  These allegations plead a breach of a duty beyond the failure to assign to Trahan and discontinue use of the intellectual property under Section 3.7(f), since the alleged wrongdoing extends to Defendants' violation of a duty to not use the confidential information for the purpose of securing a competitive advantage against Trahan.  *Cf Bancorp*, 2016 WL 4916969, at *9.  Therefore, the misappropriation claim with respect to the Cornerstone IP is not duplicative of the breach of contract claim.

### 3. Conversion

However, the conversion claim is duplicative. "To prevail on a claim of conversion, a Plaintiff must demonstrate that: '1) the property subject to conversion is a specific identifiable thing; 2) plaintiff had ownership, possession, or control over the property before its conversion; and 3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights.'" *Strategic Growth Int'l, Inc. v. RemoteMDx, Inc.*, No. 06 Civ. 3915, 2008 WL 4179235, at *3 (S.D.N.Y. Sept. 10, 2008) (quoting *Ad Rendon Commc'ns., Inc. v. Lumina Ams. Inc.*, No. 04-CV-8832 (KMK), 2007 WL 2962591, at *5 (S.D.N.Y. Oct. 9, 2007)). Here, Trahan's conversion claim is premised on Defendants' refusal to return and continued use of Trahan's Models. AC ¶¶ 307–10. The only duty potentially breached in the conversion claim is the exercise of unauthorized dominion over Plaintiff's intellectual property, which is precisely the duty Defendants allegedly breached in relation to Section 3.7(f) of the LPA. Therefore, the conversion claim is duplicative with respect to the Cornerstone IP.

For these reasons, Defendants' motion to dismiss Claims 1, 3, and 13 as duplicative is DENIED; however the motion to dismiss Claim 13 is GRANTED as to Cornerstone IP.

### G. Faithless Servant (Claim 6)

Plaintiff's faithless servant claim against each of the Individual Defendants fails because Plaintiff fails to adequately allege an agency relationship. Under the faithless servant doctrine, which is grounded in agency law, "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 200 (2d Cir. 2003). The "principal is entitled to recover from his unfaithful agent any commission paid by the principal." *Id.* While the defendant in *Phansalkar* was denominated a partner, the application of the faithless servant doctrine turned on whether the partner was the plaintiff's agent. "In order to

establish a principal/agent relationship, a party must demonstrate the following elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking." *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 CIV. 0613 GBD, 2004 WL 112948, at *4 (S.D.N.Y. Jan. 22, 2004). "The importance of control by the principal is paramount. 'There is no agency relationship where the alleged principal has no right of control over the alleged agent.'" *Id.* at *5 (quoting *Morgan Guar. Trust Co. of N.Y. v. Republic of Palau,* 657 F. Supp. 1475, 1481 n.2 (S.D.N.Y. 1987)).

Trahan was not in control of the Limited Partner Defendants; each controlled their own subdivision. AC ¶ 28. Moreover, the LPA limits Limited Partners' control over the Partnership: "No Limited Partner, in his or her capacity as such, shall participate in the conduct of, or have any control over, the Partnership business. . . . no Limited Partner, in his or her capacity as such, shall have any authority or right to act for or bind the Partnership." LPA § 6.2. The lack of control exercised by Trahan over the Limited Partner Defendants defeats any alleged agency relationship.

As for Kantrowitz, Plaintiff again rests his claim on Kantrowtiz's alleged "special employee" status because Kantrowitz was paid by Cornerstone Macro LLC. AC ¶ 238. But this argument is unavailing for the same reasons that the special employee doctrine does not create a fiduciary relationship. *See supra* Section III.B.3. Plaintiff does not point to authority suggesting that a special employee relationship can give rise to a faithless servant claim. Because no agency relationship existed between the Individual Defendants and Plaintiff, Defendants' motion to dismiss the faithless servant claim (Claim 6) is GRANTED.

### H. Implied Covenant of Good Faith and Fair Dealing (Claim 8)

Plaintiff's claim for breach of the implied covenant of good faith and fair dealing must be dismissed. "Under New York law, a covenant of good faith and fair dealing is implied in all

contracts." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (citing *Cross & Cross Props., Ltd. v. Everett Allied Co.,* 886 F.2d 497, 502 (2d Cir. 1989)).  "A breach of the duty of good faith and fair dealing is considered a breach of contract."  *Id.* (citing *Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank,* 392 F.3d 520, 525 (2d Cir. 2004)).  Accordingly, "raising both claims in a single complaint is redundant, and courts confronted with such complaints under New York law regularly dismiss any freestanding claim for breach of the covenant of fair dealing." *Jordan v. Verizon Corp.*, No. 08 Civ. 6414 (GEL), 2008 WL 5209989, at *7 (S.D.N.Y. Dec. 10, 2008).  However, an implied covenant claim "can survive a motion to dismiss 'if it is based on allegations different from those underlying the accompanying breach of contract claim.'"  *JPMorgan Chase Bank, N.A. v. IDW Grp., LLC*, No. 08 Civ. 9116 (PGG), 2009 WL 321222, at *5 (S.D.N.Y. Feb. 9, 2009) (quoting *Grand Heritage Mgmt., LLC v. Murphy,* No. 06 Civ. 5977 (NRB), 2007 WL 3355380, at *6 (S.D.N.Y. Nov. 5, 2007)).  Therefore, "to simultaneously plead breach of contract and implied covenant claims under New York law, a plaintiff must allege an implied duty that is consistent with the express contractual terms, but base its implied covenant theory on allegations that are distinct from the factual predicate for its contract claims."  *Id.*

All but one of Defendants' alleged breaches of the implied covenant are duplicative of the breach of contract claim because they are based on the same underlying allegations—the theft of his intellectual property and unfairly and inaccurately calculating attributions for purposes of compensation.[14]  *Compare* AC ¶ 261 (implied duties allegedly breached) *with id.* ¶ 254 (contractual duties allegedly breached).

---

[14] Trahan alleges that Defendants breached the implied covenant of good faith and fair dealing by, *inter alia*, (1) conspiring to remove Trahan as a partner; (2) stealing intellectually property; (3) unfairly and inaccurately calculating attributions and "rig[ging]" that process; and (4) disclosing "Trahan's confidential business information to third parties, and using this information for Defendants' benefit and to Trahan's detriment."  AC ¶ 261.

The one implied covenant allegation not reflected in the breach of contract claim is Defendants' alleged conspiracy to remove Trahan from the partnership. But "[t]he implied covenant 'can only impose an obligation consistent with other mutually agreed upon terms in the contract.'" *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005) (quoting *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 732 (S.D.N.Y.1993)). "It does not 'add to the contract a substantive provision not included by the parties.'" *Id.*; *see also Oscar de la Renta, Ltd. v. Mulberry Thai Silks, Inc.*, No. 08 CIV. 4341 (RJS), 2009 WL 1054830, at *5–6 (S.D.N.Y. Apr. 17, 2009) ("Significantly, although this implied covenant bars actions not 'expressly forbidden' by the contract but undertaken in bad faith, it does not 'operate to create new contractual rights; it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained-for benefits.'") (quoting *Don King Prods., Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y.1990)). Here, the allegedly implied duty "not to conspire with Trahan's employees to remove Trahan as a Partner," AC ¶ 261, is inconsistent with the Agreements, which gave the Limited Partner Defendants the power to remove Trahan without cause. *See* LPA § 3.7(d); LLC Agreement § 6.5(w). Therefore, Defendants' motion to dismiss Plaintiff's good faith and fair dealing claim (Claim 8) is GRANTED.

### I. Tortious Interference With Contract (Claim 9)

Plaintiff's claim against Kantrowitz for tortious interference with contract survives Defendants' motion to dismiss. "Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party;' (2) the 'defendant's knowledge of the contract;' (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification;' (4) 'actual breach of the contract;' and (5) 'damages resulting therefrom.'" *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1375 (N.Y. 1996). "[P]laintiff must

allege that 'there would not have been a breach but for the activities of defendants.'" *Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir. 1990) (quoting *Special Event Entertainment v. Rockefeller Center, Inc.*, 458 F. Supp. 72, 78 (S.D.N.Y. 1978)).  "Once a plaintiff alleges facts . . . establishing that the breaching party was predisposed toward breaching its agreement, the claim for tortious interference must be dismissed for failure to plead 'but for' causation." *Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 293–94 (S.D.N.Y. 1998) (citing *Special Event Entertainment*, 458 F. Supp. at 78).  Defendants dispute only the existence of a "third party" relationship and causation.  MOL at 30–32.

The parties dispute whether Kantrowitz was acting outside the scope of his authority, such that he could tortiously interfere with his employer's contract.  "[A] plaintiff bringing a tortious interference claim must show that the defendants were *not parties to the contract*." *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir. 1996) (emphasis in original).  "In order to show that a defendant-employee is a 'third party,' a plaintiff must show that the defendant-employee has exceeded the bounds of his or her authority." *Id.*  "A supervisor is considered to have acted outside the scope of his employment if there is evidence that the supervisor's manner of interference involved independent tortious acts such as fraud or misrepresentations, or that he acted purely from malice or self-interest." *Cohen v. Davis*, 926 F. Supp. 399, 404 (S.D.N.Y. 1996).  Kantrowitz was an employee of MSAB.  AC ¶ 271.  The Amended Complaint adequately alleges that Kantrowitz acted outside the scope of his authority by "participating in the orchestration, planning, perpetration, and execution of the scheme to defraud and steal from Trahan," all self-interested acts.  *Id.*

The Amended Complaint also adequately alleges but for causation because Kantrowitz's involvement in the scheme, and eventual promotion to co-head of MSAB served to "better position Defendants to steal Trahan's business and intellectual property after summarily removing him from the partnership."  AC ¶ 2.  Therefore, the Amended Complaint plausibly alleges that but for

Kantrowitz's participation, the Limited Partner Defendants would not have executed their scheme. Defendants argue that but for causation is defeated because Kantrowitz was allegedly recruited into this scheme by the Limited Partner Defendants. *Id.* (the "Limited Partner Defendants saw an opportunity to turn Kantrowitz against Trahan—and they did."). This does not render the Limited Partner Defendants "predisposed" to breach within the meaning of *Granite Partners*, in which the breaching party would have breached regardless of the defendant's conduct. *Granite Partners*, 17 F. Supp. 2d at 293. Here, it is not alleged that the Limited Partner Defendants would or could have breached even if Kantrowitz was not involved. Rather, the Amended Complaint alleges he was an integral part of their plan. AC ¶ 273 ("[Kantrowitz's] participation was key to [Defendants'] scheme."). Therefore, Plaintiff has adequately pleaded but for causation.

Because the Amended Complaint adequately alleges a third party relationship and but for causation, Defendants' motion to dismiss the tortious interference with contract claim against Kantrowitz (Claim 9) is DENIED.

### J. Unjust Enrichment (Claim 12)

Defendants' motion to dismiss the unjust enrichment claim on the basis that it is duplicative of the breach of contract claim is denied because it is pleaded in the alternative. Unjust enrichment is "a New York common law quasi-contract cause of action requiring the plaintiff to establish: '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quoting *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000)). "'[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.' . . . '[I]t is impermissible . . . to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the

dispute between the parties.'" *Ball v. Cook*, No. 11 Civ. 5926 (RJS), 2012 WL 4841735, at *10 (S.D.N.Y. Oct. 9, 2012) (internal citation omitted) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)).  "A plaintiff can plead unjust enrichment as an alternative claim to breach of contract, but only if there is 'a bona fide dispute concerning existence of a contract or whether the contract covers the dispute in issue.'" *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP,* 43 F. Supp. 3d 309, 317 (S.D.N.Y. 2014) (quoting *Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ. 02667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008)).

Plaintiff's unjust enrichment claim is pleaded only "[t]o the extent the express terms of the LPA and LLC Agreement do not cover the subject matter of the [unjust enrichment] claim, and/or to the extent some Defendants are not parties to the LPA and LLC Agreement . . . ." AC ¶ 296. Plaintiff therefore brings this claim in the alternative, pleading unjust enrichment only to the extent that the Agreements do not govern the subject matter of this claim.  Here, there is a dispute regarding whether the Agreements govern this dispute because Plaintiff argues that the Agreements do not cover the Pre-Cornerstone IP, which Defendants dispute.  Therefore, Plaintiff's unjust enrichment claim, as pleaded, is not duplicative, and Defendants' motion to dismiss Claim 12 is DENIED.[15]

---

[15] To state a claim for unjust enrichment against Kantrowitz, Plaintiff must plead, *inter alia*, that Kantrowitz was enriched at Plaintiff's expense.  *See Elsevier Inc. v. Doctor Evidence, LLC*, No. 17-cv-5540 (KBF), 2018 WL 557906, at *2 (S.D.N.Y. Jan. 23, 2018).  Defendants assert that "[t]he essence of such a cause of action is that one party is in possession of money or property that rightly belongs to another." *Clifford R. Gray, Inc. v. LeChase Const. Servs., LLC*, 31 A.D.3d 983, 988 (N.Y. App. Div. 2006).  However, the Amended Complaint alleges that Kantrowitz is indeed in possession of Plaintiff's property—his intellectual property.  Therefore, the Amended Complaint adequately states an unjust enrichment claim against Kantrowitz.  *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501, 519 (S.D.N.Y. 2015) (denying motion to dismiss where complaint alleged "that Defendant improperly obtained Plaintiff's intellectual property and confidential information," "used them to develop a competing product," and "caused Plaintiff's clients to terminate their dealings with Plaintiff in favor of Defendant").

**K. Declaratory Judgment Regarding Indemnification For Fees (Claim 14)**

Defendants' motion to dismiss Plaintiff's claim seeking a declaratory judgment regarding indemnification for fees incurred in connection with Trahan's withdrawal from the partnership is denied because the Amended Complaint adequately alleges Trahan was entitled to be indemnified for those fees.  Plaintiff seeks a declaratory judgment declaring "that the Partnership is responsible for Trahan's expenses relating to this dispute, except those incurred by him 'as plaintiff' in this action, in an amount no less than $77,474.19."  AC ¶ 319.

> The LPA provides, in relevant part, that Trahan will be indemnified:
>
> from and against any and all liabilities, obligations, losses, damages, . . . costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever . . . which may be imposed on, incurred by or asserted at any time against such Covered Person in any way related to or arising out of this Agreement, the Partnership or the management or administration of the Company or in connection with the business or affairs of the Partnership or the activities of such Covered Person on behalf of the Partnership . . . .

LPA § 7.4.  There is a carveout that provides Trahan "is not entitled to indemnification for claims and expenses that are 'incurred by such Covered Person as plaintiff in any action, suit or proceeding brought by such Covered Person against the Partnership or any Partner."  *Id.*

> Similarly, the LLC Agreement provides, in relevant part, that Trahan will be indemnified:
>
> from and against any and all liabilities, obligations, losses, damages, . . . costs, expenses and disbursements (including legal and accounting fees and expenses, costs of investigation and sums paid in settlement) of any kind or nature whatsoever . . . which may be imposed on, incurred by or asserted at any time against such Covered Person in any way related to or arising out of this Agreement, the Company or the management or administration of the Company or in connection with the business or affairs of the Company or the activities of such Covered Person on behalf of the Company . . . .

LLC Agreement § 7.4.  Again, a carveout provides that Trahan is not entitled to indemnification for claims and expenses that are "incurred by such Covered Person as plaintiff in any action, suit or proceeding brought by such Covered person against the Company or any Member."  *Id.*

The Amended Complaint seeks "expenses relating to this dispute, except those incurred by him 'as' plaintiff in this action," but it is silent as to what expenses relate to this dispute but were not incurred as plaintiff. *Id.* ¶ 319. Plaintiff's Opposition clarifies that "Trahan is entitled to his legal fees incurred during [the withdrawal] negotiation." Opp. at 23. The text of the LPA and LLC Agreement covers "any and all liabilities" incurred by covered persons "in any way related to arising out of" the business, and Plaintiff has made it clear that he does not seek reimbursement of fees subject to the carveout. Therefore, the fees allegedly incurred by Plaintiff are plausibly alleged to fall within the scope of the indemnification provisions and Defendants' motion to dismiss Claim 14 is DENIED.

### L. Declaratory Judgment Regarding Capital Account Balance Payment (Claim 15)

Defendants' motion to dismiss Plaintiff's claim seeking a declaratory judgment regarding the calculation of his "Capital Account balance payment" is denied because the Capital Account balance payment is not subject to Plaintiff's breach of contract claim. Under Section 3.7(b) of the LPA and Section 3.7(a) of the LLC Agreement, the Capital Account balance payment is a payment to which Plaintiff was allegedly entitled after withdrawing from the partnership. AC ¶ 322. Plaintiff alleges that "Trahan has demanded that, at the time Cornerstone Macro calculates and makes the Capital Account balance payment, it include the gross Fair Value of Trahan's Market Strategies Advisory Business." *Id.* ¶ 326. Cornerstone Macro, allegedly acting at the direction of the Limited Partner Defendants, refused to do so. *Id.*

Defendants move to dismiss this claim only on the basis that it is duplicative of Plaintiff's contract claim. However, the breach of contract claim does not allege failure to pay, or properly calculate, the Capital Account balance. *Id.* ¶ 254. While Plaintiff does allege a breach of the same contractual provision, the breach alleged is failure to make a different payment, the Accrued Net Cash Flow Distribution. *Id.*; LPA § 3.7(b)(i). Plaintiff's justification for not bringing this claim as

part of the breach of contract claim is that, at the time the Amended Complaint was filed, the Partnership had yet to issue its financial statements for 2018, Opp. at 24, which is the trigger for a 30-day clock to make the Capital Account balance payment.  AC ¶ 328.  As pleaded, the declaratory judgment claim is not duplicative because the Plaintiff does not allege a breach of contract for failure to pay Capital Account balance payment,[16] so Defendants' motion to dismiss Claim 15 is DENIED.

### M. New York Labor Law (Claim 16)

Plaintiff's claim for unauthorized deductions from wages and failure to pay wages under Section 193 of the New York Labor Law survives Defendants' motion to dismiss.  Section 193 provides that "[n]o employer shall make any deduction from the wages of an employee," except for certain deductions not relevant here.  N.Y. Lab. Law § 193.  An "employee" means "any person employed for hire by an employer in any employment."  *Id.* at § 190(2).  Plaintiff correctly argues that "the definition is interpreted broadly and extends to individuals in an executive role."  Opp. at 31; *see Pachter v. Bernard Hodes Grp., Inc.,* 891 N.E.2d 279, 282 (N.Y. 2008).  Defendant asserts that "Trahan has alleged that he is a partner in Cornerstone Macro LP, and a member in Cornerstone Holdings LLC, not that he was ever hired as an employee of either business."  MOL at 29.  But Defendants do not engage with the crucial question—whether that, by law, means Trahan was not "employed for hire" within the meaning of Section 190(2).  Eschewing briefing on the topic, Defendants ultimately rely on an argument that Trahan's allegation that he was an employee is conclusory.  *Id.* at 30.  That is insufficient and the Court is unable to conclude on this motion to dismiss that Trahan was not "employed for hire" within the meaning of Section 190(2).

Plaintiff has adequately alleged that the unpaid partnership distributions were "wages." Wages are "the earnings of an employee for labor or services rendered, regardless of whether the

---

[16] The Amended Complaint states that to the extent the Capital Account balance payments become due before the conclusion of this lawsuit, "this claim may be treated as a breach of contract claim."  *Id.* ¶ 329.  Neither party asserts they have become due.

amount of earnings is determined on a time, piece, commission or other basis."  N.Y. Lab. Law § 190(1).  In *Truelove v. Ne. Capital & Advisory, Inc.,* the New York Court of Appeals determined that a bonus plan that would award to an employee in a non-revenue generating position a portion of the company's profits did not constitute wages.  738 N.E.2d 770 (N.Y. 2000).  "The terms of defendant's bonus compensation plan did not predicate bonus payments upon plaintiff's own personal productivity nor give plaintiff a contractual right to bonus payments based upon his productivity."  *Id.* at 772.  The Court of Appeals held that "the wording of the statute, in expressly linking earnings to an employee's labor or services personally rendered, contemplates a more direct relationship between an employee's own performance and the compensation to which that employee is entitled."  *Id.*  Here, there exists the more direct link between Trahan's work and Cornerstone Macro's productivity contemplated by *Truelove.*  Trahan controlled and managed a branch of the business such that the profit sharing plan at issue here was not untethered to his labor.  Plaintiff has plausibly alleged that the partnership distributions withheld qualify as wages because Trahan alleges a direct link between his labor and the compensation to which he was allegedly entitled.  Therefore, Defendants' motion to dismiss Claim 16 is DENIED.

### N. Motion to Dismiss Under Rule 8(a)

Finally, Defendants also move to dismiss the entirety of the 123-page, 338-paragraph Amended Complaint on the grounds that it fails to comply with the Rule 8(a) requirement that a complaint shall contain "a short and plain statement of the claim showing the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir. 1988).  While long, and, indeed, far longer than it needed to be even in light of the sixteen claims, dismissal under Rule 8 is not warranted because it does not "overwhelm the defendants' ability to understand or to mount a

defense." *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir.2004); *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) (refusing to dismiss 368-page, 1,249 paragraph complaint even where it was "an undue imposition on all who [were] obliged to read it"). Therefore, Defendants' motion to dismiss under Rule 8 is DENIED.

## IV. CONCLUSION

For the reasons explained above, Defendants' motion to dismiss:

Claim 1 is DENIED;

Claim 2 is GRANTED as to Cornerstone IP and DENIED as to Pre-Cornerstone IP;

Claim 3 is DENIED;

Claim 4 is GRANTED as to Kantrowitz and DENIED as to the Limited Partner Defendants;

Claim 5 is DENIED;

Claim 6 is GRANTED;

Claim 8 is GRANTED;

Claim 9 is DENIED;

Claim 10 is GRANTED, except DENIED as to omissions by the Limited Partner Defendants and Kantrowitz's statement regarding his promotion;

Claim 11 is GRANTED, except DENIED as to omissions by the Limited Partner Defendants and Kantrowitz's statement regarding his promotion;

Claim 12 is DENIED;

Claim 13 is GRANTED as to the Cornerstone IP and DENIED as to the Pre-Cornerstone IP;

Claim 14 is DENIED;

Claim 15 is DENIED; and

Claim 16 is DENIED.

Defendants' motion to dismiss the entirety of the Amended Complaint under Rule 8 is

DENIED.

The Clerk of Court is directed to terminate the motion pending at Dkt. No. 87.

SO ORDERED.

Dated:  April 29, 2020

_____

GREGORY H. WOODS
United States District Judge